## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE SERIES 7
BROKER QUALIFICATION EXAM
SCORING LITIGATION

Misc. Action No. 06-355 (JDB);
MDL Docket No. 1772

This Document Relates To:
ALL CASES

### NASD'S MOTION TO DISMISS

Defendant National Association of Securities Dealers, Inc. (NASD), hereby moves the Court to dismiss all pending claims against NASD for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6).

Pursuant to this Court's Initial Scheduling Order filed September 19, 2006, and to the stipulated Joint Meet-and-Confer Statement upon which that order was based, *all* plaintiffs were to file a consolidated complaint. Initial Scheduling Order ¶ 1. Five plaintiffs (Bruen, Johnson, Russo, Schley, and Wilson) have had cases transferred to this Court but are not named in the Consolidated Class Action Complaint. *See* Consol. Compl. ¶ 7. The Consolidated Complaint purports to reserve claims "previously asserted" by particular plaintiffs. *Id.* ¶ 3. NASD submits that dismissal of the Consolidated Complaint on the grounds asserted would be binding as to *all* plaintiffs, either because they are parties to the Consolidated Complaint or because "all . . . orders addressing issues common to all [consolidated] actions shall be deemed to have been entered in all such actions." Initial Scheduling Order at 1. Thus, by this motion NASD seeks to dismiss all claims by all plaintiffs.

This Motion is supported by the accompanying Memorandum of Points and Authorities and by Exhibits 1 through 3 appended thereto.

Dated:  December 15, 2006

Respectfully submitted,


By: /s/  F. Joseph Warin

OF COUNSEL:

F. Joseph Warin, D.C. Bar No. 235978

John J. Flood

William M. Jay, D.C. Bar No. 480185

NATIONAL ASSOCIATION OF

Jennifer J. Schulp, D.C. Bar No. 497742

SECURITIES DEALERS, INC.

GIBSON, DUNN & CRUTCHER LLP

1735 K Street, N.W.

1050 Connecticut Avenue, N.W.

Washington, D.C.  20036

Washington, D.C.  20036

Telephone: (202) 955-8500

Fax: (202) 467-0539

*Attorneys for Defendant*
*National Association of*
*Securities Dealers, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

IN RE SERIES 7
BROKER QUALIFICATION EXAM
SCORING LITIGATION

Misc. Action No. 06-355 (JDB);
MDL Docket No. 1772

This Document Relates To:
ALL CASES

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF NASD'S MOTION TO DISMISS**

OF COUNSEL:
John J. Flood, D.C. Bar No. 269837
NATIONAL ASSOCIATION OF
SECURITIES DEALERS, INC.
1735 K Street, N.W.
Washington, D.C.  20036

F. Joseph Warin, D.C. Bar No. 235978
William M. Jay, D.C. Bar No. 480185
Jennifer J. Schulp, D.C. Bar No. 497742
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8500
Fax: (202) 467-0539

*Attorneys for Defendant
National Association of Securities Dealers, Inc.*

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ........................................................................................... 1

II.  BACKGROUND ............................................................................................ 2

    A.  NASD's Critical Role In Regulating The Securities Industry ................................ 2

        1.  NASD Performs Regulatory Functions Under The SEC's Supervision ......................................................................... 2

        2.  NASD's Regulatory Functions Include Verifying Securities Professionals' Qualifications And Fitness ................................... 3

    B.  The Series 7 Litigation ............................................................................. 6

III.  STANDARD ................................................................................................ 8

IV.  ARGUMENT .............................................................................................. 9

    A.  NASD Is Absolutely Immune From Private Damages Actions Challenging Its Performance Of Regulatory Functions ............................. 9

        1.  NASD's Administration Of Qualifications Testing, Including The Series 7 Exam, Is A Regulatory Function ................................ 11

        2.  A Simple Scoring Error Does Not Defeat Absolute Immunity ............... 17

        3.  Plaintiffs Cannot Plead Around Absolute Immunity By Casting Their Claims In State-Law Terms ............................................ 20

    B.  Plaintiffs Have No Private Right Of Action To Enforce NASD's Duties As An SRO ........................................................................... 22

    C.  Plaintiffs Expressly Waived All Claims Against NASD For Actions "Taken In Official Capacity," Which Includes The Grading Of Examinations And Reporting Of Scores .............................................. 25

    D.  Plaintiffs' Contract And Negligent-Misrepresentation Claims Fail on Their Merits, Even Taking the Allegations As True ..................................... 32

        1.  Plaintiffs Fail To State A Claim For Breach Of Contract, Because The Only Express Contract Between The Parties Plainly Exonerates NASD From Liability ............................................ 32

**Table of Contents**
**(Continued)**

Page

2.   Plaintiffs Fail To State A Claim For Negligent Misrepresentation, Because They Cannot State That They Detrimentally Relied On Any Representation By NASD ................................................................... 35

a.   The Plaintiffs' Allegations That They Relied On Statements By NASD Completely Fail To Make Any Credible Showing Of Detriment .............................. 36

b.   The Plaintiffs Cannot Bring A Third-Party Claim Based On Their Employers' Alleged Reliance ................ 39

V.   CONCLUSION ............................................................................................. 41

# TABLE OF AUTHORITIES

Page(s)

**Cases**

AMPAT/Midwest, Inc. v. Ill. Tool Works Inc.,
  896 F.2d 1035 (7th Cir. 1990) ................................................ 37

Ass'n of Inv. Brokers v. SEC,
  676 F.2d 857 n.10 (D.C. Cir. 1982) ................................ 17, 30

Austern v. Chi. Bd. Options Exch.,
  898 F.2d 882 (2d Cir. 1990) ......................................... 11, 20

\* Austin Mun. Sec. v. NASD,
  757 F.2d 676 (5th Cir. 1985) ............................................ passim

\* Barbara v. N.Y. Stock Exch.,
  99 F.3d 49 (2d Cir. 1996) ................................................ passim

Bd. of Educ. v. A, C, & S, Inc.,
  546 N.E.2d 580 (Ill. 1989) ............................................... 36

Beder v. Cleveland Browns, Inc.,
  717 N.E.2d 716 (Ohio Ct. App. 1998) .............................. 33

Bilt-Rite Contrs., Inc. v. The Architectural Studio,
  866 A.2d 270 (Pa. 2005) .................................................. 37

Boomer v. AT&T Corp.,
  309 F.3d 404 (7th Cir. 2002) ........................................... 31

Bradley v. Fisher,
  80 U.S. (13 Wall.) 335 (1872) .......................................... 16

Burlington Ins. Co. v. Okie Dokie, Inc.,
  329 F. Supp. 2d 45 (D.D.C. 2004) .................................... 36

Butz v. Economou,
  438 U.S. 478 (1978)........................................................ 14

Cahill v. Eastern Benefit Systems, Inc.,
  603 N.E.2d 788 (Ill. App. Ct. 1992) ................................. 40

Capece v. Depository Trust & Clearing Corp., No. 05-80498-CIV-RYSKAMP,
  2005 U.S. Dist. LEXIS 42039, at *13 (S.D. Fla. Oct. 11, 2005)............................ 25

Childs v. Reynoldson,
  777 F.2d 1305 (8th Cir. 1985) ......................................... 17

City of Cincinnati v. Cincinnati Reds,
  483 N.E.2d 1181 (Ohio Ct. App. 1984)............................ 34

Cortec Indus. v. Sum Holding L.P.,
  949 F.2d 42 (2d Cir. 1991) .............................................. 25

Credit Suisse First Boston Corp. v. Grunwald,
  400 F.3d 1119 (9th Cir. 2005) ......................................... 31

Crosby v. Nat'l Foreign Trade Council,
  530 U.S. 363 (2000)......................................................... 31

Cue Fashions, Inc., v. LJS Distrib., Inc.,
  807 F. Supp. 334 (S.D.N.Y. 1992) .................................... 25

**Table of Authorities**
**(Continued)**

Page(s)

\* *D'Alessio v. N.Y. Stock Exch., Inc.*,
   258 F.3d 93 (2d Cir. 2001) .................................................................... passim

*Dallas Power & Light Co. v. Cleghorn*,
   623 S.W.2d 310 (Tex. 1981).................................................................... 34

*Desiderio v. NASD*,
   191 F.3d 198 (2d Cir. 1999) .................................................................... passim

*Desiderio v. NASD*,
   2 F. Supp. 2d 516 (S.D.N.Y. 1998), *aff'd*, 191 F.3d 198 (2d Cir. 1999)................................. 12

*Dexter v. Depository Trust & Clearing Corp.*,
   406 F. Supp. 2d 260 (S.D.N.Y. 2005),
   *appeal docketed*, No. 06-0123-cv (2d Cir. Jan. 12, 2006)....................................... 9, 18, 20, 21

\* *DL Capital Group, LLC v. Nasdaq Stock Mkt.*,
   409 F.3d 93 (2d Cir. 2005) ..................................................................... passim

*Domestic Sec., Inc. v. SEC*,
   333 F.3d 239 (D.C. Cir. 2003)................................................................... 2

*Dunn v. Phoenix Village, Inc.*,
   213 F. Supp. 936 (W.D. Ark. 1963) ........................................................... 33

*Duvanel v. Sinclair Ref. Co.*,
   227 P.2d 88 (Kan. 1951)........................................................................ 33

*EEOC v. St. Francis Xavier Parochial Sch.*,
   117 F.3d 621 (D.C. Cir. 1997).................................................................. 25

*Elsroth v. Johnson*,
   700 F. Supp. 151 (S.D.N.Y. 1988) ............................................................ 38

*Exxon Corp. v. Atl. Richfield Co.*,
   678 S.W.2d 944 (Tex. 1984).................................................................... 33

\* *Feins v. Am. Stock Exch.*,
   81 F.3d 1215 (2d Cir. 1996) .................................................................... 22, 23

*First Jersey Sec., Inc. v. Bergen*,
   605 F.2d 690 (3d Cir. 1979) .................................................................... 2

*FLF, Inc. v. World Publ'ns, Inc.*,
   999 F. Supp. 640 (D. Md. 1998)................................................................ 33

\* *Gilmer v. Interstate/Johnson Lane Corp.*,
   500 U.S. 20 (1991)............................................................................. 27, 28

*Gold v. Deutsche Aktiengesellschaft*,
   365 F.3d 144 (2d Cir. 2004) .................................................................... 5

*Gustafson v. Strangis*,
   572 F. Supp. 1154 (D. Minn. 1983)............................................................ 24, 25

*Haldi v. Watson*,
   522 S.E.2d 696 (Ga. Ct. App. 1999)........................................................... 33

*Hall v. Ford Enters.*,
   445 A.2d 610 (D.C. 1982) ...................................................................... 36

*Harris v. Nat'l Evaluation Sys.*,
   719 F. Supp. 1081 (N.D. Ga. 1989), *aff'd mem.*, 900 F.2d 266 (11th Cir. 1990).................... 29

**Table of Authorities**
**(Continued)**

Page(s)

*Hart v. Canadian Imperial Bank of Commerce,*
  43 F. Supp. 2d 395 (S.D.N.Y. 1999) ................................................................. 29

*Hicks v. Sumter Bank & Trust Co.,*
  604 S.E.2d 594 (Ga. Ct. App. 2004) ................................................................. 36

*Hillsman v. Sutter Cmty. Hosps.,*
  200 Cal. Rptr. 605 (Cal. Ct. App. 1984) ........................................................... 34

*Hishon v. King & Spalding,*
  467 U.S. 69 (1984) ............................................................................................... 8

*Hoover v. Ronwin,*
  466 U.S. 558 (1984) ........................................................................................... 17

*Hunt Constr. Group, Inc. v. Constr. Servs., Inc.,*
  375 F. Supp. 2d 612 (E.D. Mich. 2005) ............................................................ 33

*Hutchison v. Sunbeam Coal Corp.,*
  519 A.2d 385 (Pa. 1986) .................................................................................... 33

*In re Series 7 Broker Qualification Exam Scoring Litig.,*
  444 F. Supp. 2d 1330 (J.P.M.L. 2006) ................................................................ 8

*Jablon v. Dean Witter & Co.,*
  614 F.2d 677 (9th Cir. 1980) ............................................................................. 24

*Julien v. Comm. of Bar Exam'rs for the Practice of Law,*
  923 F. Supp. 707 (D.V.I. 1996) ......................................................................... 17

*Kaempe v. Myers,*
  367 F.3d 958 (D.C. Cir. 2004) .......................................................................... 25

*Kaufman v. I-Stat Corp.,*
  754 A.2d 1188 (N.J. 2000) .......................................................................... 37, 39

*King v. Crossland Savings Bank,*
  111 F.3d 251 (2d Cir. 1997) ......................................................................... 39, 40

*Koveleskie v. SBC Capital Mkts.,*
  167 F.3d 361 (7th Cir. 1999) ............................................................................. 28

*Kowal v. MCI Commc'ns Corp.,*
  16 F.3d 1271 (D.C. Cir. 1994) ............................................................................ 9

*Kramer v. Time Warner, Inc.,*
  937 F.2d 767 (2d Cir. 1991) .............................................................................. 25

*Law Offices of Lawrence J. Stockler, PC v. Rose,*
  436 N.W.2d 70 (Mich. Ct. App. 1989) .............................................................. 36

*Law v. Int'l Union of Operating Eng'rs Local No. 37,*
  818 A.2d 1136 (Md. 2003) ................................................................................. 36

*Local Union 20 v. United Bhd. of Carpenters & Joiners of Am.,*
  223 F. Supp. 2d 491 (S.D.N.Y. 2002) ............................................................... 32

*Marine Midland Bank v. Yoruk,*
  662 N.Y.S.2d 957 (App. Div. 1997) .................................................................. 34

*Marshall County Health Auth. v. Shalala,*
  988 F.2d 1221 (D.C. Cir. 1993) ........................................................................ 25

# Table of Authorities
## (Continued)

Page(s)

*McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests,*
    991 S.W.2d 787 (Tex. 1999)...............................................................39

*Miller v. Schloss,*
    113 N.E. 337 (N.Y. 1916)...................................................................33

\* *Mireles v. Waco,*
    502 U.S. 9 (1991)............................................................16, 17, 19, 20

*Mirkin v. Wasserman,*
    858 P.2d 568 (Cal. 1993)....................................................................36

*Mitchell v. Gonzales,*
    819 P.2d 872 (Cal. 1991)....................................................................38

\* *MM&S Fin., Inc. v. NASD,*
    364 F.3d 908 (8th Cir. 2004) ........................................................21, 24

*Moser v. Milner Hotels, Inc.,*
    78 A.2d 393 (N.J. 1951).....................................................................33

\* *NASD v. Fiero,*
    __ N.Y.S.2d __, 33 A.D.3d 547 (N.Y. App. Div. 2006) ........................27

\* *P'ship Exch. Sec. Co. (PESCO) v. NASD,*
    169 F.3d 606 (9th Cir. 1999) ........................................................passim

*Paisley v. Waterford Roof Truss, Ltd.,*
    968 F. Supp. 1189 (E.D. Mich. 1997).................................................38

*Papasan v. Allain,*
    478 U.S. 265 (1986)..............................................................................9

*Porzig v. Dresdner Kleinwort Benson N. Am. LLC,* No. 98 Civ. 7670 (BSJ),
    1999 U.S. Dist. LEXIS 11067 (S.D.N.Y. July 21, 1999) .....................28

*Reading Terminal Merchants Ass'n v. Samuel Rappaport Assocs.,*
    456 A.2d 552 (Pa. Super. Ct. 1983).....................................................34

*Rodriguez Diaz v. Moore,*
    861 F. Supp. 1041 (N.D. Fla. 1994) ...................................................17

*Rodriguez v. Weprin,*
    116 F.3d 62 (2d Cir. 1997) .................................................................20

*Rosen v. NLRB,*
    735 F.2d 564 (D.C. Cir. 1984).............................................................16

*Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    170 F.3d 1 (1st Cir. 1999)...................................................................28

*Roth v. King,* Civ. A. No. 03-1109-RMU,
    2005 U.S. Dist. LEXIS 42345 (D.D.C. Mar. 11, 2005),
    *rev'd in part on other grounds,* 449 F.3d 1272, 1280 (D.C. Cir. 2006) .................20

*Schauer v. Mandarin Gems of California, Inc.,*
    23 Cal. Rptr. 3d 233 (Ct. App. 2005) ..................................................40

*Scher v. NASD,*
    386 F. Supp. 2d 402 (S.D.N.Y. 2005),
    *appeal docketed,* No. 05-5139-cv (2d Cir. July 28, 2005)..................14, 21

**Table of Authorities**
**(Continued)**

Page(s)

*Seus v. John Nuveen & Co., Inc.*,
146 F.3d 175 (3d Cir. 1998) .................................................................. 28

*Shearson/Am. Express Inc. v. McMahon*,
482 U.S. 220 (1987).......................................................................... 3

\* *Sindram v. Suda*,
986 F.2d 1459 (D.C. Cir. 1993) (per curiam) ....................................... 20

*Slaymaker v. Westgate State Bank*,
739 P.2d 444 (Kan. 1987) ................................................................ 37

*Sol K. Graff & Sons v. Leopold*,
416 N.E.2d 275 (Ill. App. Ct. 1981) ................................................... 34

*Sparks v. Character & Fitness Comm.*,
859 F.2d 428 (6th Cir. 1988) ........................................................... 17

\* *Sparta Surgical Corp. v. NASD*,
159 F.3d 1209 (9th Cir. 1998) .................................................... passim

*Stump v. Sparkman*,
435 U.S. 349 (1978)................................................................ 17, 20

*Teamsters Local 174 v. Lucas Flour Co.*,
369 U.S. 95 (1962)...................................................................... 31

*Thacker v. UNR Indus.*,
603 N.E.2d 449 (Ill. 1992)............................................................. 38

*Thomas James Assocs. v. Jameson*,
102 F.3d 60 (2d Cir. 1996) ............................................................. 27

*Trudeau v. FTC*,
456 F.3d 178 (D.C. Cir. 2006).................................................... 8, 27

*Vt. Teddy Bear Co., Inc. v. 583 Madison Realty Co.*,
807 N.E.2d 876 (N.Y. 2004)........................................................... 33

*Wal-Noon Corp. v. Hill*,
119 Cal. Rptr. 646 (Cal. Ct. App. 1975)............................................ 33

*Weissman v. NASD*, No. 04-13575,
2006 U.S. App. LEXIS 27091 (11th Cir. Nov. 1, 2006),
*pet. for reh'g filed* (Nov. 22, 2006).................................................. 10

*Whiteley v. Philip Morris, Inc.*,
11 Cal. Rptr. 3d 807 (Ct. App. 2004) ............................................... 37

*Wilkins v. Nat'l Broad. Co., Inc.*,
84 Cal. Rptr. 2d 329 (Ct. App. 1999) ............................................... 38

*Williams v. State*,
456 N.Y.S.2d 491 (App. Div. 1982)............................................ 37, 40

*Williams v. Steves Indus., Inc.*,
699 S.W.2d 570 (Tex. 1985).......................................................... 38

*Zandford v. NASD*,
30 F. Supp. 2d 1 (D.D.C. 1998), *aff'd mem.*, 221 F.3d 197 (D.C. Cir. 2000) .................. passim

**Table of Authorities**
**(Continued)**

Page(s)

**Statutes**

15 U.S.C. § 78c(a)(21) ..................................................................................................3

15 U.S.C. § 78*o*(a)(1) ..................................................................................................3

15 U.S.C. § 78*o*(b)(1)(B) ..........................................................................................22

15 U.S.C. § 78*o*(b)(4) ................................................................................................13

\* 15 U.S.C. § 78*o*(b)(7) ...........................................................................................4, 12

15 U.S.C. § 78*o*(b)(8) ..................................................................................................3

15 U.S.C. § 78*o*-3 .......................................................................................................2

\* 15 U.S.C. § 78*o*-3(g)(3)(B) ...................................................................................4, 30

15 U.S.C. § 78*o*-3(g)(3)(C) ........................................................................................4

15 U.S.C. § 78*o*-3(h) ..................................................................................................4

15 U.S.C. § 78s(b) ........................................................................................................3

15 U.S.C. § 78s(b)(2) ..................................................................................................30

15 U.S.C. § 78s(c) ...................................................................................................3, 30

15 U.S.C. § 78s(f) .....................................................................................................6, 23

15 U.S.C. § 78s(g) .......................................................................................................3

\* 15 U.S.C. § 78s(g)(1) .............................................................................................15, 31

15 U.S.C. § 78s(h)(1) ...................................................................................................3

15 U.S.C. § 78s(h)(4) ...................................................................................................3

15 U.S.C. § 78u(d)(1) ...................................................................................................3

15 U.S.C. § 78u(d)(3)(A) .............................................................................................3

15 U.S.C. § 78y ............................................................................................................6

44 U.S.C. § 1507 ........................................................................................................25

Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 604, 116 Stat. 745, 795-96 ......13

N.Y. Gen. Bus. Law § 359-e(3)(b) ...............................................................................5

**Regulations and Administrative Materials**

\* 17 C.F.R. § 240.15b7-1 .................................................................................... passim

17 C.F.R. § 240.19d-3 ..................................................................................................6

**Table of Authorities**
**(Continued)**

Page(s)

\* Adoption of Form U-3, Exchange Act Release No. 11424,
   7 SEC Docket 2 (May 16, 1975)...................................................................30

Adoption of Rule 15b8-1, Exchange Act Release No. 7697,
   1965 WL 89256 (Sept. 7, 1965) .........................................................12, 13

Application by NASD for Registration, 5 SEC 627 (Aug. 7, 1939).................................2

Cal. Code Regs. tit. 10, § 260.217(a)(1) ...................................................................5

*Cambridge Group, Inc*., Exchange Act Release No. 29795,
   49 SEC Docket 1490 (Oct. 8, 1991) ............................................................13

*Hugh M. Casper*, Exchange Act Release No. 7479, 42 SEC 471 (Dec. 7, 1964) ...........4

Notice of Filing of Proposed Rule Change, Exchange Act Release No. 45385,
   67 Fed. Reg. 5862, 5865 (Feb. 7, 2002) ......................................................30

Notice of Filing of Proposed Rule Change, Exchange Act Release No. 47936,
   80 SEC Docket 949 (May 28, 2003)...............................................................5

Notice of Filing of Proposed Rule Change, Exchange Act Release No. 52981,
   70 Fed. Reg. 76480 (Dec. 27, 2005).............................................................5

Order Granting Approval of Proposed Rule Change, Exchange Act Release No. 48161,
   80 SEC Docket 1805 (July 10, 2003) ...........................................................5

Order Granting Approval to Proposed Rule Change, Exchange Act Release No. 45531,
   67 Fed. Reg. 11735 (Mar. 15, 2002)......................................................5, 30

Requirement of Broker-Dealers to Comply with SRO Qualification Standards,
   Exchange Act Release No. 32261, 58 Fed. Reg. 27656, 27657 (May 11, 1993) .................13

**NASD Rules**

NASD Rule 1031 ...................................................................................................4

NASD Rule 1031(a)..............................................................................................4

NASD Rule 1032(a)..............................................................................................4

\* NASD Rule 1070(c)................................................................................6, 15, 36

NASD Rule 1070(e)..............................................................................................6

NASD Rule 1140(c)............................................................................................25

NASD Rule 8310(a)(3)........................................................................................14

NASD Rule 8310(a)(4)........................................................................................14

NASD Rule 8310(a)(5)........................................................................................14

NASD Rule 8310(a)(6)........................................................................................14

**Table of Authorities**
**(Continued)**

Page(s)

NASD Rule 8310(a)(7) ..................................................................................................14

NASD Rule 9524 ............................................................................................................6

NASD Rule 9525 ............................................................................................................6

NASD Rule 9527 ............................................................................................................6

## Other Authorities

E. Allan Farnsworth, *Farnsworth on Contracts* § 4.28 (3d ed. 2004) ...................................27, 28

8 Richard A. Lord, *Williston on Contracts* § 19:24 (4th ed. 1998) ...............................29

News Release, NASD Says Software Error Impacts Certain Series 7
    Exam Results (Jan. 6, 2006) ....................................................................................7

*Prosser & Keeton on the Law of Torts* § 41 (5th ed. 1984) ..........................................38

*Restatement (Second) of Torts* § 546 (1977) ...............................................................37

S. Rep. No. 107-205 (2002) ..........................................................................................13

*S7 Exam Software Error Reimbursements*, http://www.nasd.com/s7expenseform ........................8

*Witkin Summary of California Law* § 819 (10th ed. 2005) ............................................40

## I.    INTRODUCTION

This case turns on the federal laws and regulations that prescribe how individual brokers demonstrate their qualifications and fitness to work in the securities industry.  Congress and the Securities and Exchange Commission (SEC) have determined that anyone who wishes to conduct securities business with the public must become registered with one or more of the self-regulatory organizations (SROs) that perform the day-to-day administration of the securities and investment banking professions.  Defendant National Association of Securities Dealers, Inc. (NASD), one such SRO, plays a key role in that registration process by administering the Series 7 examination, one of the requirements by which aspiring brokers demonstrate their qualifications.

Each of the plaintiffs took the Series 7 exam as part of his or her attempt to achieve registration with NASD.  Each received a failing score on the exam and was denied registration, although in some cases only for a short period until he or she could re-take the test.  These failing scores were later discovered to be incorrect.  The plaintiffs now seek money damages for the incorrect examination scores and the consequent denials of registration.

As set out below, these claims fail on the pleadings for several reasons.  *First*, NASD is absolutely immune from private lawsuits challenging its performance of the regulatory functions that Congress and the SEC have delegated to it.  Long-established precedent makes clear that when SROs perform regulatory duties that would otherwise be performed by a government agency—such as the administration of qualifications examinations—the SROs possess an immunity from suit originating from those duties that is comparable to the agencies' own immunity.  Allowing private plaintiffs to impose their own standards of care on SROs' regulatory functions would impede the uniform national regulatory structure that Congress has established, which makes the SEC the primary overseer of SROs' performance.  *Second*, the

plaintiffs' claims are effectively based on NASD's alleged breach of its obligations under the federal securities laws and the rules that govern the administration of qualifications examinations. Federal law does not give them a private right of action for damages arising from such a breach; rather, it is the SEC that polices NASD's compliance with applicable federal law. *Third*, each of the plaintiffs has signed an unambiguous release that expressly exonerates NASD from any liability based on its regulatory actions. *Fourth*, even were the suit not barred for these independent reasons, the plaintiffs' claims for breach of contract and negligent misrepresentation would fail as a matter of state law.

The complaint against NASD should therefore be dismissed for failure to state a claim.

## II.    BACKGROUND

### A.    NASD's Critical Role In Regulating The Securities Industry

NASD is a self-regulatory organization (SRO) registered with the Securities and Exchange Commission as a national securities association pursuant to the Maloney Act amendments to the Securities Exchange Act of 1934 (the Exchange Act). *See* 15 U.S.C. § 78*o*-3; Application by NASD for Registration, 5 SEC 627 (Aug. 7, 1939). Other SROs include the New York Stock Exchange and the American Stock Exchange.

#### 1.    NASD Performs Regulatory Functions Under The SEC's Supervision

As an SRO, NASD is a key part of a comprehensive system adopted by Congress for regulating the national securities markets. Congress has chosen to delegate to SROs the primary responsibility for the daily regulation and administration of the securities industry, under the close supervision of the SEC. *See, e.g.*, *Domestic Sec., Inc. v. SEC*, 333 F.3d 239, 241-42 (D.C. Cir. 2003); *DL Capital Group, LLC v. Nasdaq Stock Mkt.*, 409 F.3d 93, 95 (2d Cir. 2005); *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 693, 694-95 (3d Cir. 1979); *see also Barbara v. N.Y.*

*Stock Exch.*, 99 F.3d 49, 59 (2d Cir. 1996) (SROs "perform[] a variety of regulatory functions that would, in other circumstances, be performed by [the SEC]").  With a few exceptions not relevant here, the SEC must approve all NASD rules, policies, practices, and interpretations before they are implemented.  *See* 15 U.S.C. § 78s(b).  The SEC can also modify or revoke NASD rules.  *See id.* § 78s(c).  *See generally, e.g.*, *Shearson/Am. Express Inc. v. McMahon*, 482 U.S. 220, 233-34 (1987) (describing the SEC's authority to approve, disapprove, or modify SRO rules).

NASD is statutorily obligated to comply with the Exchange Act, the SEC's regulations, and its own rules.  *See* 15 U.S.C. § 78s(g).  The SEC has "broad supervisory responsibilities over [SROs]" and correspondingly broad power to enforce their compliance with these obligations. *Austin Mun. Sec. v. NASD*, 757 F.2d 676, 680 (5th Cir. 1985).  If NASD violates the Exchange Act, federal regulations, or its own rules, the SEC may suspend or revoke NASD's registration as an SRO, limit NASD's activities or operations, or impose other sanctions.  *See* 15 U.S.C. § 78s(c), (h)(1), (h)(4).  The SEC is also authorized to initiate judicial proceedings against NASD to enjoin activities that would violate the Exchange Act or NASD's rules and to seek civil penalties.  *See* 15 U.S.C. § 78u(d)(1), (d)(3)(A).

### 2.    NASD's Regulatory Functions Include Verifying Securities Professionals' Qualifications And Fitness

One of the functions that NASD performs in its capacity as an SRO is policing the qualifications, character, and fitness of individuals who seek to work in the securities industry. Congress and the SEC have prescribed that virtually anyone engaging in securities transactions must be "associated" with a firm that is a member of NASD or a national securities exchange. *See* 15 U.S.C. § 78*o*(a)(1), (b)(8); 17 C.F.R. § 240.15b7-1; *see also* 15 U.S.C. § 78c(a)(21) (definition of "associated person").  No person may transact securities business with the public

for any of the more than 5,000 firms that are NASD members—a category that includes virtually every broker-dealer in the United States—without first applying to NASD for registration.  15 U.S.C. § 78*o*-3(g)(3)(B); NASD Rule 1031(a).[1]

Applicants for registration must obtain an employer's sponsorship, demonstrate their qualifications and fitness for the position, and submit to NASD's disciplinary jurisdiction.  *See* 15 U.S.C. § 78*o*-3(g)(3)(B)–(C).  NASD may deny applicants registration if they are not qualified or otherwise pose a risk to the investing public, and may revoke individuals' registrations for the same reasons.  *See id.* § 78*o*-3(g)(3)(B), (h).

Proficiency tests, including the Series 7 examination at issue here, are of "vital importance" in the qualification assessment process, which protects the public interest by "upgrading the level of competence in the securities business."  *Hugh M. Casper*, Exchange Act Release No. 7479, 42 SEC 471 (Dec. 7, 1964).  Congress and the SEC have authorized NASD to administer examinations, to determine which examinations to require for particular jobs with its member firms, and to deny registration to candidates who do not pass the required exams.  *See* 15 U.S.C. § 78*o*(b)(7); 17 C.F.R. § 240.15b7-1.  NASD's rules specify that any individual seeking to solicit or conduct, without limitation, any securities or investment banking business with the general public must take and pass the General Securities Representative examination, also known as the Series 7 examination, before he or she can be registered.  *See* NASD Rules 1031, 1032(a).  Other SROs, such as national securities exchanges, also require the Series 7 examination for certain positions, as do certain state regulators.  NASD administers the Series 7

---

[1] NASD Rules are published by the SEC in the *Federal Register* when changes are proposed or approved; the current version of all NASD Rules appears in the *NASD Manual*, which is available at http://www.nasd.com/nasdmanual.

examination on behalf of these other SROs and state authorities.  *See, e.g.*, Notice of Filing of

Proposed Rule Change, Exchange Act Release No. 52981, 70 Fed. Reg. 76480, 76480 n.5 (Dec.

27, 2005).

In order to conduct securities business with the public, individuals must also be licensed

by each State in which they do business.  Even if individuals have already passed the Series 7

examination, they must still take and pass either the Uniform Securities Agent State Law

Examination (Series 63) or the Uniform Combined State Law Examination (Series 66) in order

to receive a state license.  *See, e.g.*, N.Y. Gen. Bus. Law § 359-e(3)(b); Cal. Code Regs. tit. 10,

§ 260.217(a)(1).

The process of applying to take the required examinations and to become registered with

NASD begins when an applicant, through his employer, submits the SEC-approved Uniform

Application for Securities Industry Registration or Transfer, known as Form U4.[2]  *See, e.g.*, *Gold

v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 146 (2d Cir. 2004); *see also* 17 C.F.R.

§ 240.15b7-1 (candidates for registration must "submit[] . . . all required forms" to the SRO);

Order Granting Approval to Proposed Rule Change, Exchange Act Release No. 45531, 67 Fed.

Reg. 11735 (Mar. 15, 2002) (SEC's approval of recent modifications to Form U4).  The

applicant uses Form U4 to specify the SROs and the states with which he or she seeks to register

and the job categories requiring registration for which he or she has been hired.  An applicant

who seeks the status of Registered Representative must take the Series 7 exam.  If the applicant

passes the examination and satisfies the other qualifications for registration, NASD approves the

---

[2]  The application was formerly known as "Form U-4."  *See* Notice of Filing of Proposed Rule
Change, Exchange Act Release No. 47936, 80 SEC Docket 949 (May 28, 2003) (proposing
deletion of hyphen); Order Granting Approval of Proposed Rule Change, Exchange Act
Release No. 48161, 80 SEC Docket 1805 (July 10, 2003) (approving change).

application.   If the applicant does not pass the examination, he or she can wait 30 days and try again, potentially several times.  *See* NASD Rule 1070(e).  NASD reports all scores, passing and failing, to the applicant's employer, NASD Rule 1070(c), and makes them available to regulators and other SROs (though not to the public) in the secure online Central Registration Depository.

Individuals who are denied registration may appeal that decision within NASD.  *See* NASD Rules 9524, 9525.  Membership and registration decisions of NASD's National Adjudicatory Council and Board of Governors may be reviewed by the SEC and then by the federal courts of appeals.  *See* 15 U.S.C. §§ 78s(f), 78y; 17 C.F.R. § 240.19d-3; NASD Rule 9527.

**B.     The Series 7 Litigation**

This litigation challenges past denials of registration, or delays in obtaining registration, that were based on a grading error on the Series 7 examination.  The Series 7 test comprises 250 graded multiple-choice questions on a variety of topics.  NASD's test-administration software generates a unique examination for each test-taker, choosing 250 questions from a bank containing many times that number, and then delivers that unique examination to the test center, where it is administered electronically.  The questions vary in difficulty; each question is encoded with three variables to measure its relative difficulty, and the software uses those variables to scale each candidate's score slightly based on the overall difficulty of the 250 questions in the exam he or she received.  A harder-than-average examination would result in a slight upward adjustment, and an easier examination in a slight downward adjustment.  A scaled

score of 70 is required to pass.  *See generally* News Release, NASD Says Software Error Impacts

Certain Series 7 Exam Results (Jan. 6, 2006).[3]

On January 6, 2006, NASD announced publicly that a software error had caused

approximately 1,882 Series 7 examinations—out of approximately 60,500 administered between

October 1, 2004, and December 20, 2005—to be scored with an incorrect failing grade.  The

error was caused by a technician employed by defendant Electronic Data Systems Corp. (EDS),

which provides technology services to NASD.  The coding error, which affected a fraction of the

questions in the test database, inadvertently switched two of the three difficulty variables.

Because of the transposition, the testing software incorrectly calculated the overall difficulty of

tests involving the affected questions, and incorrectly adjusted the candidates' scores

accordingly.  The effect on any individual scaled score was slight, but it caused 1,882 tests that

should have received a marginally passing score to receive a marginally failing score instead.

No candidates who should have failed the examination were mistakenly told they had passed.

Thus, the impact of the scoring error was limited to candidates who had barely achieved a scaled

passing score.  *See generally id.*; Consol. Compl. ¶ 26.

NASD subsequently notified the affected candidates and their employers individually,

provided them with corrected score reports, and waived all fees associated with re-applying for

registration.  Because more than 1,000 of the affected candidates had already re-taken and passed

the examination, and achieved registration, before NASD discovered and announced the error,

News Release, Exh. 1, NASD also announced that it would reimburse candidates for the costs of

---

[3] The consolidated complaint incorporates this news release by reference and selectively
quotes from it.  Consol. Compl. ¶¶ 23-25.  A complete copy is attached as Exhibit 1.

preparing for, traveling to, and taking the examination again.  *See, e.g.*, *S7 Exam Software Error Reimbursements*, http://www.nasd.com/s7expenseform.

Some of the candidates who received incorrect Series 7 exam scores filed suit.  The Judicial Panel on Multidistrict Litigation consolidated 20 such actions, of which 15 seek certification of a nationwide plaintiff class, for common pretrial proceedings before this Court. *In re Series 7 Broker Qualification Exam Scoring Litig.*, 444 F. Supp. 2d 1330 (J.P.M.L. 2006); *see* Dkt. Entries 3, 16 (tag-along actions).[4]

The plaintiffs subsequently filed the Consolidated Class Action Complaint ("the complaint") that is the subject of this motion.  The complaint alleges that each of the named plaintiffs took the Series 7 examination and received an incorrect failing score.  Consol. Compl. ¶ 7.  The complaint also acknowledges that each of the named plaintiffs applied to take the examination by submitting Form U4.  *Id.* ¶ 13.

## III.    STANDARD

The Court must dismiss the claims against NASD pursuant to Rule 12(b)(6) if "no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).  In reviewing the complaint's averments, the Court is "'not bound to accept as true a legal conclusion couched as a factual allegation,' or to 'accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint.'"  *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting *Papasan v.*

---

[4]  Notices of voluntary dismissal were filed in three of the class actions, but the transferor district court took no action thereon before the cases were transferred to this Court by the Panel.  Two of the three plaintiffs had already filed new actions in this Court.  These three transferred cases—*Crabbe*, Civ. A. No. 06-1323; *Cutler*, Civ. A. No. 06-1322; and *Hester*, Civ. A. No. 06-1321—should be dismissed.

*Allain*, 478 U.S. 265, 286 (1986), and *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

## IV.    ARGUMENT

The complaint should be dismissed for any of at least four reasons. First, NASD is absolutely immune from private damages actions that challenge NASD's conduct of its regulatory functions, which indisputably include its administration of the qualifications and fitness criteria for admission into the securities industry, a responsibility delegated by the SEC. Second, Congress has not provided the plaintiffs with a private right of action for their claims to enforce NASD's duties as an SRO, and the plaintiffs cannot avoid that congressional decision by casting their complaint in state-law terms. Third, all of the plaintiffs released their claims against NASD when they signed Form U4 and applied for registration. For each of these reasons, plaintiffs have not pleaded any claim on which this Court may grant relief against NASD. In addition, the plaintiffs' claims for breach of contract and negligent misrepresentation fail of their own accord and should be dismissed for failure to state a claim.

### A.    NASD Is Absolutely Immune From Private Damages Actions Challenging Its Performance Of Regulatory Functions

"There is no question that an SRO and its officers are entitled to absolute immunity when they are, in effect, 'acting under the aegis' of their regulatory duties." *DL Capital*, 409 F.3d at 97 (quoting *Sparta Surgical Corp. v. NASD*, 159 F.3d 1209, 1214 (9th Cir. 1998)). This form of absolute immunity is "an integral part of the American system of securities regulation." *Dexter v. Depository Trust & Clearing Corp.*, 406 F. Supp. 2d 260, 263 (S.D.N.Y. 2005), *appeal docketed*, No. 06-0123-cv (2d Cir. Jan. 12, 2006). The SEC depends on NASD and other SROs to perform the critical day-to-day functions of examining qualifications, registering personnel, disciplining infractions, and regulating market activity. These functions "'would, in other

9

circumstances, be performed by a government agency. Yet government agencies, including the SEC, would be entitled to sovereign immunity for all suits for money damages.'" *Sparta*, 159 F.3d at 1214 (quoting *Barbara*, 99 F.3d at 59).

Every federal appellate court that has considered the issue has agreed that SROs have absolute immunity from private damages lawsuits challenging their performance of regulatory functions. Such protection is crucial to SROs' ability to perform these regulatory tasks within the federal framework with appropriate vigor.[5] That essential immunity is dispositive of this case. Indeed, that immunity is made all the stronger when, as in this case, NASD acts pursuant to express statutory and regulatory authorization to administer qualifications exams.

Three points are absolutely clear from the unbroken line of decisions in which the courts of appeals have upheld SROs' absolute immunity for regulatory functions. First, if a private lawsuit challenges NASD's performance of a regulatory function, NASD is absolutely immune. The administration of qualification examinations, which are legally required for individuals who wish to enter the industry and transact business in securities, clearly is such a regulatory function. It is for the SEC—not private plaintiffs—to decide whether NASD has performed that function adequately and whether the corrective actions that NASD has taken and is taking with respect to the Series 7 error are sufficient. Second, "absolute immunity must be absolute": when NASD acts pursuant to its regulatory functions, absolute immunity is not merely a pleading

---

[5] *E.g.*, *P'ship Exch. Sec. Co. (PESCO) v. NASD*, 169 F.3d 606, 608 (9th Cir. 1999) (NASD held immune); *Sparta*, 159 F.3d at 1213-15 (same); *Austin*, 757 F.2d at 692 (same); *see, e.g., DL Capital*, 409 F.3d at 97 (NASD subsidiary held immune); *D'Alessio v. N.Y. Stock Exch., Inc.*, 258 F.3d 93, 106 (2d Cir. 2001) (SRO held immune); *Barbara*, 99 F.3d at 58 (same); *accord Zandford v. NASD*, 30 F. Supp. 2d 1, 8-18 (D.D.C. 1998) (NASD held immune), *aff'd mem.*, 221 F.3d 197 (D.C. Cir. 2000); *Weissman v. NASD*, No. 04-13575, 2006 U.S. App. LEXIS 27091, at *13 (11th Cir. Nov. 1, 2006) (NASD held immune for regulatory functions), *pet. for reh'g filed* (Nov. 22, 2006).

hurdle, and it certainly cannot be circumvented by alleging an inadvertent mistake or by claiming that the injury resulted from performance of a "ministerial" rather than a "discretionary" function. *DL Capital*, 409 F.3d at 94-95 (holding that not even allegations of fraud suffice to overcome absolute immunity); *see Austern v. Chi. Bd. Options Exch.*, 898 F.2d 882, 886 (2d Cir. 1990) ("[S]emantically categorizing the challenged acts as 'ministerial' or administrative, as opposed to 'discretionary,' in large part misses the mark . . . ."). And third, NASD's absolute immunity extends to any private lawsuit for damages. The plaintiffs' artful attempt to plead their causes of action as state-law claims is unavailing. *See Sparta*, 159 F.3d at 1212, 1215.

NASD strives daily to administer every examination flawlessly. A scoring error did occur in the Series 7 exam; however, it resulted not from malice, but from a good-faith mishap. NASD has acknowledged the scoring error and has voluntarily taken steps both to ameliorate its effects and to ensure that errors like it will not occur in the future. *See* News Release, Exh. 1; Consol. Compl. ¶ 29. But the plaintiffs' claims implicate a critical regulatory function—*i.e.*, ensuring that only qualified personnel are registered as securities representatives—and present no basis for departing from the settled rule of immunity. NASD therefore is absolutely immune and the complaint must be dismissed.

**1.     NASD's Administration Of Qualifications Testing, Including The Series 7 Exam, Is A Regulatory Function**

Whether NASD is entitled to absolute immunity as an SRO depends upon the nature of the function the SRO is performing. *Sparta*, 159 F.3d at 1214; *accord DL Capital*, 409 F.3d at 99 & n.4; *D'Alessio v. N.Y. Stock Exch.*, 258 F.3d 93, 104-05 (2d Cir. 2001); *Barbara*, 99 F.3d at 58; *Zandford*, 30 F. Supp. 2d at 8-9. Under the approach taken by every reported appellate decision, the dispositive question is whether, in issuing the plaintiffs' incorrect Series 7 scores, NASD was "performing a regulatory function" in its "capacity as a[n] SRO," or, put another

way, whether the plaintiffs' "claims aris[e] out of the discharge of [NASD's] duties under the

Exchange Act." *Sparta*, 159 F.3d at 1215; *D'Alessio*, 258 F.3d at 104, 106.  Because NASD

administers examinations and grants registration as a part of its duty to police the qualifications

of securities-industry personnel—a duty assigned to it by the Exchange Act and the SEC—it is

apparent from the pleadings and from the governing federal law that the answer to that critical

question is yes.  Registration, including qualifications testing, is incontrovertibly one of the

"regulatory and general oversight functions" performed by SROs "'that would, in other

circumstances, be performed by [the SEC].'"  *D'Alessio*, 258 F.3d at 105 (quoting *Barbara*, 99

F.3d at 59) (alteration in original); *see also Desiderio v. NASD*, 2 F. Supp. 2d 516, 521 (S.D.N.Y.

1998) (registration of associated personnel arises "from the NASD's statutory function as a

securities regulator"), *aff'd*, 191 F.3d 198 (2d Cir. 1999).

    The statutory framework makes this regulatory purpose clear.  The Exchange Act bars

from the securities business anyone who does not "meet [prescribed] standards of training,

experience, *competence*, and such other qualifications as the Commission finds necessary or

appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78*o*(b)(7)

(emphasis added).  The Exchange Act expressly includes "tests" among the means of examining

competence.  *Id.* § 78*o*(b)(7)(B).  And the statute authorizes the SEC either to "cooperate with

[SROs] in devising and administering tests," *id.* § 78*o*(b)(7), or to administer the necessary

qualification exams itself, *see id.* ("The Commission, by rule, may prescribe . . . fees for any test

administered *by it*" (emphasis added)).  The SEC formerly administered its own examinations

under certain circumstances, although it always accepted passing scores on NASD's tests as

adequate credentials.  *See* Adoption of Rule 15b8-1, Exchange Act Release No. 7697, 1965 WL

89256 (Sept. 7, 1965).  Today, although the SEC no longer administers tests itself but "rel[ies]

principally on the SROs in the formulation and administration of qualification standards," the SEC retains the power to enforce compliance with these SRO-developed standards directly, and will in some cases assert that power rather than rely on the SROs' enforcement efforts. Requirement of Broker-Dealers to Comply with SRO Qualification Standards, Exchange Act Release No. 32261, 58 Fed. Reg. 27656, 27657 (May 11, 1993). Thus, the fact that the Series 7 exam is administered by NASD rather than by the SEC does not obscure the regulatory purpose of requiring and administering the tests.

This qualification-testing regime is absolutely central to the Exchange Act's framework for investor protection. By requiring that individuals who intend to solicit or conduct business in securities or investment banking first demonstrate a level of competence and knowledge, NASD's registration process serves to exclude unfit candidates and "provides an important safeguard for the investing public." *Cambridge Group, Inc.*, Exchange Act Release No. 29795, 49 SEC Docket 1490 (Oct. 8, 1991) (upholding a severe sanction for failure to register). Indeed, Congress recently expanded the authority of the SEC (and, consequently, the delegated authority of NASD and other SROs) to deny applications for registration based on previous misconduct, noting the danger posed by "the migration of fraud perpetrators into the securities industry." S. Rep. No. 107-205, at 42 (2002); *see* Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 604, 116 Stat. 745, 795-96 (amending 15 U.S.C. § 78*o*(b)(4)). The examination and registration processes serve to keep both the unqualified and the disqualified out of the industry; the SEC has described the qualification examination as a key part of registration and a "basic regulatory control in respect to competence." Adoption of Rule 15b8-1, Exchange Act Release No. 7697, 1965 WL 89256, at *1 (Sept. 7, 1965) (internal quotation marks omitted). As with the function that was at issue in the Ninth Circuit's *Sparta* decision—the suspension of trading on a securities

exchange—"there are few functions more quintessentially regulatory" than the control over membership in the industry, because granting registration "creates the public expectation" that an individual is both competent and ethically suitable to work in the securities industry. *Sparta*, 159 F.3d at 1214. In important ways, NASD "serves as [a] surrogate[] for the SEC" in performing this critical function, "and should receive the same immunity [its] princip[al] possess[es]." *Austin*, 757 F.2d at 691.

NASD's examination and registration function precisely corresponds with its duty to *remove* individuals from the industry for incompetence, misconduct, or other disqualifying reasons. A host of federal courts, including this Court, have recognized that SROs' exercise of their disciplinary authority to investigate and punish registered representatives is a regulatory function that is protected by absolute immunity. *See Zandford*, 30 F. Supp. 2d at 14-15; *accord P'ship Exch. Sec. Co. (PESCO) v. NASD*, 169 F.3d 606, 606 (9th Cir. 1999); *Barbara*, 99 F.3d at 59; *Austin*, 757 F.2d at 689-91; *Scher v. NASD*, 386 F. Supp. 2d 402, 406-07 (S.D.N.Y. 2005), *appeal docketed*, No. 05-5139-cv (2d Cir. July 28, 2005); *cf. Butz v. Economou*, 438 U.S. 478, 481, 511-13 (1978) (extending absolute immunity to federal officials for their actions in seeking to revoke a commodities merchant's registration). Because NASD's disciplinary authority extends to revoking an individual's registration and barring him or her from working in the securities industry, *see* NASD Rule 8310(a)(3)-(7), it follows *a fortiori* that the same degree of protection applies to a decision *denying* an individual's application for registration based on

14

qualifications, and barring him or her from working in the securities industry until he passes an examination.[6]

Reporting the applicants' scores to their employers is also a regulatory function for which NASD is entitled to absolute immunity. NASD's rules, approved by the SEC, *require* NASD to report to its member firms which candidates have met the requirements for registration as securities representatives, and their scores. NASD Rule 1070(c). The Exchange Act compels NASD to adhere to this procedure. 15 U.S.C. § 78s(g)(1).[7] The Second Circuit has specifically noted that "without the capacity to make announcements" protected by absolute immunity, NASD "would be stripped of a critical and necessary part of [its] regulatory powers—namely, the power to inform the public of those actions it has undertaken in the interest of maintaining a fair and orderly market or protecting investors and the public interest." *DL Capital*, 409 F.3d at 98 (citations and internal quotation marks omitted). The court in that case accordingly rejected the plaintiffs' attempt to distinguish, for immunity purposes, between taking a regulatory action and announcing that action; NASD is entitled to absolute immunity for both. *See id. DL Capital*'s analysis squarely applies to the reporting of examination scores; indeed, the reporting of examination passage and failure is an essential part of the registration system, because member firms need to know whether their personnel have passed the examinations.

---

[6] The close parallels between NASD's power to investigate and expel individuals and its delegated authority to examine and admit individuals are more than sufficient to establish that NASD is entitled to absolute immunity in this case. Those parallels are not necessary to the analysis, however: the test is whether NASD was exercising a "regulatory" function "'consistent with'" its role under the Exchange Act and SEC regulations. *DL Capital*, 409 F.3d at 99 (quoting *D'Alessio*, 258 F.3d at 106).

[7] NASD also makes public which candidates have received registration, although it does not publicize failing examination scores or denials of registration.

Moreover, the nature of NASD's qualifications-testing function practically invites litigation. NASD receives tens of thousands of applications for registration each year from individuals who wish to work in the securities industry. Some individuals are denied registration, whether because they have failed to pass the required examinations, they are otherwise unqualified, or they have criminal or disciplinary records that demonstrate their unfitness. "An unfortunate, inescapable byproduct of the NASD self-regulatory system" is that "hard feelings" by candidates who are not registered, like those who are disciplined or expelled, "are likely to result in recriminatory lawsuits." *Zandford*, 30 F. Supp. at 17-18. Absolute immunity ensures that NASD will exercise these roles without fear or favor, subject to the SEC's supervision and a review procedure that provides adequate redress. *See supra* pp. 3, 6 (describing the levels of administrative review); *Zandford*, 30 F. Supp. 2d at 18 (affirming that the safeguards of the self-regulatory process, SEC supervision, and judicial review support extending absolute immunity to NASD proceedings); *cf. Mireles v. Waco*, 502 U.S. 9, 10 (1991) (per curiam) (absolute immunity allows an adjudicator, "'in exercising the authority vested in him, [to remain] free to act upon his own convictions, without apprehension of personal consequences to himself'" (quoting *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 347 (1872)); *Rosen v. NLRB*, 735 F.2d 564, 571 (D.C. Cir. 1984) (similar).

Cases applying the functional absolute-immunity analysis outside the SRO context also confirm that administering the Series 7 examination is a regulatory function for which NASD is immune from private damages actions.[8] NASD's delegated authority to administer qualification

---

[8] Numerous courts have recognized that in analyzing SROs' immunity, it is appropriate to look to analogous precedents extending absolute immunity to other defendants, such as prosecutors, quasi-judicial officials, and bar association disciplinary committees. *See, e.g.*,

[Footnote continued on next page]

16

examinations and, upon passage and satisfaction of the other requirements, to register individuals

to work in the securities industry parallels in many ways the authority of a board of law

examiners, delegated by the state supreme court, to administer bar examinations and to admit

those who pass to the practice of law. *See, e.g.*, *Austin*, 757 F.2d at 690 (bar disciplinary

committees); *Zandford*, 30 F. Supp. 2d at 14 (same); *cf. Ass'n of Inv. Brokers v. SEC*, 676 F.2d

857, 860 n.10 (D.C. Cir. 1982) (analogizing the waiver associated with applying for NASD

registration with the waiver associated with applying for membership in the D.C. Bar). Courts

have consistently concluded that "in exercising the power . . . to determine who shall be admitted

to practice," a court or its delegate, such as a committee of bar examiners, "performs a judicial

act for which [absolute] immunity attaches." *Sparks v. Character & Fitness Comm.*, 859 F.2d

428, 433 (6th Cir. 1988); *accord, e.g.*, *Childs v. Reynoldson*, 777 F.2d 1305, 1306 (8th Cir. 1985)

(per curiam); *Julien v. Comm. of Bar Exam'rs for the Practice of Law*, 923 F. Supp. 707, 714-16

(D.V.I. 1996); *Rodriguez Diaz v. Moore*, 861 F. Supp. 1041, 1048-49 (N.D. Fla. 1994); *cf.*

*Hoover v. Ronwin*, 466 U.S. 558, 570-72 (1984) (holding that members of a committee that both

graded the bar exam and determined the passing score was entitled to state-action immunity from

the antitrust laws). In these analogous circumstances, NASD is performing a function that is no

less regulatory in nature, and no less entitled to absolute immunity.

### 2.    A Simple Scoring Error Does Not Defeat Absolute Immunity

Absolute immunity would not be absolute—in fact, would not even be immunity—if it

applied only to situations in which an SRO acted flawlessly. For this reason, when an SRO

invokes absolute immunity, "the relevant inquiry is the 'nature' and 'function' of the [SRO's]

---

[Footnote continued from previous page]

    *DL Capital*, 409 F.3d at 98-99; *Austin*, 757 F.2d at 690; *Zandford*, 30 F. Supp. 2d at 14;
    *accord D'Alessio*, 258 F.3d at 105; *Barbara*, 99 F.3d at 58.

act, not the 'act itself.'" *Mireles*, 502 U.S. at 13 (quoting *Stump v. Sparkman*, 435 U.S. 349, 362

(1978), in explaining the test for absolute immunity for judges); *see, e.g.*, *DL Capital*, 409 F.3d

at 99 n.4 (focusing on the "function being performed" by the SRO claiming immunity (internal

quotation marks omitted)).  If NASD's entitlement to absolute immunity depended on a

factfinder's assessment of whether NASD met the plaintiffs' asserted standard of care, NASD's

"exercise of its quasi-governmental functions would be unduly hampered by disruptive and

recriminatory lawsuits." *DL Capital*, 409 F.3d at 99 (internal quotation marks omitted).  Indeed,

*any* dissatisfied test-taker could sue, whether or not there was evidence of a scoring error.  That

negative effect, in turn, would undercut the congressional purpose "to encourage forceful self-

regulation of the securities industry." *Barbara*, 99 F.3d at 59.  That "forceful self-regulation" is

to take place under the SEC's supervision, not the supervision of private plaintiffs, because

SROs would be significantly discouraged from vigorous action to enforce the securities laws and

rules if the response to every denial of registration, disciplinary investigation, or stock de-listing

decision were a lawsuit for potentially crippling money damages, under one of 50 different state-

law standards. *Sparta*, 159 F.3d at 1215.  The SEC and other government regulators are immune

from such lawsuits, and "[i]t follows that [NASD] should be entitled to the same immunity

enjoyed by the SEC when it is performing functions delegated to it under the SEC's broad

oversight authority." *D'Alessio*, 258 F.3d at 105.

For these reasons, the federal courts have repeatedly rejected plaintiffs' attempts to create

exceptions to absolute immunity that would allow the doctrine to be circumvented merely by

alleging that the SRO performed its duties poorly (or worse).  To the contrary:  they have held

that "absolute immunity must be absolute" in this context. *DL Capital*, 409 F.3d at 94-95;

*accord PESCO*, 169 F.3d at 608 (the absolute immunity doctrine "admits of no exceptions").  In

*Sparta*, the Ninth Circuit rejected the notion of an exception to absolute immunity for "bad faith" or for conduct that was "capricious, even tartuffian." 159 F.3d at 1215. Likewise, in both *D'Alessio* and *DL Capital*, the Second Circuit squarely held that a plaintiff's assertion that the SRO had acted fraudulently does not justify departing from the settled rule of absolute immunity. *See DL Capital*, 409 F.3d at 98-99 (citing *D'Alessio*, 258 F.3d at 97-98); *accord Dexter*, 406 F. Supp. 2d at 263 (rejecting an exception to absolute immunity for allegedly "unlawful" regulatory conduct). "It is, after all, hard to imagine the plaintiff (or plaintiff's counsel) who would . . . fail to concoct some claim of fraud in order to try and circumvent the absolute immunity doctrine." *DL Capital*, 409 F.3d at 99. Although the analogy between the absolute immunity of SROs and the absolute immunity of government officers is not exact,[9] these holdings are consistent with the Supreme Court's applications of absolute-immunity doctrine in similar contexts. *See, e.g.*, *Mireles*, 502 U.S. at 11 (absolute judicial immunity "is not overcome by allegations of bad faith or malice"); *see also, e.g.*, *PESCO*, 169 F.3d at 608 (analogizing to cases involving absolute prosecutorial immunity).

Because allegations of fraud or bad faith are insufficient to overcome absolute immunity, it follows that the plaintiffs' allegations of negligence are also inadequate. Indeed, neither the consolidated complaint nor any one of the complaints filed before consolidation alleges that NASD has acted fraudulently or in bad faith. Not a word in the plaintiffs' pleadings contradicts NASD's position that, as soon as it discovered the scoring error, it promptly took steps to

---

[9] For instance, government officers such as judges who are denied *absolute* immunity frequently are still able to claim *qualified* immunity. Thus, precedents from the § 1983 and *Bivens* context holding that officers are qualifiedly, not absolutely, immune from liability should not be read out of context to suggest that SROs are in fact *subject to* liability for regulatory conduct undertaken in good faith.

diagnose the problem, correct it, notify the plaintiffs and the other affected candidates, and remove the erroneous scores from these candidates' records. If outright *fraud* does not justify setting aside an SRO's immunity from private lawsuits, then a mere error on the part of NASD's contractor, EDS, can hardly be sufficient reason to disregard the settled line of precedent that treats absolute immunity as absolute.

Nor can absolute immunity be overcome by the mere expedient of alleging that the act in question is "ministerial" in nature. The standard for immunity examines whether the SRO acts in a manner "consistent with" its prescribed role and powers. *DL Capital*, 409 F.3d at 98; *see Austern*, 898 F.2d at 886 (rejecting the notion that SROs' immunity for sponsoring securities arbitrations turns on a "semantic[]" distinction between "'ministerial' or administrative" and "'discretionary'" acts); *cf. Sindram v. Suda*, 986 F.2d 1459, 1461 (D.C. Cir. 1993) (per curiam) (applying a similar absolute-immunity analysis for officers who assist judges); *Rodriguez v. Weprin*, 116 F.3d 62, 67 (2d Cir. 1997) (citing *Sindram*); *Roth v. King*, Civ. A. No. 03-1109-RMU, 2005 U.S. Dist. LEXIS 42345, at *30-*31 (D.D.C. Mar. 11, 2005), *rev'd in part on other grounds*, 449 F.3d 1272, 1280 (D.C. Cir. 2006).

Thus, even "assuming arguendo that the NASD's conduct was incorrect and unlawful, it is nevertheless protected. There would be no point to an immunity that only protected actions that were in any event correct." *Dexter,* 406 F. Supp. 2d at 263; *cf. Mireles*, 502 U.S. at 12 ("If judicial [absolute] immunity means anything, it means that a judge 'will not be deprived of immunity because the action he took was in error . . . .'" (quoting *Stump*, 435 U.S. at 356)).

### 3.    Plaintiffs Cannot Plead Around Absolute Immunity By Casting Their Claims In State-Law Terms

The statutory design immunizes NASD from *all* private lawsuits challenging its official action, however pleaded. As discussed above, the crucial inquiry is whether the private lawsuit

seeks to impose liability for conduct that NASD took in pursuance of its duties under the

Exchange Act. Thus, just as the plaintiffs cannot plead around absolute immunity by alleging

"fraud" or "bad faith" in the performance of a regulatory duty, they cannot avoid the immunity

doctrine by couching their claims in terms of state law. Congress conferred absolute immunity

on SROs as part of the federal statutory scheme establishing self-regulation of the securities

markets; no state-law cause of action can undo that congressional design. *See Sparta*, 159 F.3d

at 1213; *Barbara*, 99 F.3d at 59; *see also MM&S Fin., Inc. v. NASD*, 364 F.3d 908, 911-12 (8th

Cir. 2004) ("Given Congress's grant of exclusive jurisdiction to federal courts to hear all claims

for breach of duties created under the Exchange Act, we doubt Congress intended to allow

[plaintiffs] to avoid Congress's decision not to provide an express right of action and pursue

instead a common-law breach of contract claim."). As the Ninth Circuit has pointed out, "a rule

permitting recovery under [a state-law] theory would allow states to define by common law the

regulatory duties of a self-regulatory organization, a result which cannot co-exist with the

Congressional scheme of delegated regulatory authority under the Exchange Act." *Sparta*, 159

F.3d at 1215.

    For these reasons, the federal courts have regularly relied on SROs' absolute immunity to

purported state-law claims against SROs. In both *D'Alessio* and *Barbara*, for example, the

Second Circuit held the SRO immune from suit for money damages, even though the suits were

pleaded under New York law, because the gravamen of both suits was the SRO's conduct of its

regulatory functions. *See D'Alessio*, 258 F.3d at 100; *Barbara*, 99 F.3d at 52. So too the Ninth

Circuit, the Fifth Circuit, and numerous district courts. *E.g.*, *PESCO*, 169 F.3d at 607, 608

(holding NASD absolutely immune from claims that it "violated federal and state law"); *Sparta*,

159 F.3d at 1215 (same); *Austin*, 757 F.2d at 684, 692-93 (holding NASD absolutely immune

from state-law claims including defamation and interference with business relations); *accord, e.g.*, *Dexter*, 406 F. Supp. 2d at 264 (NASD "is absolutely immune from suit on both federal and state claims"); *Scher*, 386 F. Supp. 2d at 406 (NASD is absolutely immune from state-law negligence and gross negligence claims).

For the foregoing reasons, plaintiffs' complaint should be dismissed in its entirety based on NASD's absolute immunity.

### B.    Plaintiffs Have No Private Right Of Action To Enforce NASD's Duties As An SRO

Several of the plaintiffs' claims are premised, in substance if not in style, on the proposition that NASD has violated its duties under the Exchange Act and the rules promulgated thereunder by both the SEC and NASD itself.  These are premised on the plaintiffs' purported entitlement to registration, and consequently employment, as registered representatives once they answered a sufficient number of questions to pass the Series 7 exam.  *E.g.*, Consol. Compl. ¶ 56 (alleging "adverse employment consequences" resulting from erroneous grading).  These allegations would fail even if NASD were not absolutely immune:  NASD's compliance with the rules under which it administers examinations and grants or denies registration to individuals like the plaintiffs is enforced by the SEC itself, pursuant to an elaborate regulatory framework that allows the SEC to consider challenges by individuals to SROs' conduct.  The plaintiffs have no private right of action to enforce these rules, and as the courts of appeals have recognized, they cannot circumvent this framework by purporting to claim damages under state law.

A pair of Second Circuit cases is particularly illustrative.  Just as the securities laws set criteria for registration and admission of personnel into the securities industry, they also set criteria for admitting stockbrokers to membership in national securities exchanges, which are

also SROs.  *See Feins v. Am. Stock Exch.*, 81 F.3d 1215, 1218 (2d Cir. 1996).[10]  Feins sought

membership in the American Stock Exchange (AMEX), which the exchange denied.  *Id.* at 1216.

Reviewing that decision pursuant to 15 U.S.C. § 78s(f), the SEC reversed the denial, because

Feins in fact met all of the criteria for membership, but it rejected Feins's request for monetary

compensation from the erroneous denial.  *Id.* at 1217.  Feins sued AMEX in New York state

court, seeking compensatory and punitive damages (including damages for mental anguish).  *See

id.*  Both the district court and the Second Circuit held that Feins could not maintain a private

damages action.  The Exchange Act, as amended in 1975, was "designed to correct erroneous

membership decisions of securities exchanges, whether made intentionally, negligently or

otherwise.  A private cause of action for compensatory and punitive damages is not necessary

and would add negligibly to the ability of the SEC to enforce the standards that securities

exchanges must apply in order to deny an application for membership."  *Id.* at 1222.  Although

"applicants improperly denied membership may suffer monetary damages" from the denial,

"[t]here is nothing in the statute or its legislative history to suggest that Congress intended to

recompense [their] out-of-pocket expenses or consequential damages," let alone punitive

damages.  *Id.* at 1222-23.  Nor could Feins bring a damages action for AMEX's violation of its

own rules; although SROs are required by the Exchange Act to comply with their own rules,

enforcement—including monetary sanctions—is left to the SEC, subject to review by the courts

of appeals if the SEC is too lenient.  *See id.* at 1223-24 ("[Feins's] right to seek relief from the

SEC is not the same as the private right of action she now asserts.").

---

[10]  A securities firm cannot be registered as a broker-dealer until it is admitted to membership in
an SRO, absent an exemption by the SEC.  15 U.S.C. § 78*o*(b)(1)(B).

The Second Circuit subsequently recognized the close similarity between granting membership in an exchange and granting registration to an associated person, and applied the extensive *Feins* analysis to state-law claims brought by a plaintiff seeking registration. *See Desiderio v. NASD*, 191 F.3d 198, 200-01 (2d Cir. 1999). The *Desiderio* court held that "[b]ecause *Feins* [wa]s analogous . . . , in that it addressed a denial of membership, it controls." *Id.* at 208. Thus, even though the plaintiff styled her challenges to her inability to obtain registration as state law tort claims, *see id.* at 207, she "ha[d] no private right of action and her state law claims were accordingly properly dismissed." *Id.* at 208. Although Desiderio was challenging a part of the registration process (*i.e.*, the requirement that she sign Form U4, which contains an arbitration clause with which she disagreed), her complaint was nonetheless founded on a denial of registration, as are the plaintiffs' claims here. *See id.* at 202 (dismissing as irrelevant the fact that Desiderio never submitted her Form U4 or completed the registration process).

Read together, *Feins* and *Desiderio* compel the conclusion that the plaintiffs cannot bring a private action for damages based on NASD's denials of their applications for registration. The same analysis has been followed by many other courts of appeals. *Accord, e.g.*, *MM&S Fin.*, 364 F.3d at 911 (holding that a plaintiff could not state a breach-of-contract claim based on NASD's alleged failure to follow its own rules, because "[g]iven Congress's grant of exclusive jurisdiction to federal courts to hear all claims for breach of duties created under the Exchange Act, we doubt Congress intended to allow M&MS to avoid Congress's decision not to provide an express right of action and pursue instead a common-law breach of contract claim"); *Sparta*, 159 F.3d at 1213, 1215 (noting that "there is no private right of action for violations of [SRO] rules" or for "actions taken to perform . . . self-regulatory duties under the Act," without exception

(citing *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 681 (9th Cir. 1980))); *Gustafson v. Strangis*, 572 F. Supp. 1154, 1157 (D. Minn. 1983) (listing the "[n]umerous courts [that] have held that there is no private cause of action [against NASD] for violation of the Act or for violations of . . . NASD rules").  Whether the plaintiffs plead their claims as arising under the Exchange Act or under state law, they are limited to the remedies the Exchange Act provides to a candidate erroneously denied registration.  *See supra* p. 6 (describing these administrative and judicial remedies).

> ### C.    Plaintiffs Expressly Waived All Claims Against NASD For Actions "Taken In Official Capacity," Which Includes The Grading Of Examinations And Reporting Of Scores

Form U4 provides a third, independently adequate basis for dismissal of the complaint. As a prerequisite to applying for registration, each of the plaintiffs signed Form U4 and submitted it electronically to NASD through his or her employer.  Consol. Compl. ¶ 13; *see Desiderio*, 191 F.3d at 201 ("[R]egistration in [an SRO] entails signing Form U-4."); NASD Rule 1140(c) (requiring the applicant's physical signature on every Form U4).[11]

---

[11] This Court may properly consider Form U4 without converting this motion to dismiss into one for summary judgment, for three reasons: First, the plaintiffs effectively admit that they signed Form U4, as they could not have taken the Series 7 exam without doing so.  Consol. Compl. ¶ 13.  Second, the Court may take judicial notice of Form U4, because it is an SRO rule promulgated pursuant to the Maloney Act process.  This Court may "examine matters of public record in ruling on a Rule 12(b)(6) motion," including public records of "agency action."  *Marshall County Health Auth. v. Shalala*, 988 F.2d 1221, 1222 (D.C. Cir. 1993); *accord Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004); *see also, e.g., EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624-25 (D.C. Cir. 1997) ("In determining whether a complaint fails to state a claim, we may consider . . . matters of which we may take judicial notice.").  SRO rulemaking undoubtedly qualifies.  *See, e.g., Capece v. Depository Trust & Clearing Corp.*, No. 05-80498-CIV-RYSKAMP, 2005 U.S. Dist. LEXIS 42039, at *13 (S.D. Fla. Oct. 11, 2005) (SRO rules "are subject to judicial notice because [the SRO] files such rules with the SEC for approval"); *see also, e.g., Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (allowing judicial notice of SEC filings because "the documents

[Footnote continued on next page]

Part 15 of Form U4, the only portion of the application in which signatures are required, begins with the text: "Please Read Carefully."  Exh. 2, at 13.  Section 15A, headlined in bold "Individual/Applicant's Acknowledgement and Consent," is the only portion that an applicant for initial registration is required to sign.  *See id.*  Section 15A provides in pertinent part:

> 1. I swear or affirm that I have read and understand the items and instructions on this form and that my answers (including attachments) are true and complete to the best of my knowledge.  I understand that I am subject to administrative, civil or criminal penalties if I give false or misleading answers.

> 2. I apply for registration with the *jurisdictions* and *SROs* indicated in Section 4 (SRO REGISTRATION) and Section 5 (JURISDICTION REGISTRATION) as may be amended from time to time and, in consideration of the jurisdictions and SROs receiving and considering my application, I submit to the authority of the jurisdictions and SROs and agree to comply with all provisions, conditions and covenants of the statutes, constitutions, certificates of incorporation, by-laws and rules and regulations of the *jurisdictions* and *SROs* as they are or may be adopted, or amended from time to time. I further agree to be subject to and comply with all requirements, rulings, orders, directives and decisions of, and penalties, prohibitions and limitations imposed by the *jurisdictions* and *SROs*, subject to right of appeal or review as provided by law.

> 3. **I agree that neither the *jurisdictions* or *SROs* nor any person acting on their behalf shall be liable to me for action taken or omitted to be taken in official capacity or in the scope of employment**, except as otherwise provided in the statutes, constitutions, certificates of incorporation, by-laws or the rules and regulations of the *jurisdictions* and *SROs*.

> 4. I authorize the *jurisdictions*, *SROs*, and the *designated entity* to give any information they may have concerning me to any employer or prospective employer, any federal, state or municipal agency, or any other *SRO* and **I release the *jurisdictions*, *SROs*, and the *designated entity*, and any person acting on their behalf from any and all liability of whatever nature by reason of furnishing such information**.

---

[Footnote continued from previous page]

are required by law to be filed with the SEC, and no serious question as to their authenticity can exist"); *cf.* 44 U.S.C. § 1507 (providing that "[t]he contents of the Federal Register shall be judicially noticed").  Third, plaintiffs' claims for breach of contract cannot be considered without reference to the document that memorializes the contractual relationship.  *See, e.g.*, *Cue Fashions, Inc., v. LJS Distrib., Inc.*, 807 F. Supp. 334 (S.D.N.Y. 1992); *cf. Cortec Indus. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991).

*Id.* (boldface added).  The italicized terms are defined in the Form U4 instructions; the term

"SRO" is defined to include "any national securities association (e.g., NASD)."  Ex. 3, at 3.

According to the plain and unambiguous text of Form U4, therefore, each of the plaintiffs

has already released their claims against NASD.  As demonstrated above, all aspects of the

scoring of the Series 7 exam and the reporting of the results were actions taken "in official

capacity" by NASD or "person[s] acting on [its] behalf."  And with regard to the plaintiffs'

claims for negligent misrepresentation, the plaintiffs have not pleaded any act by NASD to

publicize their incorrect failing scores to any recipient except employers, regulators, and SROs;

these claims are accordingly released by Section 15A(4) of Form U4 as well.

Plaintiffs' allegation that "Form U4 does not create a contractual relationship between the

applicant and NASD," Consol. Compl. ¶ 14, is belied both by established case law and the plain

language of the form itself.[12]  The courts have repeatedly held that Form U4 "is a contract" and

that each applicant for registration is bound by its provisions "because his signature manifests his

assent."  *Thomas James Assocs. v. Jameson*, 102 F.3d 60, 65 & n.2 (2d Cir. 1996); *see also*

*Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 23, 25 n.2 (1991) (Form U4 "is a contract

[between] the securities exchanges" and the applicant for registration); *Desiderio*, 191 F.3d at

207 (treating Form U4 as a contract and holding that it is not unconscionable).  The contractual

relationship runs between the applicant and NASD.  *See, e.g.*, *NASD v. Fiero*, __ N.Y.S.2d __,

33 A.D.3d 547 (App. Div. 2006) (holding that a registered individual is bound by the obligations

he undertakes in Form U4, including compliance with penalties imposed by NASD).  Section

_____

[12]  Of course, the Court need not accept as true for purposes of this motion the plaintiffs' "legal
conclusion couched as a factual allegation."  *Trudeau*, 456 F.3d at 193 (internal quotation
marks omitted).  Unenforceability of a contract is a matter of law.  E. Allan Farnsworth,
*Farnsworth on Contracts* § 4.28, at 579-80 (3d ed. 2004).

15A(2) of Form U4 expressly states that, "in consideration of the *jurisdictions* and *SROs* receiving and considering my application, [the applicant] submit[s] to the authority of the *jurisdictions* and *SROs* . . . ." Exh. 2, at 13 (emphases in original). Plainly, by signing Form U4, the plaintiffs assumed an express obligation to submit to NASD's regulatory authority, and did *in consideration* of NASD's express obligation to "receiv[e] and consider" their application for registration. This traditional and well-known language of contract law, imposing obligations on both the plaintiffs and NASD, is more than sufficient to defeat the plaintiffs' conclusory assertion that they have no contractual relationship with the NASD.

Similarly unavailing is plaintiffs' suggestion that Form U4 should not be enforced because it is a "contract of adhesion" or because "[n]one of the Plaintiffs or Class members had any bargaining power to negotiate [its] terms." Consol. Compl. ¶¶ 15-16. The federal courts, including the Supreme Court, have consistently rejected challenges to Form U4 as an unconscionable contract of adhesion. *Gilmer*, 500 U.S. at 33; *Desiderio*, 191 F.3d at 207; *Koveleskie v. SBC Capital Mkts.*, 167 F.3d 361, 366 (7th Cir. 1999); *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 170 F.3d 1, 17 (1st Cir. 1999); *Seus v. John Nuveen & Co., Inc.*, 146 F.3d 175, 184 (3d Cir. 1998) (noting that applicants are cautioned to read Form U4 carefully); *see also, e.g.*, *Porzig v. Dresdner Kleinwort Benson N. Am. LLC*, No. 98 Civ. 7670 (BSJ), 1999 U.S. Dist. LEXIS 11067, at *13 (S.D.N.Y. July 21, 1999) (an "unbroken line of cases dating back nearly 30 years" has "emphatically rejected" challenges to Form U4 as a contract of adhesion).

Those holdings are unsurprising, because Form U4 is neither procedurally nor substantively unconscionable. There is no risk of a "lack of understanding" on the part of the plaintiffs, or any of the other indicia of procedural unconscionability. *See generally* E. Allan

28

Farnsworth, *Farnsworth on Contracts* § 4.28, at 583, 585 (3d ed. 2004) (noting that form

contracts are not per se unconscionable). Indeed, the Supreme Court held in *Gilmer* that the

purportedly unequal bargaining power between the plaintiff and his employer did not by itself

invalidate Form U4's arbitration provision; the same is true of the provision on which NASD

relies here. *Gilmer*, 500 U.S. at 33. And there is nothing substantively objectionable about the

release of liability in this context. Not only do the NASD rules and the Exchange Act give

applicants for registration substantial procedural safeguards (including the right to seek review of

registration decisions before the SEC and courts of appeals), *see supra* p. 6, and not only are

exculpatory clauses commonly upheld under the law of contracts, *see* 8 Richard A. Lord,

*Williston on Contracts* § 19:24, at 287 (4th ed. 1998), these clauses are common in the area of

testing. *See, e.g.*, *Harris v. Nat'l Evaluation Sys.*, 719 F. Supp. 1081 (N.D. Ga. 1989), *aff'd*

*mem.*, 900 F.2d 266 (11th Cir. 1990). In *Harris*, as in this case, the plaintiff was told that she

failed a required professional examination due to a scoring error. *See id.* at 1082. She brought

suit on a negligence theory, but the court dismissed her claim based on the waiver that she signed

when registering for the test, which read: "'I understand that liability for accurate test materials

and adequate administration conditions will be limited to score correction or test retake at no

additional fee. I waive rights to all further claims against the Georgia Department of Education

and National Evaluation Systems, Inc.'" *Id.* The court held that the unambiguous terms of the

agreement barred her claim, and that the agreement was consistent with public policy. *Id.* at

1083.

　　Although the plaintiff in *Harris* relied on Georgia law, while Form U4 is governed by

federal law because it is promulgated and approved by the SEC pursuant to the Exchange Act,

there is no reason to think that federal law would deny effect to language as unambiguous as

Form U4's.  *See also, e.g.*, *Hart v. Canadian Imperial Bank of Commerce*, 43 F. Supp. 2d 395,

401 (S.D.N.Y. 1999) (noting that "[t]he format of the Form U-4 only strengthens th[e]

presumption" that any signatory carefully read and agreed to be bound by the provisions of the

individual-agreements part of the Form).  Nor is there any reason to think federal law would find

Form U4's exculpatory clause is violative of public policy or otherwise unconscionable.  Indeed,

in light of the substantial procedural safeguards afforded by the NASD registration process,

together with the right to seek review before the SEC and courts of appeals, Form U4's waiver of

liability is hardly oppressive or unconscionable.

    To the extent that the plaintiffs argue that the release provision they signed is invalid, that

argument is foreclosed not only by the long line of cases upholding Form U4 as an enforceable

contract, but also by the federal Supremacy Clause and elementary principles of preemption.

Congress and the SEC have directed that applicants for registration by NASD comply with

"procedures established by the rules" promulgated by NASD and approved by the SEC, 15

U.S.C. § 78*o*-3(g)(3)(B), "including but not limited to submitting . . . all required forms."  17

C.F.R. 240.15b7-1.  The SEC has specifically approved Form U4 and every individual

modification thereto, making the required finding that Form U4 is "consistent with the

requirements of [Title 15, United States Code,] and the rules and regulations thereunder

applicable to" NASD.  15 U.S.C. § 78s(b)(2).  *See* Notice of Filing of Proposed Rule Change,

Exchange Act Release No. 45385, 67 Fed. Reg. 5862, 5865 (Feb. 7, 2002); Order Granting

Approval to Proposed Rule Change, Exchange Act Release No. 45531, 67 Fed. Reg. 11735

(Mar. 15, 2002); *see also Ass'n of Inv. Brokers*, 676 F.2d at 860-61 & n.11 (detailing the history

of the provision that is now Section 15A(4) of Form U4).  And the SEC could have abrogated or

modified the waiver provision if the SEC deemed such a step "appropriate to insure the fair

30

administration" of the registration process by NASD.  15 U.S.C. § 78s(c).  The SEC has taken an active role in regulating the content of Form U4 since its inception, and over that time has modified several other provisions of the document.  *See, e.g.*, Adoption of Form U-3, Exchange Act Release No. 11424, 7 SEC Docket 2, 4-5 (May 16, 1975).

For an individual State, whether by statute or by common law, to attempt to invalidate an individual provision of Form U4 would be inconsistent with the scheme of SRO regulation established by Congress.  *Sparta*, 159 F.3d at 1215.  First, the SEC has specifically provided that candidates for registration *must* "submit[] . . . all required forms . . . . established by the rules of any [SRO] of which [the candidate's employer] is a member."  17 C.F.R. § 240.15b7-1.  State law cannot undo that directive.  Second, as discussed above, the rules adopted by SROs themselves preempt conflicting State laws: NASD is required by the Exchange Act to adhere to its own rules, 15 U.S.C. § 78s(g)(1), so state-law attempts to defeat those rules would effectively prevent NASD from complying with the Exchange Act, and thus are preempted.  *See, e.g.*, *Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1132 n.19 (9th Cir. 2005) (giving preemptive effect to NASD's arbitration rules); *cf. Sparta*, 159 F.3d at 1212 (treating NASD's rules as equivalent to rules and regulations promulgated by the SEC under the Exchange Act).  *See generally, e.g.*, *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (explaining that "where it is impossible for a private party to comply with both state and federal law," conflict preemption dictates that state law yield).  Even without the conflict with this express federal directive, applying state-law unconscionability doctrines to a required SRO form would effectively require the SRO promulgating that form to obtain the approval of not only the SEC, but also each and every U.S. jurisdiction.  Any such disruption of the SRO rulemaking process would be preempted as an impermissible interference with the national system of

31

securities regulation established by the Exchange Act. *See, e.g.*, *Boomer v. AT&T Corp.*, 309 F.3d 404, 417-23 (7th Cir. 2002) (holding that federal law precluded courts from refusing to enforce certain contractual provisions as unconscionable, because Congress intended that the contracts in question be enforced uniformly throughout the United States); *cf. Teamsters Local 174 v. Lucas Flour Co.*, 369 U.S. 95, 103-04 (1962) (federal labor contracts are governed by "a single body of federal law," not by "individualized local rules" that vary from State to State); *Local Union 20 v. United Bhd. of Carpenters & Joiners of Am.*, 223 F. Supp. 2d 491, 499 (S.D.N.Y. 2002) (holding preempted a claim that a federal labor contract was unconscionable under state law).

### D. Plaintiffs' Contract And Negligent-Misrepresentation Claims Fail on Their Merits, Even Taking the Allegations As True

#### 1. Plaintiffs Fail To State A Claim For Breach Of Contract, Because The Only Express Contract Between The Parties Plainly Exonerates NASD From Liability

The plaintiffs allege that NASD's failure to score the Series 7 examination correctly violated a contractual assurance made by NASD "that the exams would be correctly scored and that it would provide the Class Members, and their employers, with accurate and correct scores." Consol. Compl. ¶ 46. The plaintiffs identify no provision in their contract with NASD—Form U4—that contains such an express duty; to the contrary, Form U4 expressly provides that NASD shall *not* be held liable for breach when it performs official actions such as administering qualification exams. Rather, the plaintiffs rely on some amorphous "implied contract" whose precise terms the complaint never specifies. But Form U4 is fatal to the contract claim against NASD: the plaintiffs have already made a contract with NASD that directly contradicts their theory of liability, and they are therefore precluded from asking this Court to invent a new contract, with or without the nonexistent term they seek to conjure.

Every jurisdiction whose law might be involved in this litigation[13] has endorsed the elementary proposition of contract law that resolves this claim:  courts will not imply a contract "where there is an express contract covering the subject matter involved."  *New York Jurisprudence* § 510 (citing *Miller v. Schloss*, 113 N.E. 337, 339 (N.Y. 1916)).[14]  As the California courts have explained, "The reason for the rule is simply that where the parties have freely, fairly and voluntarily bargained for certain benefits in exchange for undertaking certain obligations, it would be inequitable to imply a different liability and to withdraw from one party benefits for which he has bargained and to which he is entitled."  *Wal-Noon Corp.*, 119 Cal. Rptr. at 651; *see also Vt. Teddy Bear Co., Inc. v. 583 Madison Realty Co.*, 807 N.E.2d 876, 879 (N.Y. 2004) (discussing the "familiar and eminently sensible proposition of law [] that, when parties set down their agreements in a clear, complete document, their writing should . . . be enforced according to its terms."  (internal quotation marks omitted; alterations in original)). Because every member of the plaintiff class has already signed Form U4, an express contract

---

[13]  A full choice-of-law analysis is not necessary for purposes of this motion to dismiss, because common principles of law dictate the dismissal of these claims.  The plaintiffs' claims, however, potentially implicate the substantive law of numerous jurisdictions, an issue that would require analysis should this case progress any further.

[14]  *Accord, e.g.*, *Dunn v. Phoenix Village, Inc.*, 213 F. Supp. 936, 949 (W.D. Ark. 1963); *Wal-Noon Corp. v. Hill*, 119 Cal. Rptr. 646, 651 (Ct. App. 1975); *Haldi v. Watson*, 522 S.E.2d 696, 698 (Ga. Ct. App. 1999); *Duvanel v. Sinclair Ref. Co.*, 227 P.2d 88, 88 (Kan. 1951); *FLF, Inc. v. World Publ'ns, Inc.*, 999 F. Supp. 640, 644 (D. Md. 1998); *Hunt Constr. Group, Inc. v. Constr. Servs., Inc.*, 375 F. Supp. 2d 612, 619-20 (E.D. Mich. 2005); *Moser v. Milner Hotels, Inc.*, 78 A.2d 393, 394 (N.J. 1951); *Beder v. Cleveland Browns, Inc.*, 717 N.E.2d 716, 720 (Ohio Ct. App. 1998); *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 388 (Pa. 1986); *Exxon Corp. v. Atl. Richfield Co.*, 678 S.W.2d 944, 947 (Tex. 1984).  In light of the widespread agreement on this principle of law, this list of the jurisdictions whose law might be implicated is not necessarily exhaustive.

with NASD concerning the registration process, the plaintiffs' implied contract theory is fatally
flawed.

The plaintiffs cannot plausibly suggest that Form U4 is not an express contract.  *See
supra* pp. 27-29.  And Form U4 plainly covers the same subject matter as the plaintiffs' implied-
contract claim.  The form is a prerequisite to NASD's receipt and consideration of an application
for registration, including the associated examinations.  Indeed, the applicant himself uses Form
U4 to announce his intention to take the Series 7 examination and to work in a job category
within the securities industry that requires that examination as a condition for registration.  *See*
Exh. 2, at 3, 6.  And Form U4 specifically addresses NASD's liability for errors in its
relationship with the applicant:  each applicant agrees that the SROs shall not be liable for any
"action taken or omitted to be taken in official capacity or in the scope of employment."  *Id.* at
13.  NASD's scoring of the Series 7 examination and reporting of its results are clearly acts
"taken in official capacity," because these are functions specifically identified by Congress and
delegated by the SEC.

Just as the plaintiffs are unable to supplant Form U4 with a different, more favorable
"implied contract," the plaintiffs cannot supplement Form U4's liability provision with a
nonexistent "implied term" giving them a right to recover damages for scoring errors.  The courts
"cannot, by implication, find terms in opposition to the express language that the parties
themselves have written into the contracts."  *See, e.g.*, *Dallas Power & Light Co. v. Cleghorn*,
623 S.W.2d 310, 311 (Tex. 1981).[15]  NASD agrees to receive and consider a candidate's

---

[15] *Accord Hillsman v. Sutter Cmty. Hosps.*, 200 Cal. Rptr. 605, 612 (Cal. Ct. App. 1984); *Sol K.
Graff & Sons v. Leopold*, 416 N.E.2d 275, 277 (Ill. App. Ct. 1981); *Marine Midland Bank v.
Yoruk*, 662 N.Y.S.2d 957, 959 (App. Div. 1997); *City of Cincinnati v. Cincinnati Reds*, 483

[Footnote continued on next page]

application.  *See* Exh. 2, at 13 (applicants submit to the jurisdiction of the SROs "in consideration of the jurisdictions and SROs receiving and considering my application").  The Exchange Act and NASD's own rules, not some implied contract, establish the structure and substance of that consideration, and as discussed above, there is no private right of action for damages arising from NASD's discharge of those responsibilities.

Any argument that NASD's contractual duty, such as it is, encompasses a duty to administer the Series 7 flawlessly is foreclosed by the liability provision contained in the very next paragraph.  On its face, this term covers all aspects of the registration system, including the scoring and reporting of the Series 7 examination, and provides that "neither the SROs nor the jurisdictions . . . shall be liable for actions taken in an official capacity."  The term contains no limitations or exceptions, nor are there any such limitations elsewhere in the contract.  Its meaning is clear and unambiguous:  NASD is not to be liable to any candidate for actions taken during the course of considering that candidate's application for registration.  To hold that the NASD in fact intended to assume a duty to score the Series 7 flawlessly, and afford candidates a contractual remedy for any breach of this duty, would plainly contradict the express terms of the exculpatory clause.

> **2.    Plaintiffs Fail To State A Claim For Negligent Misrepresentation, Because They Cannot State That They Detrimentally Relied On Any Representation By NASD**

The plaintiffs' action for negligent misrepresentation (Consol. Compl. ¶¶ 58-61) fails for one very simple reason:  they have alleged no facts sufficient to demonstrate that they *themselves* relied upon NASD's erroneous score report to their detriment.  The gravamen of the negligent

---

[Footnote continued from previous page]
   N.E.2d 1181, 1184 (Ohio Ct. App. 1984); *Reading Terminal Merchants Ass'n v. Samuel Rappaport Assocs.*, 456 A.2d 552, 557 (Pa. Super. Ct. 1983).

misrepresentation claim is that sponsoring firms took adverse actions against the plaintiffs upon hearing, from the plaintiffs themselves, of their failing Series 7 scores. Yet an essential element of negligent misrepresentation is that the *plaintiff* relied to his detriment upon the misrepresentation in question. The plaintiffs' allegations do not meet this burden, because no plaintiff needed to inform his employer of his score at all; that is done directly by NASD. Nor may the plaintiffs use the employers' reliance on the score reports to state a claim. Because the plaintiffs can point to no meaningful actions they themselves took in response to NASD's alleged misrepresentations, their claims of negligent misrepresentation must be dismissed.

> **a.    The Plaintiffs' Allegations That They Relied On Statements By NASD Completely Fail To Make Any Credible Showing Of Detriment**

The plaintiffs suggest that they relied upon NASD's erroneous score reports "when informing their employers or exam sponsors that they had failed the exam." Consol. Compl. ¶ 60. But this bare allegation is insufficient. Under NASD rules, NASD is required to report *every score* to the candidate's employer. NASD Rule 1070(c). The plaintiffs knew as much from signing Form U4, in which they specifically requested that NASD send their scores directly to their sponsoring firms. Exh. 2, at 14. Indeed, the plaintiffs themselves allege that NASD informed their employers of their failing scores. Consol. Compl. ¶ 59 ("Defendants recklessly or negligently misrepresented to Plaintiffs and Class Members, and their employers that they had failed the Series 7 exam."). Accordingly, their own theory of the case demonstrates that even if they did repeat the scores to their employers, that repetition was altogether irrelevant to the damages that they allege.

The tort of negligent misrepresentation is intended to compensate a plaintiff who actually relies on a statement that is made without reasonable care and is materially false. Although the formulations of the tort vary somewhat, a key common element is reliance by the plaintiff on the

defendant's statement.  *See, e.g., Burlington Ins. Co. v. Okie Dokie, Inc.*, 329 F. Supp. 2d 45, 48

(D.D.C. 2004).[16]  To be actionable, a negligent misrepresentation must be a "substantial factor in

determining the course of conduct" of the plaintiff who relies on it.  *Restatement (Second) of*

*Torts* § 546 (1977).  It is axiomatic that the alleged misrepresentation must "induce reliance,"

that is, it must be both believed and acted upon.  *See AMPAT/Midwest, Inc. v. Ill. Tool Works*

*Inc.*, 896 F.2d 1035, 1041 (7th Cir. 1990) (Posner, J.).  Moreover, the representation must be "an

immediate cause of [a plaintiff's] conduct," and the plaintiff must show that, absent such

representation, he "would not, in all reasonable probability, have entered into the contract or

other transaction" that is the basis of his claim for reliance.  *Whiteley v. Philip Morris, Inc.*, 11

Cal. Rptr. 3d 807, 842-42 (Ct. App. 2004) (discussing Restatement § 546 standard); *see also,*

*e.g.*, *Slaymaker v. Westgate State Bank*, 739 P.2d 444, 450 (Kan. 1987) (representations must be

"part of the moving cause, and, absent those misrepresentations, plaintiff would not have acted to

his detriment").

　　　Here, the plaintiffs cannot show that NASD's erroneous score reports substantially

motivated them to inform their employers of their failure.  Indeed, the only reasonable reading of

---

[16]  *Accord, e.g.*, *Mirkin v. Wasserman,* 858 P.2d 568, 570 (Cal. 1993) (plaintiff "must plead that he or she actually relied on the misrepresentation"); *Hall v. Ford Enters.*, 445 A.2d 610, 612 (D.C. 1982); *Hicks v. Sumter Bank & Trust Co.*, 604 S.E.2d 594, 596-97 (Ga. Ct. App. 2004); *Bd. of Educ. v. A, C, & S, Inc.*, 546 N.E.2d 580, 591 (Ill. 1989); *Law v. Int'l Union of Operating Eng'rs Local No. 37*, 818 A.2d 1136, 1145 (Md. 2003) (requiring proof that "the Plaintiff, justifiably, t[ook] action in reliance on the statement"); *Law Offices of Lawrence J. Stockler, PC v. Rose*, 436 N.W.2d 70, 79 (Mich. Ct. App. 1989) (requiring "proof that a party justifiably relied to his detriment"); *Kaufman v. I-Stat Corp.*, 754 A.2d 1188, 1196 (N.J. 2000) (plaintiffs must allege receipt of statement and "that they relied on the . . . misstatements therein" (internal quotation marks omitted)); *Williams v. State*, 456 N.Y.S.2d 491, 493 (App. Div. 1982) (necessary element is "that claimant has relied upon information given to him to his detriment"); *Bilt-Rite Contrs., Inc. v. The Architectural Studio*, 866 A.2d 270, 277 (Pa. 2005).

the facts alleged is that any decision to "self-report" was wholly irrelevant to whether employers were notified of the plaintiffs' Series 7 scores. Because those scores were reported to their employers irrespective of the plaintiffs' own actions; because the plaintiffs were informed when they registered for the exam that their scores would be reported; and because it is inconceivable that the plaintiffs "would not, in all reasonable probability," have reported *passing* scores, the plaintiffs cannot establish the reliance element. *See, e.g.*, *Wilkins v. Nat'l Broad. Co., Inc.*, 84 Cal. Rptr. 2d 329, 338 (Ct. App. 1999) (holding that the plaintiffs failed to show reliance, because they would have had proceeded with an interview with undercover reporters even had they known the reporters' true identity).

More fundamentally, even if the plaintiffs could plausibly state that their self-reporting of their scores was meaningful "reliance" on false information from NASD, they could not show that the reliance was *detrimental*. Negligent misrepresentation, like all torts, requires the plaintiff to demonstrate proximate causation. *See, e.g.,* W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 41, at 263 (5th ed. 1984) (noting that causation is "[a]n essential element of the plaintiff's cause of action for negligence, or for that matter any other tort"). An act or omission "is not regarded as a cause of an event if the particular event would have occurred without it." *Id.*; *see, e.g.*, *Elsroth v. Johnson*, 700 F. Supp. 151, 166 (S.D.N.Y. 1988) (courts are "particularly mindful of Professor Prosser's observation").[17]

The plaintiffs' theory here is patently inconsistent with these principles. The ultimate harm that the plaintiffs allege—adverse action taken by their employers in response to their

---

[17] *Accord Paisley v. Waterford Roof Truss, Ltd.*, 968 F. Supp. 1189, 1196 (E.D. Mich. 1997); *Mitchell v. Gonzales*, 819 P.2d 872, 878 (Cal. 1991); *Thacker v. UNR Indus.*, 603 N.E.2d 449, 455 (Ill. 1992); *Williams v. Steves Indus., Inc.*, 699 S.W.2d 570, 575 (Tex. 1985).

failing grades on the Series 7—was not caused by the plaintiffs' alleged reliance on NASD's representation. As stated above, the plaintiffs' employers received their scores directly from NASD. Nor do the plaintiffs allege that they suffered any greater damages, such as harsher treatment, as a result of their having disclosed their scores directly to their employers. Plaintiffs cannot connect their purported reliance on NASD's representations to the detriment they allege, and their negligent-misrepresentation claims against NASD accordingly fail.

### b. The Plaintiffs Cannot Bring A Third-Party Claim Based On Their Employers' Alleged Reliance

To the extent the plaintiffs' allegations may be read to seek recovery under a negligent misrepresentation theory for the purported reliance of their employers, such a theory is inconsistent with well-established precedent.[18] The plaintiffs may not allege reliance by entities who are not parties to this action—the securities firms for which they work or worked. The standard is crystal clear: the *plaintiff* must rely on the defendant's misrepresentation. *See, e.g., Kaufman*, 754 A.2d at 1196 (plaintiffs must allege that they received the statements and "that they relied on the statements and misstatements therein"). Plaintiffs cannot set themselves up as third-party enforcers to prosecute a cause of action that (if it exists at all) belongs to other entities that have not chosen to sue. Any such elimination of the reliance requirement would dramatically and unjustifiably expand the scope of potential liability for negligent misrepresentation. As several courts have noted, the requirement that "any claimant justifiably rely on the alleged negligent misrepresentation" serves as an important limitation on the cause of action that ensures that defendants will not be subjected to "almost unlimited liability."

---

[18] Plaintiffs do not explicitly allege reliance by their employers. Yet they do note that the employers also received the purported misrepresentations, and allege that they were damaged "[a]s a result of these misrepresentations." Consol. Compl. ¶¶ 59, 61.

*McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 793-94 (Tex. 1999). State courts accordingly have repeatedly rejected invitations to eliminate the personal-reliance element of the tort.

A few examples suffice to show that the plaintiffs cannot plead a valid negligent-misrepresentation cause of action based on the actions their employers allegedly took. *King v. Crossland Savings Bank*, 111 F.3d 251 (2d Cir. 1997), is particularly relevant. There, the plaintiffs brought an action for negligent misrepresentation under New York law against American Express after it falsely reported the theft of travelers checks and the plaintiffs were arrested for the theft. *Id.* at 253-54. In rejecting the plaintiffs' claim, the Second Circuit addressed the very issue that is dispositive here: whether a defendant, who "arguably has a duty to provide accurate information," may be liable for negligent misrepresentation where "the plaintiff did not directly rely on the defendant's misrepresentation." *Id.* at 258. The court unequivocally concluded that plaintiffs could not state a claim, observing that the New York courts "squarely instruct that providers of erroneous information . . . cannot be held liable unless each of the elements of negligent misrepresentation is met." *Id.* at 258-59 (citing *Williams*, 456 N.Y.S.2d at 493). Courts from other relevant jurisdictions have reached similar holdings. In *Schauer v. Mandarin Gems of California, Inc.*, 23 Cal. Rptr. 3d 233 (Ct. App. 2005), the court dismissed a wife's claim for fraud[19] against a jewelry appraiser because her husband was the one who had relied upon the defendant's inaccurate diamond appraisal in purchasing an engagement ring. *Id.* at 241. And in *Cahill v. Eastern Benefit Systems, Inc.*, 603 N.E.2d 788 (Ill. App. Ct. 1992), the court concluded that the plaintiff failed to state a cause of action against a medical

---

[19] By statute, negligent misrepresentation is a form of fraud or deceit under California law. *See Witkin Summary of California Law* § 819, at 1182 (10th ed. 2005).

benefits analyst whose allegedly negligent estimate of reasonable medical costs had purportedly caused the plaintiff's health insurer to deny part of the plaintiff's claim, because the insurer, not the plaintiff, was the one who relied on the estimate.  *Id.* at 792.

Thus, to the extent that the plaintiffs seek recovery for the harm caused by the reliance of third parties, *i.e.*, their employers, that theory is foreclosed by well-established limitations on the tort of negligent misrepresentation.

## V.    CONCLUSION

For the foregoing reasons, all claims against NASD should be dismissed for failure to state a claim upon which relief can be granted.

Dated:  December 15, 2006                    Respectfully submitted,

                                             By: /s/  F. Joseph Warin
                                             F. Joseph Warin, D.C. Bar No. 235978
OF COUNSEL:                                  William M. Jay, D.C. Bar No. 480185
John J. Flood, D.C. Bar No. 269837           Jennifer J. Schulp, D.C. Bar No. 497742
NATIONAL ASSOCIATION OF                      GIBSON, DUNN & CRUTCHER LLP
SECURITIES DEALERS, INC.                     1050 Connecticut Avenue, N.W.
1735 K Street, N.W.                          Washington, D.C.  20036
Washington, D.C.  20036                      Telephone: (202) 955-8500
                                             Fax: (202) 467-0539

                                             *Attorneys for Defendant*
                                             *National Association of*
                                             *Securities Dealers, Inc.*

41

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 15th day of December, 2006, I caused NASD's Motion to Dismiss,

the Memorandum of Law in Support, and accompanying Exhibits and Proposed Order to be

served on all parties required to be served by the means listed below:

> All parties whose counsel are registered with the Court's CM/ECF system were served electronically.

> The following parties were served by mailing one copy of the document by U.S. mail, first class postage prepaid, to their counsel at the addresses listed:

John Balestriere
BALESTRIERE PLLC
225 Broadway, Suite 2700
New York, NY  10007
Fax: (212) 208-2613

*Attorney for Andrew Crabbe and Linda Cutler*

William W. Graham
GRAHAM & ERVANIAN, P.C.
604 Locust Street, Suite 630
Des Moines, IA  50309
Fax: (515) 282-4235

*Attorney for Christopher Wilson*

Gerald E. Martin
BARRETT, JOHNSTON & PARSLEY
217 Second Avenue North
Nashville, TN  37201
Fax: (615) 252-3798

*Attorney for Jason Plunkett*

John G. Richards
DAVIS, BUCCO & ARDIZZI
10 East 6th Avenue, Suite 100
Conshohocken, PA  19428
Fax: (610) 238-0244

*Attorney for Mark Russo*

Joseph Tacopina
*Of Counsel*
ARTHUR L. AIDALA & ASSOCIATES, P.C.
597 Fifth Avenue
New York, NY 10017
Fax: (212) 750-8297

*Attorney for James Bruen*

<u>/s/ William M. Jay</u>

William M. Jay