**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

IN RE SERIES 7
BROKER QUALIFICATION EXAM
SCORING LITIGATION

This Document Relates To:
ALL CASES

Misc. Action No. 06-355 (JDB);
MDL Docket No. 1772

**REPLY MEMORANDUM**
**IN SUPPORT OF NASD'S MOTION TO DISMISS**

OF COUNSEL:
John J. Flood, D.C. Bar No. 269837
NATIONAL ASSOCIATION OF
SECURITIES DEALERS, INC.
1735 K Street, N.W.
Washington, D.C.  20036

F. Joseph Warin, D.C. Bar No. 235978
William M. Jay, D.C. Bar No. 480185
Jennifer J. Schulp, D.C. Bar No. 497742
John C. Snyder, D.C. Bar No. 500162
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8500

*Attorneys for Defendant*
*National Association of Securities Dealers, Inc.*

# TABLE OF CONTENTS

Page

I.   NASD Is Absolutely Immune From All Of The Plaintiffs' Claims .................................. 1

   A.   NASD's Immunity Extends To All Actions Taken Pursuant To Its
        Delegated Authority Under The Exchange Act, A Category That Plainly
        Includes Administering And Scoring Qualification Exams.................................... 1

   B.   The Plaintiffs' Claim That They Can Defeat Immunity By Alleging A
        "Ministerial" Act Is Incorrect In Every Respect...................................................... 3

        1.   Established Precedent Rejects The Plaintiffs' Proposed Test For
             SROs' Immunity ...................................................................................... 4

        2.   Even In The Inapposite Cases On Which The Plaintiffs Rely, The
             Defendants Would Be Immune................................................................. 6

        3.   Administering The Series 7 Exam Is Not A Ministerial Function.............. 8

   C.   NASD Is Not Estopped, Because NASD Has Not Made Inconsistent
        Arguments To This Court Or Any Other................................................................. 9

II.  The Plaintiffs Have No Private Right Of Action Against NASD.................................... 12

III. The Plaintiffs Expressly And Validly Waived Their Claims Against NASD ................ 13

   A.   Form U4 Is Valid Under Federal Law, Which Preempts The Plaintiffs'
        Claim Of Invalidity Under State Law..................................................................... 14

   B.   Form U4's Release Is Not Ambiguous Or Otherwise Unconscionable................ 18

IV.  The Plaintiffs Have Abandoned Their Claim Against NASD For Breach Of An
     Implied Contract ........................................................................................................ 20

V.   The Plaintiffs' Negligent-Misrepresentation Claim Fails Because The Plaintiffs
     Cannot Plead Detrimental Reliance ........................................................................... 23

VI.  Conclusion ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Bruce Terminix Cos. v. Dobson,*
   513 U.S. 265 (1995) ........................................................................................... 14

*Am. Benefits Group v. NASD,*
   No. 99 Civ. 4733 (JGK), 1999 WL 605246 (S.D.N.Y. Aug. 10, 1999) ................... 11

*Antoine v. Byers & Anderson, Inc.,*
   508 U.S. 429 (1993) ............................................................................................. 7

\* *Austern v. Chi. Bd. Options Exch.,*
   898 F.2d 882 (2d Cir. 1990) ...................................................................... 4, 5, 11

*B & B Livery, Inc. v. Riehl,*
   960 P.2d 134 (Colo. 1998) ................................................................................. 20

*Balt. & Ohio Sw. Ry. Co. v. Voight,*
   176 U.S. 498 (1900) .......................................................................................... 20

*Barbara v. N.Y. Stock Exch.,*
   99 F.3d 49 (2d Cir. 1996) ................................................................................. 10

*Barnett Bank of Marion County, N.A. v. Nelson,*
   517 U.S. 25 (1996) ........................................................................................... 18

\* *Boomer v. AT&T,*
   309 F.3d 404 (7th Cir. 2002 ) ..................................................................... 14, 18

*Briscoe v. LaHue,*
   460 U.S. 325 (1983) .......................................................................................... 11

*Cloud Corp. v. Hasbro, Inc.,*
   314 F.3d 289 (7th Cir. 2003) ............................................................................ 19

*Columbia First Bank v. Ferguson,*
   665 A.2d 650 (D.C. 1995) ................................................................................. 25

*Confederate Mem'l Ass'n, Inc. v. Hines,*
   995 F.2d 295 (D.C. Cir. 1993) .......................................................................... 21

\* *Credit Suisse First Boston Corp. v. Grunwald,*
   400 F.3d 1119 (9th Cir. 2005) .......................................................................... 17

**Table of Authorities**
**(Continued)**

Page(s)

*Curry v. Castillo (In re Castillo)*,
   297 F.3d 940 (9th Cir. 2002) ................................................................. 6, 7, 9

*D'Alessio v. N.Y. Stock Exch.*,
   258 F.3d 93 (2d Cir. 2001) ........................................................................ 12

*Del Raso v. United States*,
   244 F.3d 567 (7th Cir. 2001) ..................................................................... 20

*Desiderio v. NASD*,
   191 F.3d 198 (2d Cir. 1999) ...................................................................... 13

*Dist. of Columbia v. Cumbari Assocs, Inc.*,
   580 A.2d 1295 (D.C. 1990) ....................................................................... 22

\*   *DL Capital Group, LLC v. Nasdaq*,
   409 F.3d 93 (2d Cir. 2005) .......................................................... 3, 5, 8, 12, 25

*Firestone v. Firestone*,
   76 F.3d 1205 (D.C. Cir. 1996) ................................................................... 22

*Forrester v. White*,
   484 U.S. 219 (1988) ..................................................................................... 5

*Gilmer v. Interstate/Johnson Lane Corp.*,
   500 U.S. 20 (1991) ..................................................................................... 20

*Graman v. NASD*,
   Civ. A. No. 97-1556-JR, 1998 U.S. Dist. LEXIS 11624 (D.D.C. Apr. 27, 1998) ............. 10, 11

\*   *Harris v. Nat'l Evaluation Sys.*,
   719 F. Supp. 1081 (N.D. Ga. 1989), *aff'd mem.*, 900 F.2d 266 (11th Cir. 1990) .................... 20

*Int'l Med. Group, Inc. v. Am. Arbitration Ass'n*,
   312 F.3d 833 (7th Cir. 2002) ................................................................... 5, 11

*Loubser v. Thacker*,
   440 F.3d 439 (7th Cir. 2006) ...................................................................... 8

*MM&S Fin., Inc. v. NASD*,
   364 F.3d 908 (8th Cir. 2004) ..................................................................... 13

*NASD v. Fiero*,
   33 A.D.3d 547 (N.Y. App. Div. 2006) ......................................................... 11

iii

**Table of Authorities**
**(Continued)**

Page(s)

*New Eng. Cleaning Servs. v. Am. Arbitration Ass'n*,
    199 F.3d 542 (1st Cir. 1999) ........................................................ 5, 11

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ........................................................ 10

\* *Rodriguez v. Weprin*,
    116 F.3d 62 (2d Cir. 1997) ........................................................ 6, 7

*Sanders v. United States*,
    184 F. App'x 13 (D.C. Cir. 2006) ........................................................ 6

\* *Scher v. NASD*,
    386 F. Supp. 2d 402 (S.D.N.Y. 2005), *aff'd summarily*, No. 05-5139-cv,
    2007 U.S. App. LEXIS 4692 (2d Cir. Feb. 26, 2007) ........................................ 10, 11

\* *Sindram v. Suda*,
    986 F.2d 1459 (D.C. Cir. 1993) (per curiam) ........................................................ 6

*Sparks v. Character & Fitness Comm.*,
    859 F.2d 428 (6th Cir. 1988) ........................................................ 7

*Weinraub v. Glen Rauch Sec.*,
    419 F. Supp. 2d 507 (S.D.N.Y. 2005) ........................................................ 11

\* *Wilson v. Kelkhoff*,
    86 F.3d 1438 (7th Cir. 1996) ........................................................ 6, 8

**Constitutional Provisions**

U.S. Const. art. VI, cl. 2 ........................................................ 14

**Statutes**

15 U.S.C. § 78*o*(b)(7) ........................................................ 2

15 U.S.C. § 78*o*-3(g)(3)(B) ........................................................ 15

15 U.S.C. § 78s(b)(1) ........................................................ 16

15 U.S.C. § 78s(b)(2) ........................................................ 16

15 U.S.C. § 78s(f) ........................................................ 13

**Table of Authorities**
**(Continued)**

Page(s)

\* 15 U.S.C. § 78s(g)(1) ............................................................................ 15

15 U.S.C. § 78s(h)(1) ............................................................................ 13

15 U.S.C. § 7001(a) ............................................................................... 19

15 U.S.C. § 7006(4) ............................................................................... 19

**Federal Regulations**

\* 17 C.F.R. § 240.15b7-1 ..................................................................... 2, 15

**Rules**

Fed. R. Bankr. P. Form B1 ..................................................................... 16

Fed. R. Civ. P. 12(b)(6) .......................................................................... 14

Fed. R. Civ. P. 15(a) ............................................................................... 22

Fed. R. Civ. P. Form 1A ......................................................................... 16

**Federal Regulatory Materials**

Adoption of Form U-3, Exchange Act Release No. 11424,
   7 SEC Docket 2, 1975 WL 162750 (May 16, 1975) ...................... 16, 17

**NASD Rules**

NASD By-Laws art. V, § 2 ...................................................................... 15

\* NASD Rule 1013(a)(3) ........................................................................... 15

NASD Rule 1070 ....................................................................................... 2

NASD Rule 1070(d) .................................................................................. 9

NASD Rule 1080 ....................................................................................... 2

NASD Rule 1140(a) ................................................................................ 19

\* NASD Rule 1140(c) ................................................................................ 15

NASD Rule 1140(c)(1) ........................................................................... 19

**Table of Authorities**
**(Continued)**

Page(s)

**Other Authorities**

W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 41 (5th ed. 1984)..................... 24

13 Richard A. Lord, *Williston on Contracts* § 37:54 (4th ed. 2000) ........................................... 22

*Restatement (Second) of Contracts* § 310(1) (1981).................................................... 22

1 Robert D. Sack, *Sack on Defamation* § 9.2.2 (3d ed. Supp. 2006)........................................... 25

**REPLY MEMORANDUM IN SUPPORT OF NASD'S MOTION TO DISMISS**

Throughout their opposition brief, the plaintiffs offer little or no response to the well-established precedent, clear statutory and regulatory mandates, express contractual language, and basic common-law principles on which NASD based its motion to dismiss.  Instead the plaintiffs seek to overcome the governing law of immunity and their own release of liability by resorting repeatedly to the same specious hypothetical—that they must prevail, or otherwise some unfortunate motorist might one day be denied recovery for a fender-bender with an NASD employee's company car.  But that one-car parade of horribles is unavailing.  NASD's quasi-governmental regulatory functions are not peripheral to this case or to the plaintiffs' claims.

In fact, the plaintiffs' claims squarely implicate one of NASD's most important regulatory functions, *i.e.*, the administration of qualifications examinations as part of registering competent brokers.  NASD's conduct of that function is policed, on a unified, nationwide basis, by the Securities and Exchange Commission—not by private plaintiffs applying dozens of divergent state-law standards of care.  The plaintiffs therefore are barred by federal law from using state tort principles to second-guess the SEC.  And they are equally barred by the plain, express terms of a release that each and every one of them signed from suing over an action NASD undertook "in official capacity," which plainly includes registration and testing.  For these and other reasons, the claims against NASD should be dismissed.

**I.    NASD Is Absolutely Immune From All Of The Plaintiffs' Claims**

**A.    NASD's Immunity Extends To All Actions Taken Pursuant To Its Delegated Authority Under The Exchange Act, A Category That Plainly Includes Administering And Scoring Qualification Exams**

The federal courts of appeals unanimously agree that NASD is entitled to immunity for its performance of regulatory functions.  *See* Mem. of Pts. & Auth. in Supp. of NASD's Mot. to Dismiss 10 & n.5 [hereinafter "NASD Br."].  This long line of cases establishes beyond dispute

that the federal framework for cooperative self-regulation of the securities industry entitles

NASD and other self-regulatory organizations (SROs) to absolute protection against state-law

tort claims that challenge conduct undertaken in a regulatory capacity.  Indeed, after a long

digression into judicial and prosecutorial immunity, the plaintiffs grudgingly admit that NASD

and other SROs are entitled to immunity for *regulatory* actions.  Pls.' Mem. of Law in Opp. to

Defs.' Mots. to Dismiss 12 [hereinafter "Pls.' Br."] ("The plaintiffs acknowledge the line of

cases . . . that purportedly support the general proposition that the NASD is immune from lawsuit

when the NASD is performing regulatory functions that have been delegated to it by the SEC.").

The only question, then, is whether administering the Series 7 examination meets that

standard.  Plainly it does:  the administration of examinations is a regulatory function that has

been expressly delegated to NASD by the SEC.  *See* NASD Br. 4-5, 12-13.  The Securities

Exchange Act of 1934 ("Exchange Act") closely regulates who may work in the securities

industry.  Congress has required that anyone transacting securities business satisfy "standards of

. . . competence," including "tests," which are to be administered either by the SEC itself *or*, if

the SEC chooses, in "cooperat[ion] with registered securities associations," *i.e.*, NASD.  15

U.S.C. § 78*o*(b)(7).  The SEC has indeed chosen to cooperate with NASD in examining the

competence of would-be stockbrokers, and SEC regulations require anyone working for an

NASD member and transacting business in securities to "pass[] any required examinations . . .

established by [NASD] rules."  17 C.F.R. § 240.15b7-1.  And the SEC has specifically approved

NASD's rules governing the conduct of those examinations.  *See, e.g.*, NASD Rules 1070, 1080.

Again, the plaintiffs do not offer any reason why NASD's administration of qualification

examinations should not be considered a regulatory function—a critically important one.

Rather, the plaintiffs attempt to obscure the well-accepted standard for determining which NASD functions are entitled to immunity. They do not acknowledge the square holdings of the Second Circuit, the Ninth Circuit, and many other courts that the test for regulatory immunity is whether NASD's actions were pursuant to its quasi-governmental regulatory authority:

> [A] self-regulatory organization when acting in its capacity as a SRO, is entitled to immunity from suit *when it engages in conduct consistent with the quasi-governmental powers delegated to it* pursuant to the Exchange Act and the regulations and rules promulgated thereunder."
>
> . . . .
>
> [W]e have made clear that it is the SRO's *function* as a quasi-governmental authority that entitles it to absolute immunity. Because Nasdaq here engaged in conduct consistent with the quasi-governmental powers delegated to it by the NASD pursuant to the Exchange Act and the regulations and rules promulgated thereunder, Nasdaq and its officers are entitled to absolute immunity from plaintiff's suit . . . .

*DL Capital Group, LLC v. Nasdaq*, 409 F.3d 93, 97-99 (2d Cir. 2005) (first emphasis added; internal quotation marks and citations omitted); *accord Sparta Surgical Corp. v. NASD*, 159 F.3d 1209, 1214 (9th Cir. 1998).

Measuring the plaintiffs' allegations against this accepted standard, it is clear that NASD is entitled to absolute immunity. NASD administers and grades qualification examinations pursuant to authority expressly delegated by the SEC, as an integral part of the process of registering securities representatives. No federal court has endorsed reasoning that would allow the plaintiffs to defeat the immunity of this quintessentially regulatory function by focusing exclusively on a single act within NASD's regulatory powers, and the plaintiffs cite none.

### B. The Plaintiffs' Claim That They Can Defeat Immunity By Alleging A "Ministerial" Act Is Incorrect In Every Respect

The plaintiffs rely entirely on the notion that this Court should break new ground and hold that NASD's regulatory immunity does not extend to regulatory functions that can be characterized as "ministerial" duties. Not only is the purported distinction between "ministerial"

3

and "discretionary" functions inconsistent with the accepted standard, described above, it is ripped from another context and has no application to SROs' regulatory immunity.  Indeed, even in the public-employee context from which the plaintiffs seek to borrow the distinction, none of the officials to whom they compare NASD would be liable for inadvertent errors of the sort they allege.  And the distinction is irrelevant in any event, because the NASD functions at issue here are not ministerial.

## 1. Established Precedent Rejects The Plaintiffs' Proposed Test For SROs' Immunity

The plaintiffs cannot cite a single case actually applying the supposed "ministerial"/"discretionary" distinction to an SRO or similar private entity.  In all of the cases they cite, the SRO was held to be immune.  And as the previous section demonstrates, that immunity was extended based on whether or not the SRO was acting within the scope of duties delegated by the SEC, *not* based on any "ministerial"/"discretionary" distinction.  The plaintiffs are attempting to string together scraps of dicta and to call the result a new doctrine.

In fact, as NASD explained in its opening brief (Br. 20), federal courts have *rejected* attempts to deprive SROs and other *private* actors of immunity based on a flawed analogy to public officials' "ministerial" and "discretionary" acts.  For example, the Second Circuit considered and rejected a request to extend the distinction drawn in the *Forrester* case on which the plaintiffs rely heavily, Pls.' Br. 8-10, to an action against an SRO that provides an arbitration forum.  *Austern v. Chi. Bd. Options Exch.*, 898 F.2d 882, 886 (2d Cir. 1990).  The plaintiff asserted that the SRO was not immune from claims based on "ministerial" acts, such as scheduling.  The court rejected that notion:  "[S]emantically categorizing the challenged acts as 'ministerial' or administrative, as opposed to 'discretionary,' in large part misses the mark, since the scope of arbitral immunity is 'defined by the *functions* it protects and serves.'"  *Id.* at 886

4

(quoting *Forrester v. White*, 484 U.S. 219, 227 (1988)).  Rather, the sponsor of the arbitral forum

was "entitled to immunity for *all functions that are integrally related to the arbitral process*,"

including the supposedly "ministerial" functions the plaintiff challenged.  *Id.* (emphasis added).

Cases following *Austern* have taken a similar line.  The First Circuit has held that an

arbitrator's immunity extends even to "administrative" tasks such as billing, "insofar as these are

integrally related to the arbitration."  *New Eng. Cleaning Servs. v. Am. Arbitration Ass'n*, 199

F.3d 542, 545 (1st Cir. 1999).  And the Seventh Circuit likewise has applied arbitral immunity to

an arbitration provider's alleged "administrative mistake" in "docket[ing] a properly filed

demand for arbitration."  *Int'l Med. Group, Inc. v. Am. Arbitration Ass'n*, 312 F.3d 833, 844-45

(7th Cir. 2002); *see id.* at 843 (citing *New England Cleaning* for the proposition that an

"arbitration provider's immunity extends to all administrative tasks it performs").  NASD's

opening brief explained these points and cited *Austern* in support; the plaintiffs offer absolutely

no response, do not discuss *Austern* or its progeny, and cannot find a single case in which SROs'

immunity has turned on this false distinction.  As in *Austern*, the plaintiffs' argument "misses the

mark."  898 F.2d at 886.

The *Austern* line of cases is of a piece with the established law on SROs' regulatory

immunity.  *See supra* Section I.A.  An SRO's immunity is determined by reference to the

function the SRO is performing and whether that function is performed pursuant to authority

delegated by the SEC.  Here, qualification examinations indubitably are an integral part of the

registration process that NASD performs pursuant to SEC mandate.  More generally, it would be

truly surprising if Congress and the SEC had erected a framework that gave NASD immunity

from claims of outright fraud or bad faith, *see DL Capital*, 409 F.3d at 98-99; *Sparta*, 159 F.3d at

1215, but left it liable for claims based on inadvertent, good-faith mistakes.

### 2.    Even In The Inapposite Cases On Which The Plaintiffs Rely, The Defendants Would Be Immune

Even if the cases the plaintiffs cite from outside the SRO context were an appropriate source of guidance, they would not support their contention that immunity does not attach to "ministerial" acts by public officials such as judges. Rather, public officials' "conduct deserving of protection [by absolute immunity] includes not only actual decisions, but also those mundane, even mechanical, tasks undertaken by judges that are related to the judicial process: The fact that the activity is routine or requires no adjudicatory skill renders that activity no less a judicial function." *Wilson v. Kelkhoff*, 86 F.3d 1438, 1444-45 (7th Cir. 1996) (internal quotation marks and alteration omitted). Thus, the D.C. Circuit has extended absolute immunity to court clerks, even when they perform ministerial functions:

> [W]hether an act is judicial in character does not depend on whether it is discretionary. Rather, immunity applies to all acts of auxiliary court personnel that are basic and integral parts of the judicial function, unless those acts are done in the clear absence of all jurisdiction.

*Sindram v. Suda*, 986 F.2d 1459, 1461 (D.C. Cir. 1993) (per curiam) (internal quotation marks omitted); *see* NASD Br. 20. *Sindram* is still a leading case in this and other circuits. *See, e.g.*, *Sanders v. United States*, 184 F. App'x 13, 14 (D.C. Cir. 2006); *Rodriguez v. Weprin*, 116 F.3d 62, 67 (2d Cir. 1997) ("Rodriguez's attempt to characterize the clerks' scheduling duties as 'ministerial' is not dispositive." (citing *Sindram*, 986 F.2d at 1461)); *see also Curry v. Castillo (In re Castillo)*, 297 F.3d 940, 952 (9th Cir. 2002) ("[W]e have extended absolute quasi-judicial immunity . . . to court clerks and other non-judicial officers for purely administrative acts—acts

6

which taken out of context would appear ministerial, but when viewed in context are actually a part of the judicial function.").[1]

Scoring Series 7 examinations is an integral part of NASD's regulatory function of determining that an individual is both intellectually qualified and morally fit to enter the securities industry. *Cf. Sparks v. Character & Fitness Comm.*, 859 F.2d 428, 434 (6th Cir. 1988). The regulatory immunity that protects NASD's exercise of that responsibility extends to all activities within the scope of the registration function, including the administration and grading of examinations. *See supra* Section I.A.

Moreover, even lower-level officials who have *only* administrative or ministerial responsibilities would be entitled to immunity from claims like the plaintiffs' under the very cases they cite. When a public official is the defendant, there are *two* levels of immunity— absolute immunity and qualified immunity. Some of the decisions the plaintiffs cite have held that public officials—for example, a court reporter—should receive *qualified* immunity rather than *absolute* immunity from lawsuits over their performance of ministerial duties. But the officials always are entitled to *some* form of immunity. Thus, the plaintiffs are altogether incorrect to suggest that they are free to bring negligence claims so long as they are based on "ministerial" acts, because their allegations of simple negligence could not defeat even qualified immunity. Their key example is the court reporter, *see* Pls.' Br. 10-11, but as the Seventh Circuit recently clarified, "Not that court reporters are liable in a section 1983 case for innocent errors,

---

[1] Nothing in *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429 (1993), the inapposite case on which the plaintiffs rely, changes that analysis. *See, e.g.*, *Curry*, 297 F.3d at 952 (extending absolute immunity to allegedly ministerial acts); *Rodriguez*, 116 F.3d at 67 (same).

even if negligent. Section 1983 claims cannot be founded on negligence." *Loubser v. Thacker*, 440 F.3d 439, 442 (7th Cir. 2006).

### 3.    Administering The Series 7 Exam Is Not A Ministerial Function

The plaintiffs' assertion that they are suing over merely "ministerial" functions is belied by both their complaint and their brief. Their claims challenge NASD's choice of software and technology provider; its supposed "failure to perform any supervision of EDS"; the "design" of its software; the adequacy of the "quality-control mechanism[s]" that NASD used or directed EDS to use; and the reporting of scores. Pls.' Br. 6; Consol. Compl. ¶¶ 56, 59. These are hardly ministerial functions. As the Second Circuit has held, the reporting of regulatory decisions is entitled to immunity because reporting "is as much a part of [NASD's] regulatory duties as is the actual [decision]." *DL Capital*, 409 F.3d at 98 (internal quotation marks omitted). Nor is the supervision and execution of a multimillion-dollar technology contract a task for automatons.

Indeed, it makes little sense to contend that a negligence claim against an *organization* challenges only a "ministerial" act with no component of discretion. Negligence turns on the standard of care, including precautions and policies in place to prevent errors. Implementing those precautions and safeguards necessarily involves an element of discretion.[2] Accepting the plaintiffs' argument would require NASD to conduct its regulatory functions, including the design of examinations, based on compliance with a hodgepodge of state duty-of-care regulations. As the court explained in *Sparta*, the very purpose of absolute immunity is to avoid

---

[2] The plaintiffs may contend that following the standard of care is ministerial, but even if that were true—which it is not, *cf. Wilson*, 86 F.3d at 1444 (rejecting the argument that officials necessarily perform a "ministerial" function if "the law was clear [but] the [officials] simply failed to follow it")—it would beg the question whether states may impose their own varying standards of due care on NASD's regulatory functions *at all*. *See infra* Section II.

just such a result, and to ensure that the securities industry is regulated according to a nationally uniform standard. *See* 159 F.3d at 1215.

Finally, grading qualification exams cannot be severed from the regulatory function of which it is a part—ensuring that only qualified and reliable personnel are registered and authorized to transact securities business. *Cf. Curry*, 297 F.3d at 952 (extending absolute immunity to "acts which taken out of context would appear ministerial, but when viewed in context are actually a part of the judicial function"). And even if it were appropriate to focus narrowly on programming or operating the testing and grading software, that component of registration has a discretionary aspect as well. First, allowing claims like the plaintiffs' to go forward would profoundly affect the design of examinations: the plaintiffs admit that NASD would be immune for grading an *essay* examination, but contend that a *multiple-choice* examination is different. *See* Pls.' Br. 11. Second, the Series 7 and similar examinations are one important way in which NASD verifies the credentials of applicants for registration, but they are not the only way. NASD has discretion to determine that an individual is qualified even if he or she has not passed—or cannot pass—a required examination. *See* NASD Rule 1070(d). Thus, even a denial of registration based purely on qualifications includes a component of independent judgment, which NASD makes pursuant to delegated authority; NASD therefore is entitled to immunity.

### C.     NASD Is Not Estopped, Because NASD Has Not Made Inconsistent Arguments To This Court Or Any Other

The doctrine of regulatory immunity, and the immunity of SROs more generally, is well established and enjoys the unanimous endorsement of the courts of appeals. Equally well established is the point—one of the few on which the plaintiffs and NASD agree—that SROs are not considered part of the government for purposes of the "state action" doctrine. *See, e.g.,*

*Graman v. NASD*, Civ. A. No. 97-1556-JR, 1998 U.S. Dist. LEXIS 11624, at *9 (D.D.C. Apr.

27, 1998) (collecting cases). The plaintiffs attempt to argue that the two doctrines are mutually

exclusive—that NASD cannot possibly enjoy immunity if it is not part of the federal

government. That notion is nonsense, and so is the suggestion that NASD would somehow work

a fraud on this Court by invoking its immunity. As for the plaintiffs' unsupported assertions that

NASD is claiming in this litigation to be "a governmental actor," Pls.' Br. 20, 21, 22, 23, NASD

has never made any such claim. *See, e.g.*, NASD Br. 9-10 (explaining that the SEC has

expressly chosen to have qualifications examinations administered by SROs instead of by a

government agency). SROs and other *private* actors can and do exercise immunity.

Plainly there can be no judicial estoppel if NASD has not previously prevailed on an

argument that is "clearly inconsistent" with its assertion of regulatory immunity. *See New

Hampshire v. Maine*, 532 U.S. 742, 750 (2001). The plaintiffs state that in *Graman*, NASD

argued and this Court agreed that NASD is not a state actor, and they complain that this

argument is "inconsistent" with the invocation of absolute immunity in this litigation. Pls.' Br.

22. But "it is by no means 'inconsistent' to find that, on the one hand, the NASD exercises

insufficient state action to trigger constitutional protections in a case such as this, while

nevertheless holding that the NASD is entitled to absolute immunity in the exercise of its quasi-

public regulatory duties." *Scher v. NASD*, 386 F. Supp. 2d 402, 408 (S.D.N.Y. 2005), *aff'd

summarily*, No. 05-5139-cv, 2007 U.S. App. LEXIS 4692 (2d Cir. Feb. 26, 2007).

Indeed, court after court has recognized that NASD and other SROs are not state actors,

but that because they exercise *quasi*-governmental functions under the close supervision of the

SEC, they are not subject to private damages actions. *See, e.g., Barbara v. N.Y. Stock Exch.*, 99

F.3d 49, 58 (2d Cir. 1996) ("Although the [SRO] is a *private*, rather than a governmental entity,

immunity doctrines protect private actors when they perform important governmental functions" (emphasis added)); *Scher*, 386 F. Supp. 2d at 408 (dismissing constitutional claims because NASD is not a state actor and dismissing damages claims based on NASD's absolute immunity); *Am. Benefits Group v. NASD*, No. 99 Civ. 4733 (JGK), 1999 WL 605246, at *8 (S.D.N.Y. Aug. 10, 1999) (same); *NASD v. Fiero*, 33 A.D.3d 547, 548 (N.Y. App. Div. 2006) (same).  These courts have squarely rejected arguments identical to the plaintiffs'—right down to the lizard simile.  *Compare* Pls.' Br. 23 (likening NASD to a "chameleon"), *with, e.g.*, *Weinraub v. Glen Rauch Sec.*, 419 F. Supp. 2d 507, 517 n.55 (S.D.N.Y. 2005) (rejecting plaintiff's argument that NASD "'turns like a chameleon'" and "'can't have it both ways,'" and imposing Rule 11 sanctions), *appeal dismissed*, 180 F. App'x 233, 235 (2d Cir. 2006).

Indeed, even outside the regulatory context, nongovernmental actors can exercise absolute immunity.  Arbitrators are one common example.  *See, e.g.*, *Int'l Med. Group*, 312 F.3d at 843-44; *New Eng. Cleaning*, 199 F.3d at 545; *Austern*, 898 F.2d at 886.  Witnesses are another.  *See Briscoe v. LaHue*, 460 U.S. 325, 329-30, 334 (1983) (explaining that although witnesses are not state actors, they are absolutely immune from suit over their testimony).

Thus, there is absolutely no merit to the plaintiffs' argument that NASD cannot claim immunity because it has previously shown that it is not a state actor.  Numerous decisions have concluded *both* that NASD is not a state actor and that it is immune from private lawsuits challenging its regulatory actions.  That Judge Robertson agreed with the former line of cases in *Graman* does not in any way suggest that this Court should reject the latter.

\* \* \*

Accepting the plaintiffs' argument would cripple the doctrine of regulatory immunity. No regulatory action or decision would be safe, for underlying virtually every step that an SRO

11

takes is some action that the plaintiffs could characterize as "ministerial."  For example, reporting an exchange's regulatory actions or providing information requested by federal authorities could easily be characterized as a ministerial function, yet NASD has been held immune for such actions.  *See DL Capital*, 409 F.3d at 98; *D'Alessio v. N.Y. Stock Exch.*, 258 F.3d 93, 106 (2d Cir. 2001).  Registration and testing are entitled to the same immunity.

Furthermore, this Court should reject the suggestion that absolute immunity is overcome by the mere invocation of the word "ministerial."  SROs' absolute immunity cannot be reduced to a mere pleading threshold, or else SROs' important "quasi-governmental functions would be unduly hampered by disruptive and recriminatory lawsuits."  *DL Capital*, 409 F.3d at 99.  This Court should dismiss the claims against NASD in accordance with the established principle that "absolute immunity must be absolute."  *Id.* at 95.

## II.    The Plaintiffs Have No Private Right Of Action Against NASD

The plaintiffs' assertion that they may maintain a private right of action against NASD, notwithstanding the settled rule that there is no private cause of action against an SRO for violation of its own rules, is belied by two key facts:

*First,* the plaintiffs contend that their claims have nothing to do with NASD's duties under its own rules or the Exchange Act.  But the complaint specifically charges NASD with failure to score the examination properly and to report the correct scores.  Consol. Compl. ¶¶ 46, 56(b), 59.  The source of those purported duties can only be NASD's rules and the SEC regulations they implement, which authorize NASD to administer required examinations and direct it to report the candidates' scores to their employers.  Thus, the plaintiffs' claims are plainly entangled with NASD's regulatory role and arise under the governing federal framework, which denies them a private right of action.

*Second*, the plaintiffs' assertion (Consol. Compl. ¶¶ 55, 56(d)) that NASD's performance of its regulatory responsibilities in the area of qualifications testing and registration is governed by state-law duties of due care, not by any federal law, is belied by the SEC's role in reviewing NASD's membership and registration determinations.  *See generally* NASD Br. 5-6 (describing the process by which denials of registration are appealed within NASD, then to the SEC, then to the federal courts of appeals).  The plaintiffs cannot seriously contend that the SEC, considering the appeal of an unhappy applicant who was denied registration based on a failing test score, would determine whether to grant relief based on state law.  "A rule permitting recovery under such a theory would allow states to define by common law the regulatory duties of a self-regulatory organization, a result which cannot co-exist with the Congressional scheme of delegated regulatory authority under the Exchange Act."  *Sparta*, 159 F.3d at 1215.  Rather, federal law creates the duty, and the SEC enforces it—not private plaintiffs.  *See* 15 U.S.C. § 78s(f) (in registration proceedings, SROs must apply their rules "in a manner, consistent with the purposes of [the Exchange Act]"); *id.* § 78s(h)(1) (giving the SEC power to discipline SROs for failure to perform their duties correctly).

Thus, merely pleading under state law does not allow the plaintiffs to circumvent the congressional decision to leave in the hands of the SEC the enforcement of NASD's obligations under the Exchange Act and its own rules.  As both the Second and the Eighth Circuit have recognized, allowing the plaintiffs to pursue a state-law damages action would expressly conflict with the federal framework, which allows none.  *MM&S Fin., Inc. v. NASD*, 364 F.3d 908, 911-12 (8th Cir. 2004); *Desiderio v. NASD*, 191 F.3d 198, 208 (2d Cir. 1999).

## III.    The Plaintiffs Expressly And Validly Waived Their Claims Against NASD

Every person who applies for registration and enrolls to take the Series 7 examination agrees "that neither [NASD] nor any person acting on [its] behalf shall be liable to me for action

taken or omitted to be taken in official capacity or in the scope of employment." This plain language is more than sufficient to dismiss this entire action pursuant to Rule 12(b)(6).[3] The plaintiffs' attempt to escape the consequences of this release essentially reduces to an argument that *state* law excuses them from signing a legal document that, under four different sources of *federal* law, is both valid and mandatory. The Supremacy Clause is a sufficient answer. And the plaintiffs' suggestion that the release might be too ambiguous to be enforceable is altogether meritless.

### A.    Form U4 Is Valid Under Federal Law, Which Preempts The Plaintiffs' Claim Of Invalidity Under State Law

State law cannot invalidate federal law. U.S. Const. art. VI, cl. 2. The state-law doctrine of unconscionability is no exception; unconscionability arguments must yield when federal law requires that a contractual provision remain enforceable. *See Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 269, 281 (1995) (holding that federal law precluded courts from refusing to enforce arbitration clauses as unconscionable); *see also, e.g.*, *Boomer v. AT&T*, 309 F.3d 404, 417-23 (7th Cir. 2002) (holding that federal law precluded courts from refusing to enforce certain contractual provisions as unconscionable, because Congress intended that the contracts be interpreted uniformly throughout the United States). Because the SEC has specifically approved Form U4 under the Exchange Act's rulemaking process, and because the congressionally created framework for regulating the securities industry requires that all applicants submit the same form, the plaintiffs cannot use state law to blue-pencil the release provision out of Form U4.

---

[3] The plaintiffs do not dispute that this issue is appropriate for resolution on a motion to dismiss. *See* NASD Br. 25 n.11.

Although NASD explained in some detail (Br. 30-32) that federal law guarantees Form U4's validity and enforceability, notwithstanding any state's law, the plaintiffs offer virtually no response. The sole defense they advance is that "[t]he Form U4 is not a statute, regulation, SEC rule or NASD rule—it is an application form." Pls.' Br. 34. That tautological statement is wrong for several reasons.

First, *four* separate sources of federal law—the Exchange Act; SEC regulations; NASD's by-laws and rules; and Form U4 itself—preempt any effort by the plaintiffs to repudiate a key part of the agreement they signed. The plaintiffs concede that the first three sources of federal law—federal "statute, regulation, SEC rule [and] NASD rule"—are binding, and offer no response to the fact that Form U4's role in the registration process is guaranteed by each:

- Congress has specified by statute that anyone who seeks to transact securities business with the public for an NASD member firm must register with NASD and has expressly authorized NASD to promulgate "procedures" that applicants must follow. 15 U.S.C. § 78*o*-3(g)(3)(B).

- The SEC has prescribed by rule that applicants for registration with NASD must meet all the requirements established by NASD rules, "including but not limited to *submitting and maintaining all required forms*." 17 C.F.R. § 240.15b7-1 (emphasis added).

- NASD has specified Form U4 as a requirement for registration by individuals. *See* NASD By-Laws art. V, § 2; NASD Rules 1013(a)(3), 1140(c). Form U4 itself is promulgated according to the SRO rulemaking process and approved by the SEC. *See* NASD Br. 30 (citing the SEC's orders approving the initial version, subsequent modifications, and the current version).

Had the plaintiffs submitted a Form U4 with the supposedly unconscionable provision deleted, NASD would have been required by its rules (and by 15 U.S.C. § 78s(g)(1), which requires NASD to follow its own rules) to reject their applications, and the plaintiffs could have not sat for the exam. Accordingly, the plaintiffs cannot use state law to excuse themselves from the consequences of their signatures *after* taking the exam by retroactively excising the release provision from Form U4. The plaintiffs want to strike an entirely different deal than the one they

15

all signed; in effect, they want to apply for registration and examination using a different application form *without* a release.  But federal law—the Exchange Act, SEC regulations, and NASD rules—specifies that applicants must sign the uniform Form U4 used nationwide, not their own preferred application form.

Even if the plaintiffs could explain away these sources of federal law, Form U4 *itself* independently overrides the application of state-law unconscionability doctrines.  Form U4, including the release provision, has been specifically approved by the SEC through the Exchange Act's rulemaking process.  Before NASD can promulgate or modify any "rule," it submits the proposal to the SEC.  15 U.S.C. § 78s(b)(1).  In turn, the SEC solicits public comment and determines whether the NASD rule is "consistent with the requirements of [the Exchange Act] and the rules and regulations thereunder applicable to [NASD]."  *Id.* § 78s(b)(2).  If the rule change does not meet that standard, the SEC disapproves it and it has no effect.  *See id.* § 78s(b)(1), (2).  Form U4 was created pursuant to that rulemaking process, and the SEC itself modified several aspects of NASD's proposed format before adopting the Form.  *See* Adoption of Form U-3, Exchange Act Release No. 11424, 7 SEC Docket 2, 1975 WL 162750, at *4-*5 (May 16, 1975).  Every modification of Form U4 from that day to this has been approved by the SEC.  NASD Br. 30-31.  The plaintiffs' description of the document as a "mere form," Pls.' Br. 34, fails to acknowledge that the SEC *itself* gives Form U4 the status of an NASD rule.[4]

Establishing that Form U4 is an NASD rule is fatal to the plaintiffs' unconscionability theory, because SRO rules (including Form U4) have the status of federal law.  And as numerous

---

[4] There is nothing unusual about creating standard forms pursuant to a statutory rulemaking process; Congress has adopted several pursuant to the Rules Enabling Act, after proposal by the Judicial Conference of the United States and the Supreme Court.  *See, e.g.*, Fed. R. Bankr. P. Form B1; Fed. R. Civ. P. Form 1A.

courts have recognized, SRO rules therefore preempt conflicting state law. *E.g.*, *Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1132 (9th Cir. 2005) ("[W]e conclude that SRO rules that have been approved by the Commission pursuant to 15 U.S.C. § 78s(b)(2) preempt state law when the two are in conflict, either directly or because the state law stands as an obstacle to the accomplishment of the objectives of Congress." (footnote omitted)); *accord Sparta*, 159 F.3d at 1212. Plaintiffs accept this point—indeed, that is apparently why they try to distinguish Form U4 from other NASD rules. *See* Pls. Br. 34.

Second, invalidating part of Form U4 under the laws of different states would conflict with the federal decision to require a uniform nationwide application. The SEC's purpose in adopting a uniform application was to "alleviat[e] a substantial and particularly duplicative paperwork burden imposed on broker-dealers registered with more than one organization or state." Adoption of Form U-3, *supra*, at *2 (internal quotation marks omitted). In other words, the entire point of creating and requiring Form U4 is to ensure that every registered broker throughout the country fills out the same paperwork, provides the same information, and agrees to the same conditions. If the plaintiffs succeed in applying state law to Form U4, the document could no longer be called the "*Uniform* Application for Securities Industry Registration or Transfer," because each state would be free to invalidate various bits of it. The plaintiffs' assertions that the release provision is unconscionable because they lacked the ability "to negotiate the terms and conditions of the Form U4," Pls.' Br. 26, only show how utterly incompatible with the *uniform* federal registration process their contentions are.

State-law unconscionability doctrine therefore is preempted, as applied to Form U4, as "an obstacle to the accomplishment and execution of the [federal regulatory] purposes" of nationwide uniformity and constancy. *E.g.*, *Barnett Bank of Marion County, N.A. v. Nelson*, 517

U.S. 25, 31 (1996) (internal quotation marks omitted).  In an analogous case, the Seventh Circuit

held that the federal Communications Act prevented Illinois law from invalidating an arbitration

clause in an agreement between a long-distance carrier and its customers.  *Boomer*, 309 F.3d at

417.  The court gave three reasons:

> First, [the statute] demonstrate[s] a congressional intent that customers of
> individual long-distance carriers receive uniform terms and conditions of service;
> however, allowing a state law challenge to the CSA's arbitration clause would
> result in customers receiving different terms based on their locality.  Second, . . .
> allowing state law to invalidate this clause will affect the rates AT&T offers,
> resulting in discriminatory rate structures.  Third, [the Communications Act]
> declares unlawful rates, terms and conditions which are not just and reasonable,
> demonstrating Congress's intent that federal law govern the validity of the terms
> and conditions of long-distance service contracts.

*Id*. at 418.  Similar reasoning applies here.  As noted, the SEC expressly intended that applicants

for registration with *national* securities associations and *national* securities exchanges complete

the same form and agree to the same terms and conditions.  Moreover, allowing individual states

to invalidate a limitation of liability might well require NASD to alter the fee for test-takers in

those states.  And the Exchange Act prescribes the terms pursuant to which the SEC reviews and

approves Form U4 and other SRO rules, "demonstrating Congress's intent that federal law

govern [their] validity."  *Id.*  Thus, even if Form U4 did not itself have preemptive effect, the

state-law doctrines on which the plaintiffs rely would be impliedly preempted.

### B.     Form U4's Release Is Not Ambiguous Or Otherwise Unconscionable

Even if the plaintiffs' unconscionability argument were not foreclosed by multiple

sources of federal law, it would fail on its own terms.  The plaintiffs rely heavily on the notion

that the Form U4 release provision is too ambiguous to be enforceable.  But on any natural

reading, the release covers the administration of qualifications examinations; after all, the reason

the plaintiffs submitted Form U4 was to enroll for the examination required for registration. *See* Consol. Compl. ¶ 13.[5] And NASD administers the examination under a direct grant of authority by the SEC. *See* NASD Br. 4-5, 12-13. Plainly, therefore, NASD's scoring of the examination is "in official capacity," and the plaintiffs have released any claim based on that scoring.

The plaintiffs' strained argument that the release provision might someday be read to apply to a car accident between an applicant and an NASD employee, and therefore must today be struck down in its entirety, is wholly inapposite. The NASD functions at issue *in this case*—administering the examination and denying registration—unambiguously fall within the scope of the release provision, even if functions at issue in *some other case* might present a closer question. A contractual provision is not rendered unenforceable merely because a lawyer can dream up a hypothetical circumstance in which the terms might not apply as clearly.

Nor is the provision unconscionable merely because it appears in a standard contract or because it releases liability. The Supreme Court has already dispatched the notion that "unequal

---

[5] The plaintiffs' insinuation (Br. 27) that some or all of them might not actually have signed Form U4 and agreed to its contents is unfounded, and in any event legally irrelevant. First, although applicants *submit* Form U4 electronically, they must also sign a physical copy, which their sponsor firm retains. NASD Rule 1140(a), (c)(1). Thus, the plaintiffs' assertion that "none of the named Plaintiffs submitted a handwritten signature on their Form U4" leaves out a key detail of the registration process. In Mr. Plunkett's Form U4, a company representative specifically avers: "I have provided the *applicant* an opportunity to review the information contained herein and the *applicant* has approved this information *and signed the Form U4*." Pls.' Br. Ex. E, at 15 (final emphasis added). The plaintiffs' assertions about being bound by the actions of an "agent" therefore are no more than a red herring. Second, whether Form U4 is signed electronically or physically is not relevant to its enforceability. Federal law recognizes that "a signature, contract, or other record relating to such transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form." 15 U.S.C. § 7001(a); *see id.* § 7006(4) (defining "electronic signature"); NASD Rule 1140(a). Although a handwritten signature may be, as the plaintiffs contend, "better evidence of identity than a typed one," *Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 296 (7th Cir. 2003), identity is not in question here.

bargaining power" makes part of Form U4 unenforceable.  *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 33 (1991).  And the assertion that a pre-dispute release can *never* be valid in the context of testing is equally incorrect, as the plaintiffs' submission of Mr. Plunkett's Form U4 unintentionally shows.  Mr. Plunkett worked in Georgia and registered for the Series 7 exam there.  *See* Pls.' Br. Ex. E, at 1, 6, 8.  And waivers of negligence liability for scoring errors in professional examinations are enforceable under Georgia law.  *Harris v. Nat'l Evaluation Sys.*, 719 F. Supp. 1081 (N.D. Ga. 1989), *aff'd mem.*, 900 F.2d 266 (11th Cir. 1990).  To negate this specific showing of binding law, the plaintiffs must come up with something more than a general appeal to the notion that waivers "are disfavored."  They have not done so.[6]  And their assertion that they are denied "any remedy whatsoever" is simply incorrect:  NASD has already provided certain relief, *see* NASD Br. 7-8, and the SEC has the power to review its adequacy.

* * *

All of the plaintiffs signed a clear and unambiguous release of the claims they now seek to bring.  State unconscionability doctrine does not let them renegotiate that contract.  Form U4 therefore is a separate and sufficient ground for dismissal of all claims against NASD.

## IV.    The Plaintiffs Have Abandoned Their Claim Against NASD For Breach Of An Implied Contract

The complaint alleges in Count I that NASD breached an *implied* contractual assurance to the plaintiffs by scoring their exams incorrectly.  This count makes no reference to the

---

  [6] The plaintiffs ignore *Harris*, and Georgia law, but cite scattered cases from various other jurisdictions (which, under a choice-of-law analysis, likely are irrelevant to this litigation) for the broad proposition that exculpatory provisions are "simply unenforceable."  Pls.' Br. 31.  But several of the plaintiffs' cases actually *uphold* releases.  *See, e.g.*, *Balt. & Ohio Sw. Ry. Co. v. Voight*, 176 U.S. 498, 520 (1900) (pre-*Erie* decision applying general common law); *Del Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001) (North Carolina law); *B & B Livery, Inc. v. Riehl*, 960 P.2d 134, 137-38 (Colo. 1998).  *See generally* NASD Br. 29.

20

contract between NASD and EDS,[7] or to any other written document; rather, it states three times that it is based on an "implied" contract. Consol. Compl. ¶¶ 45-47. NASD pointed out that the plaintiffs' assertion of an implied contract was completely inconsistent with the *express* contract between NASD and the plaintiffs—Form U4—which covers the same matters as the purported implied contract and therefore bars any such theory of recovery. NASD Br. 32-35. Apparently the plaintiffs can offer no credible rejoinder, as their opposition brief makes no mention of any "implied contract" whatsoever.

Rather, the plaintiffs retreat to an entirely new theory. Their brief announces, for the very first time, that they are asserting a breach of contract claim *against NASD* as third-party beneficiaries of the technology services contract between NASD and EDS. Pls.' Br. 34. This claim, of course, makes no appearance in the complaint, which expressly distinguishes the implied-contract Claim I against NASD from the third-party beneficiary Claim II against EDS, and the allegations in the complaint do not support it. Nor did any of the 20 separate actions merged into the consolidated complaint assert such a claim against NASD. The plaintiffs cannot save their contract claim with this eleventh-hour reliance on a theory they have not pleaded.

The complaint contains no assertion that NASD breached its contract with EDS. *See* Consol. Compl. ¶¶ 52-53 (alleging that *EDS* breached). That alone is fatal to any third-party beneficiary claim against NASD. And the plaintiffs may not treat their opposition brief as an implicit amendment to the complaint, as the brief neither satisfies the rules of notice pleading nor complies with the procedural requirements for amending a complaint. *See Confederate Mem'l Ass'n, Inc. v. Hines*, 995 F.2d 295, 299 (D.C. Cir. 1993) (holding that "a bare request in an

---

[7] The complaint refers to the NASD-EDS contract only in Count II ("EDS' Breach of Contract"), which is not directed against NASD.

opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought—does not constitute a motion" to amend under Fed. R. Civ. P. 15(a) (citation omitted)).  Here, the plaintiffs have not bothered to present even a "bare request" to amend the complaint, much less any grounds.[8]

Even if the plaintiffs' brief could be construed as a proper motion for leave to amend further, amendment would be futile and the request should be denied.  Courts may deny leave to pursue futile amendments.  *E.g.*, *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996).  The plaintiffs' novel theory, which appears to assert that their purported third-party beneficiary status gives them broad rights to recover against either of the contracting parties,[9] is contrary to elementary principles of contract law.  A third-party beneficiary does not assume the rights of both promisor and promisee.  Rather, "[i]n the vast majority of cases, the third-party beneficiary's action lies *only against the promisor*."  *Dist. of Columbia v. Cumbari Assocs, Inc.*, 580 A.2d 1295 (D.C. 1990) (emphasis added) (citing *Restatement (Second) of Contracts* § 304 (1981)).  Only where the beneficiary had a previous enforceable claim against one contracting party, and the other contracting party essentially assumed this pre-existing obligation, may the beneficiary bring an action against either party.  *See* 13 Richard A. Lord, *Williston on Contracts* § 37:54, at 317 (4th ed. 2000); *Restatement (Second) of Contracts* § 310(1) (1981).  The plaintiffs have not offered any reason to think their claim might fall within this exception.[10]

---

[8]  This Court has already given the plaintiffs a second opportunity to plead and ample time in which to frame the amended complaint.  *See* Initial Scheduling Order ¶ 1 (Sept. 19, 2006).

[9]  *See* Pls.' Br. 37 (using the ambiguous "Defendant" and "Defendants" to describe the target or targets of the third-party beneficiary claim).

[10]  The only breach alleged is EDS's purported failure "to accurately and reliably develop and deliver an automated scoring function for the Series 7 exam."  Consol. Compl. ¶ 52.

[Footnote continued on next page]

Thus, permitting plaintiffs to amend the complaint to add a third-party beneficiary claim against NASD would be wholly futile.

Because the plaintiffs have completely abandoned their implied-contract claim against NASD, and have relied instead on a third-party beneficiary theory that is both procedurally improper and legally meritless, this Court should dismiss the plaintiffs' breach of contract claim against NASD without leave to amend.

**V.    The Plaintiffs' Negligent-Misrepresentation Claim Fails Because The Plaintiffs Cannot Plead Detrimental Reliance**

Two undisputed propositions of law defeat the plaintiffs' negligent-misrepresentation claim.  First, to state a claim for negligent misrepresentation, the plaintiffs must allege that they, not some third party, relied on a misrepresentation by NASD and suffered harm as a result. NASD Br. 36-37 & n.16.  Second, NASD is required by its rules and the Exchange Act to report each and every Series 7 score, passing and failing, to the candidate's employer.  NASD Br. 36. The plaintiffs do not dispute either of these legal points.  Instead, they argue that they relied on NASD's grading by telling their employers their scores, and that this reliance was detrimental because they suffered "detrimental employment consequences" when their employers learned their scores.  Pls.' Br. 40.  But this assertion entirely overlooks the thrust of NASD's point:  any decision by the plaintiffs to "inform" their employers of their scores was entirely irrelevant to the harm that allegedly resulted.  It is absolutely certain that their employers would have learned of the scores in any event. *See* NASD Rule 1070(c).  The plaintiffs, in other words, are trying to sue

---

[Footnote continued from previous page]

Plaintiffs have not pointed to any promise made *by NASD* to EDS, on behalf of Series 7 candidates or anyone else—let alone to a subsequent breach.  And even if they had, their third-party beneficiary theory would fail for the reasons EDS has already explained. *See* EDS Br. 15-16 & n.10.

for damages they allegedly sustained when their *employers* relied on incorrect score reports—reliance that did not depend in any way on whether the plaintiffs were involved in passing along those reports.

The plaintiffs ask this Court to look *only* at NASD's alleged misstatement. *See* Pls.' Br. 40. They insist on such a myopic focus in an attempt to circumvent a key element of the tort of negligent misrepresentation: *who relied* on that misstatement to his or her detriment? The plaintiffs claim that they relied on their scores, and that as a result of their *employers'* reliance on the same scores they were harmed. But they cannot show any harm traceable directly to their *own* reliance, *i.e.*, harm that, without their reliance, "would not have occurred." W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 41, at 265 (5th ed. 1984). The employers acted based on the score reports that they would have received in any event. *See, e.g.*, *id.* at 265-66 (explaining that a railroad embankment is "no cause of the inundation of the plaintiff's land by a cloudburst which would have flooded it in any case").[11]

If the plaintiffs want to pursue an action based on NASD's reporting their scores to their employers (not to them), their recourse would be an action for *defamation*, not negligent misrepresentation. The plaintiffs assert no defamation claim,[12] and cannot do so: First, as the plaintiffs apparently concede, a specific provision of Form U4 bars any such suit and absolves the NASD "from any and all liability of whatever nature" for the "furnishing" of information

---

[11] The plaintiffs prefer to state the law as follows: "[N]o case has been found where the defendant's act could be called a substantial factor when the event would have occurred without it." Pls.' Br. 40 (internal quotation marks omitted). NASD agrees. What the plaintiffs are trying to obscure is that "the defendant's act," for these purposes, is NASD's informing *the plaintiffs* of their scores. And the alleged harm to the plaintiffs "would have occurred without" NASD's doing any such thing.

[12] A few of the plaintiffs included defamation claims in their pre-consolidation complaints. *See, e.g.*, Cutler Compl. ¶¶ 42-46.

about an applicant "to any employer or prospective employer."  NASD Br. Ex. 2, at 13 (Section 15A(4)); *see* Pls.' Br. 29-30 (citing this provision as an example of sufficiently specific exculpatory language).  Second, NASD is legally obligated to report scores to sponsoring firms, and any defamation action would therefore be barred by the doctrine of privilege.  *See* 1 Robert D. Sack, *Sack on Defamation* § 9.2.2, at 9-13 (3d ed. Supp. 2006) ("If there is a legal duty to make the communication, the privilege is clear."); *accord, e.g.*, *Columbia First Bank v. Ferguson*, 665 A.2d 650, 655 (D.C. 1995) (bank's federally required report to Office of Thrift Supervision was privileged against defamation liability).  Third, the reporting of scores is a regulatory function assigned to NASD by statute and overseen by the SEC, and the plaintiffs cannot use tort law to impose a penalty on NASD's performance of it.  *See DL Capital*, 409 F.3d at 98.  It is to dodge these obstacles that the plaintiffs have sought to plead their case under the heading of negligent misrepresentation.  This Court should not permit that end run.

## VI.    Conclusion

For the foregoing reasons, as well as those stated in the opening brief, all claims against NASD should be dismissed with prejudice.

Dated:  March 5, 2007                                  Respectfully submitted,


                                                      By: /s/  F. Joseph Warin
OF COUNSEL:                                           F. Joseph Warin, D.C. Bar No. 235978
John J. Flood, D.C. Bar No. 269837                   William M. Jay, D.C. Bar No. 480185
NATIONAL ASSOCIATION OF                              Jennifer J. Schulp, D.C. Bar No. 497742
SECURITIES DEALERS, INC.                             John C. Snyder, D.C. Bar No. 500162
1735 K Street, N.W.                                   GIBSON, DUNN & CRUTCHER LLP
Washington, D.C.  20036                               1050 Connecticut Avenue, N.W.
                                                      Washington, D.C.  20036
                                                      Telephone: (202) 955-8500

                                                      *Attorneys for Defendant*
                                                      *National Association of Securities Dealers, Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 5th day of March, 2007, I caused the Reply Memorandum in Support

of NASD's Motion to Dismiss to be served on all parties required to be served by the means

listed below:

> All parties whose counsel are registered with the Court's CM/ECF system were served electronically.

> The following parties were served by mailing one copy of the document by U.S. mail, first class postage prepaid, to their counsel at the addresses listed:

John Balestriere
BALESTRIERE PLLC
225 Broadway, Suite 2700
New York, NY  10007

*Attorney for Andrew Crabbe and Linda Cutler*

Joseph Tacopina
*Of Counsel*
ARTHUR L. AIDALA & ASSOCIATES, P.C.
597 Fifth Avenue
New York, NY  10017

*Attorney for James Bruen*

William W. Graham
GRAHAM & ERVANIAN, P.C.
604 Locust Street, Suite 630
Des Moines, IA  50309

*Attorney for Christopher Wilson*

Jeffrey S. Nobel
SCHATZ NOBEL IZARD, P.C.
20 Church Street, Suite 1700
Hartford, CT  06103

*Attorney for Alex Ruimerman*

<u>/s/ F. Joseph Warin</u>

F. Joseph Warin