**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**IN RE SERIES 7 BROKER
QUALIFICATION EXAM SCORING
LITIGATION**

---

**This Document Relates To:
ALL CASES**

**Misc. Action No.  06-355 (JDB);
MDL Docket No. 1772**

---

**MEMORANDUM OPINION**

This multidistrict litigation is the result of a mistake in the scoring of a broker

qualification examination that led a number of individuals to believe erroneously that they had

failed when in fact they had obtained a passing score.  Plaintiffs have each brought an action for

money damages on behalf of a putative class consisting of members who were notified

incorrectly that they had failed the exam.  Currently before the Court are motions to dismiss filed

by defendants National Association of Securities Dealers ("NASD"),[1] a self-regulatory

organization ("SRO") under securities laws, and Electronic Data Systems Corporation ("EDS"), a

corporation that provided technology services to NASD.  The Court concludes that all of

plaintiffs' claims, although pled in the form of common-law causes of action, are displaced by the

Securities Exchange Act, which envisions Securities and Exchange Commission ("SEC")

---

[1]On July 30, 2007, NASD consolidated its regulatory functions with those of NYSE
Regulation, Inc., and changed its name to the Financial Industry Regulatory Authority, Inc.
("FINRA").  Because the events involved in this multidistrict litigation occurred prior to the
reorganization, the Court will continue to refer to defendant as NASD.

oversight rather than private damages actions as the sole means of monitoring an SRO's exercise

of the regulatory duties that defendants allegedly breached.

## **BACKGROUND**

Any individual wishing to buy, sell, or solicit securities products must first take and pass

an entry-level examination known as the Series 7.  Consol. Class Action Compl. ¶ 12.  The

computerized exam, which is administered by defendant NASD, consists of approximately 250

multiple choice questions of varying difficulty.  Id. ¶¶ 11, 12.  Immediately after an applicant

takes the examination, a software program developed by defendant EDS scores the exam and

notifies the applicant whether they received a passing score of 70% or above.  Id. ¶¶ 12, 18.

Because each examination is composed of a unique set of questions randomly chosen from a

larger pool, the "'passing score of 70 percent is subject to minor statistical adjustments based on

the overall difficulty of each individual's examination.'"  Id. ¶ 24 (quoting NASD news release).

On January 6, 2006, NASD issued a news release acknowledging that a "limited number

of individuals" who took the Series 7 exam between October 1, 2004, and December 20, 2005,

had been incorrectly notified that they received a failing grade.  Id. ¶ 23.  According to NASD, an

error occurred in the process used to weigh the difficulty level of 213 questions that had been

introduced to the examination-question pool in October 2004.  Id. ¶24.  As a result, the scaled

scores for those individuals whose examinations included any of the affected questions were

incorrectly calculated.  Id.  In all, 1882 tests that should have received a marginally passing score

received a marginally failing score instead.  Id. ¶ 27.  The faulty scoring allegedly resulted from

human error by an EDS maintenance technician who "inadvertently switched two of the three

difficulty variables" when coding the difficulty level of the questions.  Id.  Plaintiffs believe that

the coding error was the result of either the use by EDS of outdated software that did not provide a means of verifying the coding, or the failure of EDS to perform quality control.  Id. ¶ 30.  They further allege that NASD failed either to supervise EDS with respect to the coding of exam questions or to ensure that EDS was undertaking adequate quality control measures.  Id. ¶ 31.

Plaintiffs are members of a putative class that includes individuals who took the Series 7 examination between October 1, 2004, and December 20, 2005, and who were informed immediately after taking the exam that they had failed when, in fact, they had passed.  Id. ¶ 7.  During that time period, plaintiffs notified their sponsoring agencies or member firms that they had failed the Series 7 qualification exam; as a result, they experienced adverse employment consequences that resulted in "substantial damages."  Id. ¶ 21.  The harm they allegedly suffered included loss of employment, wages, employment benefits, and employment opportunities.  Id. ¶ 4.  Plaintiffs and their sponsoring agencies and member firms were notified by NASD in January 2006 that their failing scores were reported in error and that they had actually passed the Series 7 examination.  Id. ¶ 22.

The first lawsuit seeking damages for the Series 7 scoring error was filed in the Middle District of Tennessee on February 3, 2006.  See Plunkett v. Nat'l Ass'n of Sec. Dealers, Inc., No. 3:06-cv-89 (M.D. Tenn.).  Numerous others soon followed in districts across the country.  On June 27, 2006, the Judicial Panel on Multidistrict Litigation transferred nine actions to this Court and consolidated them for pretrial purposes as MDL No. 1772, In re Series 7 Broker Qualification Exam Scoring Litigation.  With the addition of subsequent tag-along cases, this multidistrict litigation now consists of nineteen pending actions.  Dismissal has been effected for two other cases that were transferred to this Court after a notice of voluntary dismissal had

already been filed in the transferor court.  See Hester v. Nat'l Ass'n of Sec. Dealers, No. 06-cv-1321 (D.D.C.); Cutler v. Nat'l Ass'n of Sec. Dealers, No. 06-cv-1322 (D.D.C.).

Plaintiffs filed a consolidated class complaint on October 31, 2006.  The consolidated complaint incorporates all of the parties subject to the MDL proceeding but does not supplant or supersede the complaints filed by plaintiffs in each individual case.  Consol. Class Action Compl. ¶ 2.  For ease of discussion, the Court in this memorandum opinion will refer exclusively to the consolidated class action complaint.  Plaintiffs have asserted four causes of action.  First, they claim that NASD breached an implied contract that existed between NASD and plaintiffs by virtue of their taking the Series 7.  Id. ¶¶ 44-48.  Second, they allege that EDS breached its contract with NASD, for which plaintiffs claim to be third-party beneficiaries.  Id. ¶¶ 49-53.  The third cause of action is asserted against both defendants for negligence in (1) designing, manufacturing, and testing the software used to score the Series 7; (2) failing to properly score the Series 7; (3) failing to properly supervise contractors; and (4) failing to ensure that plaintiffs did not receive incorrect exam results.  Id. ¶¶ 54-57.  Finally, plaintiffs assert a negligent-misrepresentation claim against defendants based on the reporting to plaintiffs and their employers that plaintiffs had failed the Series 7.  Id. ¶¶ 58-61.  Now pending before the Court are motions to dismiss filed by NASD and EDS.  Argument was heard on April 25, 2007.  For the reasons provided below, the Court grants defendants' motions and dismisses each of the underlying actions.

**STANDARD OF REVIEW**

All that the Federal Rules of Civil Procedure require of a complaint is that it contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to

'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. ___, 127 S. Ct. 1955, 1964 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)); <u>accord</u> <u>Erickson v. Pardus</u>, 551 U.S. ___, 127 S. Ct. 2197, 2200 (2007) (per curiam). "A Rule 12(b)(6) motion tests the legal sufficiency of a complaint." <u>Browning v. Clinton</u>, 292 F.3d 235, 242 (D.C. Cir. 2002). Thus, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)," <u>Bell Atl. Corp.</u>, 127 S. Ct. at 1965 (citations omitted), and after drawing all inferences in plaintiffs' favor, <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974).

## <u>ANALYSIS</u>

Defendants offer a panoply of theories upon which to dismiss plaintiffs' complaints. They primarily urge this Court to find NASD, and by extension EDS, absolutely immune for all acts taken in furtherance of NASD's so-called regulatory functions as a self-regulatory organization ("SRO"). Defendants frame their second theory for dismissal in terms of a lack of a private right of action by plaintiffs to enforce the securities laws and the SEC and NASD rules promulgated thereunder. Third, defendants rely on the liability-release clause in the Form U4, which was signed by all plaintiffs prior to taking the Series 7 exam. Finally, defendants strike at perceived weaknesses on the merits of each claim.

A basic understanding of the role that SROs play in the securities industry is necessary to properly evaluate defendants' arguments. NASD is a registered national securities association under the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78o-3(b) (2000), and therefore qualifies as an SRO pursuant to 15 U.S.C. § 78c(a)(26). <u>See</u> <u>Nat'l Ass'n of Sec. Dealers</u>

v. SEC, 431 F.3d 803, 804, 806 (D.C. Cir. 2005).  As an SRO, NASD "serves as a quasi-

governmental agency" in the exercise of its "'delegated government power . . . to enforce . . . the

legal requirements laid down in the Exchange Act.'"  Id. at 804 (omissions in original) (quoting

Merrill Lynch v. Nat'l Ass'n of Sec. Dealers, Inc., 616 F.2d 1363, 1367 (5th Cir. 1980)).  The

SEC retains close oversight of SROs.  For example, the Commission approves of all SRO rule

changes, however minor, 15 U.S.C. § 78s(b), and may amend the SRO rules itself if deemed

necessary, § 78s(c).  If an SRO does not comply with the Exchange Act, the SEC rules, or its

own rules, as required by § 78s(g), it faces the suspension or revocation of its SRO registration,

as well as other sanctions.  § 78s(h).

       One of NASD's essential functions as a registered national securities association and SRO

is to act as a gatekeeper to participation in the securities industry.  The Exchange Act requires

that practically anyone conducting securities-related business be associated with a broker-dealer

that is a member of a registered securities association such as NASD.  Id. § 78o(a)(1), (b)(8).

Furthermore, all natural persons associated with a broker-dealer must "meet such standards of

training, experience, competence, and such other qualifications as the Commission finds

necessary or appropriate in the public interest or for the protection of investors."  § 78o(b)(7).

The SEC has delegated to NASD the task of devising and administering competency exams to

individuals who wish to become associated with registered broker-dealers.  See id.; 17 C.F.R.

§ 240.15b7-1 (2007) (requiring natural persons associated with registered brokers or dealers to be

"registered or approved in accordance with the standards of training, experience, competence,

and other qualification standards (including but not limited to . . . passing any required

examinations) established by the rules of any national securities exchange . . . of which such

-6-

broker or dealer is a member").  NASD's own rules specify that an individual must take and pass the General Securities Representative examination, otherwise known as the Series 7, in order to sell, purchase, or induce the sale or purchase of any securities products.  NASD Manual, Rules 1031, 1032, available at http://www.finra.org (last visited Sept. 6, 2007).  Furthermore, NASD may bar an individual from becoming associated with a member firm or deny an individual's application for NASD registration if that person does not meet the standards of training, experience, and competence prescribed by NASD's rules.  See 15 U.S.C. § 78o-3(g)(3)(B).  An individual who is barred from becoming associated with an SRO member firm or denied registration has a right to review of that decision, first by the SEC, id. § 78s(d), (f), and then in the federal courts of appeals, see id. § 78y.

Defendants seek, apparently for the first time in any court, absolute immunity for NASD's performance of the gatekeeping function just described.  SRO absolute immunity was initially recognized only for NASD's exercise of its disciplinary function.  See Austin Mun. Sec., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc. ("Austin"), 757 F.2d 676 (5th Cir. 1985).  Austin involved constitutional and common-law claims asserted against NASD and officers of a District Business Conduct Committee ("DBCC"), the disciplinary arm of NASD, seeking damages for economic and reputational injuries stemming from disciplinary actions taken against the plaintiffs.  Id. at 681-82, 684.  The Fifth Circuit, observing that it was the first court to consider the "extent of immunity for disciplinary officers of a Congressionally-mandated self-regulatory organization," found that its analysis was "guided . . . by Supreme Court decisions concerning the immunity of judges, prosecutors, and executive disciplinary officials."  Id. at 686.  Those decisions recognized an absolute-immunity defense for government officials "whose special functions or constitutional

status requires complete protection from suit."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).

The Fifth Circuit noted that lower courts had extended absolute immunity to private individuals

performing similar functions.  See Austin, 757 F.2d at 690-91 (citing, inter alia, Simons v.

Bellinger, 643 F.2d 774, 785 (D.C. Cir. 1980) (bar association disciplinary committee members),

and Corey v. N.Y. Stock Exch., 691 F.2d 1205, 1208-11 (6th Cir. 1982) (arbitrators)).

     The Austin court thus proceeded to analyze the claims against the NASD defendants

under the requirements drawn from the Supreme Court's decision in Butz v. Economou, 438 U.S.

478, 510-13 (1978) (finding officials of Department of Agriculture absolutely immune from suits

for money damages based on alleged violations of constitutional rights).  See Austin, 757 F.2d at

688, 689.  Under the Fifth Circuit's interpretation of Butz, if:

    a)     the official's functions share the characteristics of the judicial process;
    b)     the official's activities are likely to result in recriminatory lawsuits by
           disappointed parties; and
    c)     sufficient safeguards exist in the regulatory framework to control
           unconstitutional conduct,
then that person's official conduct is absolutely immune from civil liability.

Id. at 688; accord Simons, 643 F.2d at 778.  Applying these factors first to the DBCC members,

the court concluded that they were absolutely immune for actions within the scope of their

disciplinary duties, which were essentially adjudicatory and prosecutorial in nature.  Austin, 757

F.2d at 689-91.  The court then applied Butz to NASD itself, and found that NASD too "was

acting in an adjudicatory and prosecutorial capacity" because it was being sued solely on the

basis of the DBCC members' conduct.  Id. at 692.  The court also concluded that NASD would

be a target for recriminatory lawsuits and that sufficient safeguards against unconstitutional

conduct existed in the regulatory framework, which provided for SEC, congressional, and

judicial oversight of disciplinary actions.  Id.  Thus, NASD was absolutely immune from civil liability.  Id. at 692.

Other courts, finding Austin persuasive, have borrowed official-immunity principles to confer absolute immunity on SROs for suits arising out of their disciplinary activities.  The Second Circuit, following Austin, has held that the New York Stock Exchange ("NYSE") "is absolutely immune from damages claims arising out of the performance of its federally-mandated conduct of disciplinary proceedings."  Barbara v. N.Y. Stock Exch., Inc., 99 F.3d 49, 58 (2d Cir. 1996).  Like the Fifth Circuit, the Second Circuit observed that absolute immunity had previously been extended to "private entities engaged in quasi-public adjudicatory and prosecutorial duties," id. at 58, and applied the Butz factors to the NYSE to the same effect, id. at 59.

Similarly, a judge of this Court found NASD and its disciplinary officials absolutely immune from liability for prosecutorial and adjudicative acts.  Zandford v. Nat'l Ass'n of Sec. Dealers, Inc., 30 F. Supp. 2d 1, 18 (D.D.C. 1998).  That decision was issued on remand after the D.C. Circuit, in a non-precedential opinion, stated its "concern[] that the doctrine of absolute immunity might have been applied [in the district court's earlier opinion] with too broad a stroke."  Zandford v. Nat'l Ass'n of Sec. Dealers, Inc., No. 94-7058, 1996 WL 135716, at *1 (D.C. Cir. Feb. 14, 1996); see id. ("While the NASD and DBCC disciplinary officers are entitled to absolute immunity for actions that are prosecutorial or adjudicative in nature, see Austin Municipal Securities, Inc. v. NASD, Inc., 757 F.2d 676 (5th Cir.1985), absolute immunity does not extend to acts that are purely investigatory or administrative.").  The D.C. Circuit eventually affirmed Zandford on statute-of-limitations grounds, see Zandford v. Nat'l Ass'n of Sec. Dealers, Inc., No. 98-7101, 2000 WL 292931 (D.C. Cir. Feb. 16, 2000), and thus has not addressed SRO

immunity in a published opinion.

Here, plaintiffs argue that NASD's and EDS's activities would not qualify under the Butz

factors for the type of official immunity applied to SROs in Austin and Barbara.  The Court

agrees that defendants do not satisfy that absolute immunity test.  NASD half-heartedly evokes

the "close parallels between NASD's power to investigate and expel individuals and its delegated

authority to examine and admit individuals" as a basis for absolute immunity under the Butz

analysis.  NASD's Mem. in Support of Mot. to Dismiss ("NASD's Mem.") at 15 n.6.  Yet the

creation and administration of a standardized competency exam for admission to the securities

industry (to use a description of events urged by NASD) bears little resemblance to the kinds of

quasi-judicial functions that typically support absolute immunity.  See, e.g., Antoine v. Byers &

Anderson, Inc., 508 U.S. 429, 435-36 (1993) (explaining that "touchstone" of judicial immunity

doctrine "has been performance of the function of resolving disputes between parties, or of

authoritatively adjudicating private rights" (internal quotation marks omitted)).  The judicial

activity that is perhaps the closest analog -- "the inherent judicial function of determining who is

authorized to practice law," Simons, 643 F.3d at 780 -- warrants absolute immunity only because

it is a function "so inherently related to the essential functioning of the courts as to be

traditionally regarded as [a] judicial act[]."  Sparks v. Character & Fitness Comm. of Ky., 859

F.2d 428, 434 (6th Cir. 1988).  Although NASD's creation of the Series 7 and its denial of

plaintiffs' registration based on their apparent failure of that exam is factually similar to a bar

admission committee's administration of the bar exam and the denial of a bar application based

on a failing exam score, the latter function is deemed to be judicial for unique functional and

historical reasons.  See Sparks, 859 F.2d at 434.  As noted, however, NASD does not press this

analogy.  Instead, it contends that the parallels between its actions here and its power to investigate and expel members "are not necessary to the analysis" because "the test is whether NASD was exercising a 'regulatory' function 'consistent with' its role under the Exchange Act and SEC regulations."  NASD's Mem. at 15 n.6.

The recent trend has indeed been to extend SRO absolute immunity to encompass so-called regulatory acts.  The move away from official-immunity doctrines and towards the concept of regulatory immunity was presaged by the Second Circuit's decision in Barbara.  Although the grant of absolute immunity to the NYSE was based on the application of traditional official-immunity principles, i.e., the Butz factors, the court additionally observed that "absolute immunity is particularly appropriate in the unique context of the self-regulation of the national securities exchanges."  Barbara, 99 F.3d at 59.  The court continued:

> Under the Exchange Act, the Exchange performs a variety of regulatory functions that would, in other circumstances, be performed by a government agency.  Yet government agencies, including the SEC, would be entitled to sovereign immunity from all suits for money damages.  See Sprecher v. Graber, 716 F.2d 968, 973 (2d Cir. 1983); see also Austin, 757 F.2d at 692.  As a private corporation, the Exchange does not share in the SEC's sovereign immunity, but its special status and connection to the SEC influences our decision to recognize an absolute immunity from suits for money damages with respect to the Exchange's conduct of disciplinary proceedings.

Id.

Building on this dictum, the Ninth Circuit conclusively adopted regulatory immunity in Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc., 159 F.3d 1209 (9th Cir. 1998).  Sparta involved common-law claims brought against NASD for its decision to suspend trading of, and to delist temporarily, the plaintiff's stock offering.  Id. at 1212.  Those decisions were not deemed adjudicatory, prosecutorial, or arbitral acts.  Nonetheless, the Ninth Circuit believed that

"[e]xtending absolute immunity when a self-regulatory organization is exercising <u>quasi-governmental</u> powers is consistent with the structure of the securities market as constructed by Congress," <u>id.</u> at 1213 (emphasis added) -- a structure that grants SROs "enormous discretionary authority concerning stock listing and de-listing," but subject to close SEC oversight, <u>id.</u> at 1214. The Ninth Circuit quoted the Second Circuit's observations in <u>Barbara</u> regarding SEC sovereign immunity and concluded that self-regulatory organizations enjoy immunity from suits "when they are acting under the aegis of the Exchange Act's delegated authority." <u>Id.</u>

Subsequent to <u>Sparta</u>, the Second Circuit reevaluated the meaning of its own decision in <u>Barbara</u> and, like the Ninth Circuit, concluded that an SRO is absolutely immune "from liability for claims arising out of the discharge of its duties under the Exchange Act." <u>D'Alessio v. N.Y. Stock Exch., Inc.</u>, 258 F.3d 93, 104 (2d Cir. 2001). Although acknowledging that "the immunity inquiry in <u>Barbara</u> was confined to the NYSE's conduct in connection with disciplinary proceedings," the Second Circuit in <u>D'Alessio</u> stated that "<u>Barbara</u> stood for the broader proposition that a SRO, such as the NYSE, may be entitled to immunity from suit for conduct falling within the scope of the SRO's regulatory and general oversight functions." <u>Id.</u> at 105. Such immunity is appropriate, the Second Circuit has reasoned, because "SROs effectively 'stand[] in the shoes of the SEC'" when "they perform regulatory functions that would otherwise be performed by the SEC." <u>DL Capital Group, LLC v. Nasdaq Stock Mkt., Inc.</u>, 409 F.3d 93, 95 (2d Cir. 2005) (alteration in original) (quoting <u>D'Alessio</u>, 258 F.3d at 105)). And, because an SRO "'performs a variety of regulatory functions that would, in other circumstances, be performed by [the SEC]' -- an agency which is accorded sovereign immunity from all suits for money damages -- [an SRO] should, in light of its 'special status and connection to the SEC,' out

of fairness be accorded full immunity from suits for money damages, as well." Id. at 97 (first

alteration in original) (quoting Barbara, 99 F.3d at 59); see also D'Alessio, 258 F.3d at 105 ("It

follows that the NYSE should be entitled to the same immunity enjoyed by the SEC when it is

performing functions delegated to it under the SEC's broad oversight authority.").

The Second Circuit has taken the further step of according absolute immunity to private

entities that exercise regulatory functions pursuant to a delegation of authority from an SRO.

Reasoning that "the decision to extend absolute immunity depends 'upon the nature of the

governmental function being performed,'" rather than the identity of the person or entity

performing the function, the court found the for-profit Nasdaq absolutely immune for its

performance of "regulatory duties delegated to it by the NASD." DL Capital Group, LLC, 409

F.3d at 99 n.4 (quoting D'Alessio, 258 F.3d at 104-05).

The Second and Ninth Circuits remain the only two courts of appeals to have afforded

absolute immunity to SROs based on the exercise of regulatory functions. The Eleventh Circuit

did, however, recently hold argument en banc to consider whether NASD and its subsidiary

Nasdaq enjoy absolute immunity for their advertising and marketing activities. See Weissman v.

Nat'l Ass'n of Sec. Dealers, Inc., No. 04-13575, Order (11th Cir. Mar. 8, 2007). In the now-

vacated panel opinion in Weissman, all three judges agreed that SROs should be accorded

"absolute immunity from civil damages for conduct undertaken as part of their statutorily

delegated adjudicatory, regulatory, and prosecutorial authority," and disagreed only as to whether

the alleged activities were regulatory in nature.[2] Weissman v. Nat'l Ass'n of Sec. Dealers, Inc.,

---

[2]The difficulty the Eleventh Circuit has encountered in answering this question is in some
ways reminiscent of "the 'non-governmental'-'governmental' quagmire that . . . long plagued the
law of municipal corporations." Indian Towing Co. v. United States, 350 U.S. 61, 65 (1955).

468 F.3d 1306, 1311 (11th Cir. 2006), vacated pending rehearing en banc, 481 F.3d 1295, 1296 (11th Cir. 2007); id. at 1315 (Tjoflat, J., dissenting) ("NASD and NASDAQ enjoy absolute immunity from suit when 'acting under the aegis of the Exchange Act's delegated authority.'" (quoting Sparta Surgical Corp., 159 F.3d at 1214)).  All three members of the initial panel also adopted the rationale that "NASD 'stands in the shoes' of the SEC, and thus is 'entitled to the same immunity enjoyed by the SEC when [NASD] is performing functions delegated to it under the SEC's broad oversight authority.'"  Id. at 1316 (Tjoflat, J., dissenting) (quoting D'Alessio, 258 F.3d at 105); see also id. at 1311.  Additionally, at least one other district court outside of the Second and Ninth Circuits has applied regulatory immunity to an SRO based exclusively on this reasoning.  See In re Olick, No. 99-cv-5128, 2000 WL 354191, at *4 (E.D. Pa. Apr. 4, 2000).

As the progression of the law in this area indicates, courts have looked to the sovereign immunity of the SEC as a justification for extending absolute immunity to SROs.  Although the SROs in these cases have been granted immunity coextensive with that of the SEC,[3] it is not necessarily true that a plaintiff alleging a tort or contract claim based on actions taken by the SEC would have no recourse against the United States more generally.  The federal government's entitlement to sovereign immunity inures only so long as it has not been waived, and whether a plaintiff could recover money damages based on the particular claims alleged would seem to

---

[3]The SRO immunity cases have all cribbed the general proposition that the government has not waived the SEC's immunity from suits for money damages from the Second Circuit's opinion in Sprecher v. Graber.  See, e.g., Sparta, 159 F.3d at 1214 (citing Sprecher, 716 F.2d at 973).  In Sprecher, the court observed that the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b) (1976), provided no basis for the plaintiff's claims against the SEC "since it authorizes suits only against the United States itself, not its individual agencies"; the Tucker Act, 28 U.S.C. § 1346(a) (1976), provided no jurisdiction for the action in the district court because the amount in controversy exceeded $10,000; and the Administrative Procedure Act, 5 U.S.C. § 702 (1976), does not waive sovereign immunity for claims seeking money damages.  716 F.2d at 973.

require a case-by-case consideration of the various statutes waiving sovereign immunity. Such an analysis is not always straightforward. In supplemental briefing requested by this Court, the parties disagreed as to whether plaintiffs here could have asserted claims under the FTCA or the Tucker Act, assuming hypothetically that the alleged actions with respect to the Series 7 had been taken by the SEC itself instead of an SRO and its contractor. With respect to the tort claims, this analysis implicates, among other things, the FTCA's discretionary-function exception, under which the United States retains its immunity against suits premised on the exercise of discretion by its officers. See 28 U.S.C. § 2680(a) (2000). Thus far, however, courts applying regulatory immunity to SROs have found it unnecessary to look beyond the immunity of the SEC as an agency. The result of this approach, criticized by plaintiffs, is that an SRO may actually enjoy greater immunity than would the government if a federal official had performed the regulatory function. See Pls.' Opp'n to Defs.' Mot. to Dismiss ("Pls.' Opp'n") at 12-13.

    Plaintiffs also object to what they see as the unfairness of courts on the one hand affording absolute immunity to SROs based on their quasi-governmental status while on the other hand refusing to recognize SROs as state actors. See, e.g., Scher v. Nat'l Ass'n of Sec. Dealers, Inc., 386 F. Supp. 2d 402, 408 (S.D.N.Y. 2005). Plaintiffs frame their argument in terms of judicial estoppel, which "prohibit[s] parties from deliberately changing positions according to the exigencies of the moment." New Hampshire v. Maine, 532 U.S. 742, 750 (2001) (internal quotation marks omitted). Although that doctrine is not satisfied in this case,[4]

---

[4]Before NASD could be precluded by judicial estoppel from claiming absolute immunity here, this Court would first have to find that NASD's position is "clearly inconsistent" with its position in previous proceedings that it is not a state actor, and then consider whether NASD "has succeeded in persuading a court to accept that . . . earlier position." New Hampshire, 532 U.S. at 750; see also id. at 750-51 ("Absent success in a prior proceeding, a party's later inconsistent

there is at the very least a superficial appeal to plaintiffs' argument: why should an entity afforded absolute immunity as an extension of the "sovereign immunity which governmental agencies enjoy," Weismann, 468 F.3d at 1311, vacated, 481 F.3d 1295, not be held accountable for constitutional violations in the same manner as those governmental agencies?  Again, the result of a sovereign-immunity based rationale may be that an SRO enjoys greater protection from suit than would the government.

Moreover, the approach taken in SRO cases appears to differ from that used in other contexts where absolute immunity has been extended to private actors or entities exercising federally delegated governmental functions.  The concept of providing absolute immunity to certain non-governmental actors is not unique to SROs.  As the Fourth Circuit has explained, "[i]f absolute immunity protects a particular governmental function, no matter how many times or to what level that function is delegated, it is a small step to protect that function when delegated to private contractors, particularly in light of the government's unquestioned need to delegate governmental functions."  Mangold v. Analytic Servs., Inc., 77 F.3d 1442, 1447-48 (4th Cir. 1996); cf. Boyle v. United Tech. Corp., 487 U.S. 500, 511 (1988).  But rather than looking to

---

position introduces no 'risk of inconsistent court determinations,' and thus poses little threat to judicial integrity." (citation omitted)).  The state-actor doctrine is activity specific.  It requires "such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'"  Perpetual Sec., Inc. v. Tang, 290 F.3d 132, 137 (2d Cir. 2002) (quoting Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001)).  Plaintiffs point to a brief submitted by NASD to the D.C. Circuit in which it argued that decisions about membership admission and rejection did not "take[] on the quality of government action."  Reply Brief for Petitioner at 10, Nat'l Ass'n of Sec. Dealers, Inc. v. SEC, 431 F.3d 803 (D.C. Cir. 2005) (No. 05-1154).  But even assuming that this position is clearly inconsistent with NASD's current one, the D.C. Circuit did not adopt NASD's approach.  In fact, plaintiffs have not cited any case in which a court accepted an argument by NASD that it is not a state actor with respect to the type of action challenged in this case.

the sovereign immunity of the federal agency whose officials would otherwise have been tasked with a particular function,[5] courts in non-SRO cases have applied the common law of immunity for federal officials articulated in <u>Westfall v. Erwin</u>, 484 U.S. 292, 295 (1988).  In <u>Westfall</u>, the Supreme Court recognized absolute immunity from state-law tort suits for federal officials who were exercising discretion while acting within the scope of their official duties, so long as the public benefits derived from the grant of immunity outweigh the costs.  <u>Id.</u> at 295-98 & n.3.  Although <u>Westfall</u> was superseded by the Federal Employees Liability Reform and Tort Compensation Act, <u>see</u> 28 U.S.C. § 2679(d), the "<u>Westfall</u> test remains the framework for determining when non-governmental persons or entities are entitled to the same immunity." <u>Murray v. Northup Grumman Info. Tech., Inc.</u>, 444 F.3d 169, 174 (2d Cir. 2006); <u>accord</u> <u>Houston Cmty. Hosp. v. Blue Cross & Blue Shield of Tex., Inc.</u>, 481 F.3d 265, 269 (5th Cir. 2007); <u>Mangold</u>, 77 F.3d at 1447 & n.4; <u>see also</u> <u>Beebe v. Wash. Metro. Area Transit Auth.</u>, 129 F.3d 1283, 1289 (D.C. Cir. 1997) (noting that "<u>Westfall</u> remains the common law rule" for official immunity).

---

[5]The borrowing of "sovereign" immunity by private entities exercising governmental functions is not wholly unprecedented.  At common law, a municipal corporation "was an arm of the State, and when acting in that 'governmental' or 'public' capacity, it shared the immunity traditionally accorded the sovereign." <u>Owen v. City of Independence, Missouri</u>, 445 U.S. 622, 645 (1980).  "But the principle of sovereign immunity -- itself a somewhat arid fountainhead for municipal immunity -- is necessarily nullified when the State expressly or impliedly allows itself, or its creation, to be sued." <u>Id.</u> (footnote omitted).  Furthermore, this Circuit long ago rejected the sovereign-immunity approach to municipal liability in favor of a discretionary/ministerial analysis.  <u>See</u> <u>Spencer v. Gen. Hosp. of Dist. of Columbia</u>, 425 F.2d 479, 481 (D.C. Cir. 1969) ("We found that the articulation of the immunity test in terms of 'governmental,' as opposed to 'proprietary,' functions had increasingly lost its vitality as an accurate or adequate rationale for the immunity privilege.").  The Supreme Court has characterized this latter analysis as "grounded not on the principle of sovereign immunity, but on a concern for separation of powers." <u>Owen</u>, 445 U.S. at 648.

Whether considered under this <u>Westfall</u>-based line of precedent or the analysis in the SRO regulatory-immunity cases, an SRO would be immunized from suits arising out of the exercise of a <u>discretionary</u> regulatory function.  The results may diverge, however, when the challenged action is ministerial in nature -- a label that plaintiffs seek to apply to defendants' actions here.  The Supreme Court has been "'quite sparing in [its] recognition of absolute immunity, and [has] refused to extend it any further than its justification would warrant.'" <u>Antoine</u>, 508 U.S. at 432 n.4 (quoting <u>Burns v. Reed</u>, 500 U.S. 478, 486-87 (1991)).  Thus, in <u>Westfall</u>, the Court rejected the view that absolute immunity should apply to all conduct falling within the scope of an official's duties because "[t]he central purpose of official immunity, promoting effective government, would not be furthered by shielding an official from state-law tort liability without regard to whether the alleged tortious conduct is discretionary in nature." <u>Westfall</u>, 484 U.S. at 296; <u>cf.</u> <u>Berkovitz v. United States</u>, 486 U.S. 531, 538 (1988) ("[W]e intend specifically to reject the Government's argument . . . that the [discretionary-function] exception precludes liability for any and all acts arising out of the regulatory programs of federal agencies.").  Lower courts applying governmental immunity to private entities likewise have been careful to do so "only when 'the contributions of immunity to effective government . . . outweigh the . . . harm to individual citizens.'" <u>Murray</u>, 444 F.3d at 175 (quoting <u>Doe v. McMillan</u>, 412 U.S. 306, 320 (1973)).  As part of this analysis, they too require that the alleged actions be discretionary in nature.  <u>See, e.g.</u>, <u>Houston Cmty. Hosp.</u>, 481 F.3d at 269; <u>Murray</u>, 444 F.3d at 175; <u>Mangold</u>, 77 F.3d at 1447.

Defendants suggest, however, that courts granting regulatory immunity to SROs have not distinguished between discretionary and ministerial actions, and instead have accorded immunity

so long as the SRO's actions were consistent with the Exchange Act.  See, e.g., NASD's Reply in Support of Mot. to Dismiss at 3-4.  But, except for one district court case in which an SRO was explicitly accorded immunity for actions "ministerial in nature" -- the court there believed that "[i]t would be illogical to clothe the NASD with absolute immunity for its regulatory decisions, and then to impose liability on a clearing agent that simply carried out its functions in obedience to, and in express reliance on, those decisions," Dexter v. Depository Trust & Clearing Corp., 406 F. Supp. 2d 260, 264 (S.D.N.Y. 2005) -- the decisions in the SRO regulatory context have not addressed the discretionary/ministerial distinction one way or the other.  To the extent that it is possible to characterize post-hoc the actions taken by the SROs in those cases, they resemble exercises of discretion.  See DL Capital Group, 409 F.3d at 96 (cancelling trades); D'Alessio, 258 F.3d at 106 (interpreting and enforcing Exchange Act rules and regulations); Sparta, 159 F.3d at 1211 (delisting securities and suspending trading).  Finally, the Court does not see the need to address in detail certain decisions relied upon by defendants because they involve arbitral or judicial immunity and are thus inapposite.  See, e.g., New Eng. Cleaning Servs., Inc. v. Am. Arbitration Ass'n, 199 F.3d 542, 545 (1st Cir. 1999); Sindram v. Suda, 986 F.2d 1459, 1461 (D.C. Cir. 1993); Austern v. Chi. Bd. Options Exch., Inc., 898 F.2d 882, 886 (2d Cir. 1990).

Defendants argue that if the discretionary/ministerial distinction does apply to SROs (and it is difficult to see why it should not), their actions fall on the discretionary side of the line.  It is not the case that all "governmental activities involving an element of choice" are entitled to immunity.  United States v. Gaubert, 499 U.S. 315, 335 (1991) (Scalia, J., concurring).  "Because the purpose of the [discretionary-function] exception is to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy

through the medium of an action in tort, when properly construed, the exception protects only governmental actions and decisions based on considerations of public policy." Id. at 323 (internal quotation marks and citation omitted). This definition of "discretionary" is more likely satisfied with respect to NASD, which is alleged to have negligently supervised EDS's activities, than with respect to EDS, which allegedly negligently carried out the technological aspects of the Series 7 administration. See Burkhart v. Wash. Metro. Area Transit Auth., 112 F.3d 1207, 1217 (D.C. Cir 1997) (finding supervision of transit employees a discretionary act). In any event, however, this Court need not decide conclusively whether the alleged activities in this case were discretionary or ministerial in nature because it finds that plaintiffs' claims are subject to dismissal on another rationale.

There is a thread of reasoning running through the SRO regulatory immunity cases that doctrinally sounds more in preemption than immunity, and which this Court finds persuasive. Preemption derives from the understanding that Congress's carefully crafted design for regulation of the securities industry, which depends upon the SEC's delegation of governmental functions to private SROs, leaves no room for plaintiffs to use common-law claims to recover damages for an SRO's negligent performance of its regulatory duties. For example, the Ninth Circuit noted in Sparta that permitting the plaintiff's common-law breach of contract suit against NASD to proceed based on an implied contract between NASD and an applicant "would allow states to define by common law the regulatory duties of a self-regulatory organization, a result which cannot co-exist with the Congressional scheme of delegated regulatory authority under the Exchange Act." Sparta Surgical Corp., 159 F.3d at 1215; see also id. at 1213-14 (describing structure of securities market). The Second Circuit similarly observed in Barbara that "allowing

suits against the Exchange arising out of the Exchange's disciplinary functions would clearly 'stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' namely, to encourage forceful self-regulation of the securities industry." 99 F.3d at 59 (citations omitted) (alteration in original). Although that court did not squarely rely "on the doctrine of federal preemption" in that case, it cited the doctrine in further support of its holding that the SRO was immune from common-law damages claims. Id.

Defendants rely on what they call a private-right-of-action analysis, referring to cases in which courts have precluded common-law claims arising out of an SRO's performance of its delegated regulatory functions. This analysis, too, sounds in preemption, insofar as the Exchange Act displaces common-law actions that seek damages arising from the breach of an SRO's Exchange Act duties.[6] The cases cited by defendants begin with the premise that the Exchange Act does not itself provide a private right of action, either express or implied, for enforcement of the various regulatory duties delegated to SROs. For example, it is well-established that no private right of action exists with respect to the Exchange Act's requirement, found in 15 U.S.C. § 78s(g), that SROs comply with the Act and their own rules. See, e.g., MM&S Fin., Inc. v. Nat'l

---

[6]Analogous concerns surface with respect to a predicate question in many SRO cases -- whether, in the removal context, the plaintiff's common-law claims implicate substantial federal interests sufficient to support federal-court jurisdiction. See, e.g., D'Alessio, 258 F.3d at 102 & n.6 (asserting jurisdiction and noting that breach-of-contract and negligent-misrepresentation claims were "predicated on alleged breaches of certain duties imposed on the NYSE under the Exchange Act in its capacity as a SRO"); Sparta Surgical Corp., 159 F.3d at 1212 (finding federal jurisdiction over state-law claims because "viability of any cause of action founded upon NASD's conduct in delisting a stock or suspending trading depends on whether the association's rules were violated"); Lowe v. NASD Regulation, Inc., No. 99-cv-1751, 1999 WL 1680653, at *3 (D.D.C. 1999) ("Although the Plaintiffs['] complaint is careful to allege only state law claims, each claim is predicated on the NASDR's violation of its own rules. Without explicitly pleading so, the Plaintiffs are seeking to enforce the duty to follow its own Rules of Arbitration, which is a duty imposed by the Exchange Act.").

Ass'n of Sec. Dealers, Inc., 364 F.3d 908, 911 (8th Cir. 2004); Feins v. Am. Stock Exch., Inc., 81

F.3d 1215, 1224 (2d Cir. 1996); see also Jablon v. Dean Witter & Co., 614 F.2d 677, 681 (9th

Cir. 1980) (finding "no implied right of action for an NASD rule violation"). The Second Circuit

has also declined to imply a private right of action under the Exchange Act for damages based on

the wrongful denial of SRO membership. Feins, 81 F.3d at 1223.

Building upon these holdings, courts have logically concluded that the Exchange Act

preempts common-law claims that are nothing more than disguised actions to enforce regulatory

duties. In Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc., 191 F.3d 198 (2d Cir. 1999), state-law

tort claims were asserted against NASD for damages resulting from the revocation of the

plaintiff's offer of employment after NASD denied her registration application. Id. at 200. Upon

acknowledging Feins's holding that "there is no private right of action available under the

Securities Exchange Act to redress denials of membership in an exchange," and finding the

denial of exchange membership analogous to the denial of membership in a national securities

association like NASD, the Second Circuit in Desiderio affirmed the dismissal of the state-law

claims. Id. at 208. In the same vein, the Eighth Circuit has characterized a breach-of-contract

claim premised on NASD's violations of its own rules as an "attempt . . . to bypass the Exchange

Act," and in particular the Act's lack of a private right of action to enforce violations of SRO

rules. MM&S Fin., 364 F.3d at 912. The court therefore affirmed the district court's denial of a

motion to amend the complaint to add such a common-law claim. Id. Likewise, the Southern

District of California dismissed contract and negligence claims that were considered "attempt[s]

to evade the doctrine that no private right of action exists against the NASD for failing to

supervise its members adequately." Niss v. Nat'l Ass'n of Sec. Dealers, Inc., 989 F. Supp. 1302,

1307-08 (S.D. Cal. 1997). And the district court in <u>Sparta</u> originally dismissed the common-law claims against NASD, which it saw as an attempt to "circumvent the lack of a private right of action under the Exchange Act," because those claims were "all founded on the defendants' decision, made in their regulatory capacity, to de-list" the plaintiff's securities. <u>Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.</u>, No. 95-cv-3926, 1997 WL 50223, at *3 (N.D. Cal. Jan. 30, 1997). In fact, the <u>Sparta</u> district court's observation in its nominally titled "immunity" discussion that "national securities associations and exchanges are . . . exempt from private suit when acting in their regulatory capacity" cited <u>Feins</u> as its sole support. <u>Id.</u> at *4. <u>But see</u> <u>Shapira v. Charles Schwab & Co.</u>, 187 F. Supp. 2d 188, 191-92 & n.9 (S.D.N.Y. 2002) (refusing to dismiss common-law tort claim against NASD on private-right-of-action grounds because court did not view complaint "as an attempt to dress up a claim regarding the NASD's failure to follow its own rules").[7]

All of the common-law claims asserted in this action, whether cast in tort or contract, seek money damages arising from NASD's erroneous determination that plaintiffs failed to meet the minimum competency standards necessary for participation in the securities industry. Plaintiffs argue that their claims are "distinctly derived from the duties created at common law by the relationship between the parties." Pls.' Opp'n at 23. But the crux of all of their claims is that NASD (itself and through its contractor EDS) breached its duty, which exists solely by virtue of

---

[7]In <u>Shapira</u>, NASD was sued for tortious interference with prospective economic advantage on the basis of its release of the plaintiff's allegedly sealed arrest record to the plaintiff's potential employer. 187 F. Supp. 2d at 189-90. Although the district court noted that SEC regulations required NASD to maintain questionnaires containing the arrest records of persons associated with broker-dealers, it rejected NASD's absolute-immunity defense because "NASD ha[d] failed to establish that the action complained of by plaintiff took place pursuant to the NASD's regulatory mandate." <u>Id.</u> at 191.

the Exchange Act, to establish a means of ensuring that all persons associated with a registered broker-dealer are qualified to transact securities-related business with the public. See 15 U.S.C. § 78o(b)(7). This duty encompasses the design and administration of the Series 7 as well as the obligation, under NASD's own rules, to inform the exam taker's employer of a failing or passing score, see NASD Manual, Rule 1070(c). There is no express private right of action to enforce § 78o(b)(7), and plaintiffs have not argued that an implied private right of action exists. In any event, such an argument would be futile. As the Second Circuit explained in Feins, Congress amended the Exchange Act in 1975 to "expand[] oversight and enforcement powers of administrative agencies such as the SEC" over SROs as part of the "hybrid scheme of self-regulation and government regulation" embodied in the Act. 81 F.3d at 1222. The overall statutory structure, which is designed so that "[g]overnment agencies work together with the self-regulatory organizations to insure compliance with the statute, the rules promulgated thereunder, and the self-regulatory organization's own rules," id. at 1221, suggests just as strongly here as in Feins that Congress did not intend private individuals to play a role in enforcing an SRO's Exchange Act duties.[8] See generally Tax Analysts v. IRS, 214 F.3d 179, 186 (D.C. Cir. 2000) (focusing implied-right-of-action analysis on "discovering legislative intent by means of the language of the statute, the statutory structure, or some other source" (internal quotation marks omitted)). Plaintiffs cannot avoid this result simply by pleading their claims in state common-law terms.

---

[8]Although Feins involved a securities exchange rather than a national securities association, both are granted the authority to create and enforce standards of competency. Compare 15 U.S.C. § 78f with id. § 78o. Furthermore, both types of entities are SROs and thus are subject to the same SEC and judicial oversight. See §§ 78s, 78y.

NASD also highlights the administrative and judicial remedies provided under the Exchange Act for denials of registration. See NASD's Mem. at 25. To the extent that a failing score on the Series 7 represents a contributing factor in the ultimate denial of an applicant's registration, Congress has provided the exclusive mechanism through which to review that denial. See 15 U.S.C. §§ 78s(f), 78y; cf. Feins, 81 F.3d at 1222. Although Congress has not expressly provided any statutory remedy for the mere failure of an examination, the Exchange Act delegates to the SEC (which in turn has delegated to SROs) the responsibility for establishing rules and regulations governing such aspects of exam administration. See § 78o(b)(7); 17 C.F.R. § 240.15b7-1. Under NASD's rules, an applicant who fails an examination may retake the exam after the passage of time, see NASD Manual, Rule 1070(e), but there is no means of challenging the failing score. Given this regulatory scheme, it would be incongruous to allow a claim for money damages based on an improperly scored exam to proceed in federal court against an SRO when an applicant who has experienced the more consequential impact of an erroneous denial of registration cannot proceed with claims seeking damages flowing from that denial, see Desiderio, 191 F.3d at 208. This observation is not intended to minimize the seriousness of the adverse career consequences alleged by plaintiffs. Rather, it simply acknowledges the decision by NASD, whose rules are approved by the SEC pursuant to the unique regulatory scheme designed by Congress, to elect an appropriate avenue of relief for an individual who fails an examination. Cf. Feins, 81 F.3d at 1222-23. To the extent that plaintiffs are seeking remedies for the negligent performance of an SRO's regulatory duties that Congress did not see fit to provide, this Court will not accede to their request by providing such remedies in the guise of state common-law claims. The self-regulatory structure of the securities

market under the Exchange Act preempts such claims under the body of case law that has evolved contemporaneously with the development of SRO absolute immunity.

Accordingly, plaintiffs' state-law claims, which all seek money damages for defendants' allegedly negligent performance of duties imposed by operation of the Exchange Act, will be dismissed.  Hence, the Court has no occasion to reach defendants' remaining arguments.

## <u>CONCLUSION</u>

For the foregoing reasons, defendants' motions to dismiss are granted.  A separate order will be issued forthwith.


        <u>  /s/ John D. Bates  </u>
          JOHN D. BATES
         United States District Judge

Dated:  <u>September 7, 2007</u>